CLEMENT SETH ROBERTS (SBN 209203)
croberts@orrick.com
KAREN G. JOHNSON-MCKEWAN (SBN121570)
kjohnson-mckewan@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     +1 415 773 5700
Facsimile:     +1 415 773 5759

ROBERT L. URIARTE (SBN 258274)
ruriarte@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94021
Telephone:  +1 650 614 7400
Facsimile:  +1 650 614 7401

*Attorneys for Defendant*
*RingCentral, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZOOM VIDEO COMMUNICATIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> RINGCENTRAL, INC., <br><br> Defendant. | Case No. 4:21-cv-01727-DMR <br><br> **RINGCENTRAL, INC.'S EX PARTE MOTION FOR (1) TEMPORARY RESTRAINING ORDER AND (2) ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| RINGCENTRAL, INC., <br><br> Counterclaimant, <br><br> v. <br><br> ZOOM VIDEO COMMUNICATIONS, INC. <br><br> Counterdefendant. | Proposed Date:     March 17, 2021 <br> Proposed Time:     10:00 a.m. <br><br> **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

**TO THE CLERK OF THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE**, that on March 17, 2021, at 10:00 a.m., or as soon thereafter as the matter may be heard in United States District Court located at Oakland Courthouse, Courtroom 4 – 3rd Floor; 1301 Clay Street, Oakland, CA 94612, Counterclaimant RingCentral, Inc., will and hereby does move *ex parte*, pursuant to Local Rules 7-10 and 65-1, and Federal Rules of Civil Procedure 26 and 65, for:

(1) a temporary restraining order enjoining Zoom Video Communications, Inc. ("Zoom") from blocking activation of RingCentral customers, including (i) technological steps blocking the provisioning API calls from RingCentral or its customers to Zoom;  (ii) technological steps blocking API calls to Zoom's servers for provisioning test accounts from RingCentral or from its customers; and (iii) any other technological steps designed to block, impair, or impede RingCentral or its customer from accessing the service under the SAA; and

(2) an order to show cause why a preliminary injunction should not issue, pursuant to Federal Rule of Civil Procedure 65, enjoining Zoom, its officers, agents, directors, affiliates, servants, employees, and all persons acting in concert with it, from directly or indirectly committing the above-described conduct during the pendency of this action.

Good cause exists for issuance of a temporary restraining order and order to show cause for entry of a preliminary injunction in this case because Zoom's conduct is unlawful and is designed to cause, and is causing, irreparable harm to RingCentral.  The hearing on this motion is noticed for March 17, 2021, at 10:00 a.m. due to the exigent circumstances.   RingCentral respectfully requests that, due to the nature of the expedited relief required and urgent need to prevent further ongoing harm to RingCentral, this motion be heard at the Court's earliest convenience.  Counsel for RingCentral provided Zoom with notice of this *ex parte* Motion on March 15, 2021, pursuant to Local Rule 65-1(b).  RingCentral is also serving Zoom with a copy of the pleadings, this motion, and all related papers in support thereof.  This motion is based on this motion, the Memorandum of Points and Authorities and supporting materials attached thereto, all papers on file, matters subject to judicial notice, and any oral argument the Court may hear.

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR

# TABLE OF CONTENTS

Page No.

INTRODUCTION ................................................................................................................- 1 -

FACTUAL BACKGROUND ..............................................................................................- 2 -

LEGAL STANDARD ..........................................................................................................- 6 -

ARGUMENT .......................................................................................................................- 7 -

I.      RINGCENTRAL IS LIKELY TO SUCCEED ON THE MERITS .........................- 7 -

     A. The SAA Has Not Been Terminated..................................................................- 8 -

     B. Zoom is Obligated to Continue Activating Customers During the EOL
Period ...............................................................................................................- 13 -

II.     RINGCENTRAL WILL SUFFER IRREPARABLE HARM ABSENT AN
INJUNCTION...........................................................................................................- 14 -

III.    THE BALANCE OF EQUITIES FAVORS AN INJUNCTION................................- 15 -

IV.     HOLDING ZOOM TO ITS CONTRACTUAL PROMISES IS IN THE PUBLIC
INTEREST ................................................................................................................- 17 -

V.      CONCLUSION .........................................................................................................- 17 -

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alton & S. Ry. v. Bhd. of Maint. of Way Emples.*,
   883 F. Supp. 755 (1995)...........................................................................................17

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,
   571 U.S. 49 (2013)...................................................................................................17

*BZ Clarity Tent Sub, LLC v. Ross Mollison Int'l Pty, Ltd.*,
   No. 2:15-CV-1065 JCM (CWH), 2015 U.S. Dist. LEXIS 76470 (D. Nev. June
   12, 2015) ..................................................................................................................15

*Colaco v. Cavotec SA*,
   25 Cal. App. 5th 1172 (2018)...................................................................................8

*Dodocase VR, Inc. v. MerchSource, LLC*,
   2018 U.S. Dist. LEXIS 48654 (N.D. Cal. Mar. 23, 2018) .......................................15

*Doe v. Gallinot*,
   657 F.2d 1017 (9th Cir. 1982)..................................................................................7

*Epic Games v. Apple Inc.*,
   2020 U.S. Dist. LEXIS 188668 (N.D. Cal. Oct. 9, 2020) ........................................17

*ET Trading, Ltd v. ClearPlex Direct, LLC*,
   2015 WL 913911 (N.D. Cal. Mar. 2, 2015) .............................................................14

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000)..................................................................................16

*Great Minds v. Off. Depot, Inc.*,
   945 F.3d 1106 (9th Cir. 2019)..................................................................................10

*HiQ Labs, Inc. v. LinkedIn Corp.*,
   938 F.3d 985 (9th Cir. 2019)....................................................................................7

*L.A. Unified Sch. Dist. v. U.S. Dist. Ct.*,
   650 F.2d 1004 (9th Cir. 1981)..................................................................................6

*Marblelife, Inc. v. Stone Res., Inc.*,
   759 F. Supp. 2d 552 (E.D. Pa. 2010) .......................................................................15

*Metalcraft of Mayville, Inc. v. Toro Co.*,
   848 F.3d 1358 (Fed. Cir. 2017).................................................................................15

*Newmark Realty Capital v. BGC Partners*,
    2017 U.S. Dist. LEXIS 228902 (N.D. Cal. Nov. 16, 2017)......................................14

*Physicians Indem. Risk Retention Grp. v. Risk Mgmt. Ctr.*,
    2009 U.S. Dist. LEXIS 149264 (D. Nev. Dec. 1, 2009).........................................17

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991)..............................................................................14

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*,
    860 F.3d 844 (6th Cir. 2017)..............................................................................15

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001)..........................................................................7, 14

*T'Bear v. Forman*,
    2020 U.S. Dist. LEXIS 24544 (N.D. Cal. Feb. 12, 2020).........................................7

*Traeger Pellet Grills LLC v. Dansons US LLC*,
    2019 U.S. Dist. LEXIS 207921 (D. Ariz. Dec. 3, 2019).......................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................................7

**Statutes**

Cal. Bus. & Prof. Code § 16600 ...........................................................................16

**Other Authorities**

Fed. R. Civ. P. 65 ....................................................................................................1

Fed. R. Civ. P. 65(b) ...............................................................................................6

Fed. R. Civ. P. 26 and 65 .......................................................................................1

Local Rule 65-1(b) ..................................................................................................1

Local Rules 7-10 and 65-1 ......................................................................................1

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

RingCentral, Inc. seeks an emergency *ex parte* restraining order to prevent its business partner Zoom Video Communications, Inc., from resorting to self-help tactics designed to harm RingCentral and its customers.  On Friday, March 12, 2021, Zoom declared its intention to use "technological steps" to block RingCentral from exercising its contractual rights under the parties' longstanding Strategic Alliance Agreement ("SAA"), which authorizes RingCentral to resell Zoom's services on a white-label basis, branded as RingCentral Meetings ("RCM").  Dkt. 1 ¶ 26.  Under the plain language of the SAA, RingCentral is entitled to resell RCM to its customers until ███████ .  By prematurely cutting off RingCentral customers from the Zoom service, Zoom is causing and will cause irreparable harm to RingCentral and its customer relationships. Among other things, absent an injunction, RingCentral will be unable to make good on commitments it has made to customers and resellers—commitments that Zoom is contractually obligated to help RingCentral fulfill.  Moreover, harming RingCentral's customer relationships appears to be the entire point of Zoom's scheme: Zoom hopes to scare RingCentral's customers into abandoning RingCentral and contracting with Zoom directly.

The purported basis for Zoom's resort to self-help tactics (as well as Zoom's lawsuit) is the patently false assertion that the parties' SAA is "terminated."  Dkt. 1 at ¶1.  It is not.  As Zoom concedes, before the end of the SAA's 2020 term, RingCentral "invoked ███████ e ███████," Dkt. 1 ¶ 18, thereby ███████ ███████, Ex. 1 at 12, SAA § 16(d).  Zoom's judicial admission that RingCentral invoked the SAA's ███████ is dispositive of this motion, as well as Zoom's claims.  The SAA remains in effect, and a temporary restraining order is required to stop Zoom from using technological blocking measures to destroy RingCentral's rights under the SAA.  As explained below, RingCentral is likely to prevail on the merits in this action, and it is entitled to an injunction under both the traditional four-factor test and the Ninth Circuit's "serious questions" standard.

# **FACTUAL BACKGROUND**

**Overview of the RingCentral-Zoom Business Relationship**

Founded in 1999, RingCentral is headquartered in Belmont, California, and employs more than 3,000 employees.  RingCentral is a leading provider of enterprise cloud communications, collaboration, and contact center solutions.  RingCentral provides unified voice, video meetings, team messaging, digital customer engagement, and integrated contact center solutions for enterprises of all sizes.  Declaration of Kira Makagon ("Makagon Decl.") ¶ 3.

On October 18, 2013, RingCentral entered into a Strategic Alliance Agreement ("SAA") with Zoom, then a two-year-old video communications startup.  Ex. 1 at 1.[1]  The SAA gave RingCentral the right to ███████████████████████  Zoom's video meetings technology with RingCentral's cloud communications services.  Ex. 1 at 20.  RingCentral showed faith in the parties' partnership from the outset, ████████████████████████████████ ██████████████████████████████████████.  Ex. 1 at 2, SAA § 2(a).  In connection with these marketing efforts, the SAA grants to RingCentral (among other things) a ██████ ████████████████████████████████████████████████████" Zoom's trademarks. Ex. 1 at 8, SAA § 9(a).

The SAA marked the beginning of a long and successful relationship between Zoom and RingCentral, as the parties extended the term and expanded the scope of the SAA on multiple occasions over the next six years.  By the time the SAA expires on ███████████, the parties will have done business together for nearly a decade.  Ex. 1 at 1.

The SAA provides that Zoom is responsible for p█████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████  Ex. 1 at 1, SAA § 1(h); Ex. 1 at 18.  As Zoom's capabilities expanded over the years, the parties amended the definition of Service to reflect those new capabilities, such as Large Meeting Capacity and Webinars.  Ex. 1 at 62, SAA § 2(a).  Some

---

[1] The SAA and its amendments have been compiled into a single PDF comprising Exhibit 1. Page citations refer to Exhibit 1 page numbers.  All citations to exhibits herein are to the exhibits attached to the Index of Evidence filed concurrently with this motion.

of these amendments were ████████████████████████████████████████

████. Ex. 1 at 64, SAA § 5(c) and SAA § 6(c).

The SAA required Zoom to ████████████████████████████

████████████████████ Zoom developed this software and provided RingCentral

with periodic updates to fix bugs, patch security vulnerabilities, and add new functionality.

RingCentral also devoted substantial resources to integrating Zoom's software and technology

into RingCentral's offerings, Makagon Decl. ¶ 6, and has delivered the Service to many

thousands of RingCentral "Customers," which are defined in the SAA as ████████████

████████████████████████ Ex. 1 at 1, SAA § 1(c).

RingCentral has also driven millions of dollars in revenue to Zoom under the SAA's revenue-

sharing provisions, Makagon Decl. ¶ 5, provided input to Zoom about its product roadmap, and

strived to be a good partner throughout their relationship, including by attempting to resolve

Zoom's numerous contractual breaches over the years privately and through negotiation. *See* Exs.

2, 3, and 6.

**The SAA's Term, End of Life, and Post-Termination Provisions**

The initial term of the SAA ran from ████████████████████████

████████████████████ Ex. 1 at 12, SAA § 16(a). The SAA gives each party t██

████████████████████████████████████████████████████████████

████████████████

The parties mutually agreed to extend the term on multiple occasions, most recently via

SAA Amendment 8 in 2019, ████████████████████████████. Amendment 8

contained ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████



This provision is crystal clear that by choosing the

The provision also says that

Section 16(e) of the SAA is also relevant to this motion.  It sets forth Zoom's

Ex. 1 at 13, SAA § 16(e) (emphasis added).  Under this provision, Zoom is

On July 27, 2020, Zoom sent a letter to RingCentral notifying it of Zoom's election to decline the SAA's automatic renewal period after expiration of the term ending . Ex. 4.  The July 27 letter is entitled "Notice of Non-Renewal of Strategic Alliance Agreement"—contrary to Zoom's allegations (Dkt. 1 ¶17), the July 27 letter *was not* a termination notice.  *Id.*

In response to Zoom's July 27 Notice of Non-Renewal, on July 29, 2020, RingCentral wrote to Zoom to provide notice of RingCentral's election to exercise its ███████████ ██████████████████████████████████ Ex. 5.  Zoom did not respond to this notice.

**Zoom Breaches the SAA in Response to Competitive Pressure from RingCentral**

Over the past few years, Zoom and RingCentral began to compete directly as Zoom attempted to offer VOIP telephone services that compete with RingCentral's, and RingCentral began offering its own video conferencing solution, RingCentral Video ("RCV").  RCV is relatively new, but it already provides some advantages over RCM.[2]  But RCV also lacks some features that are important to certain classes of customers.  For example, RCV does not currently have a Webinar capability or offer breakout rooms.  Thus, there are some existing and prospective customers who want RingCentral's leading VOIP and messaging capabilities but want to pair it with RCM.

Zoom understands this dynamic and that ████████████████████████████ ██████████████████████████████ntral was and is relying on ████ █████d to transition its sales pipeline to RCV.  To complete that transition, RingCentral needs to complete the RCV feature set by, for example, delivering a Webinar capability and adding breakout rooms.  As everyone who has ever built software knows, standing up a competing product (especially something as complicated as a carrier-grade telecommunications product) takes time, and that is *why* Ring Central negotiated for an extended ████████ Makagon Decl. ¶ 13.

Nevertheless, on February 24, 2021, Zoom sent a letter to RingCentral asserting that RingCentral's efforts to sell the Service during the ██████████ breach the SAA and violate unidentified "intellectual property" rights.  Ex. 7.  Zoom's letter discussed Zoom's view that the "purpose" of the ██████████ does not include continued sales of RCM.  Ex. 7.

---

[2] For example, RCV allows one-click phone audio connections to video meetings, which is extremely useful for users who need to join video meetings using telephone-based audio connections due to unstable internet connections.  By contrast, to join a Zoom video meeting using phone audio, a user typically must enter up to 30 digits into their phone.

1       RingCentral responded to Zoom's letter on February 26, 2021. Ex. 8.  RingCentral's letter

2 pointed out that Zoom's position is irreconcilable with the plain text of the SAA and fundamental

3 cannons of contract interpretation.  RingCentral's letter invited a constructive dialogue on an

4 amicable path forward but made clear RingCentral's intent to protect itself and its Customers

5 from Zoom's misconduct.  *Id.*

6       On Tuesday, March 9, 2021, RingCentral's outside counsel Clement Roberts reached out

7 to Zoom's outside counsel Douglas Lumish and asked that the parties "work together to avoid"

8 formal legal action. Ex. 9.  Counsel for the parties spoke later that evening.  After not hearing

9 back from Mr. Lumish on Wednesday, Mr. Roberts followed up on Thursday, March 11 to ask

10 whether Zoom would be getting back to RingCentral the following day about the various

11 frameworks for potential resolution that RingCentral had proposed.  Zoom did not get back to

12 RingCentral the following day.  Instead, Zoom filed a lawsuit, after which Mr. Lumish sent an

13 email apologizing for not getting back to Mr. Roberts and asking him to convey Zoom's lawsuit

14 to RingCentral. *Id.*

15       Zoom's heavily redacted complaint predictably generated inaccurate press reports

16 spreading Zoom's false narrative to the market, including at least one article discussing

17 "previously unreported news" that Zoom "terminated its seven-year partnership with

18 RingCentral" in July 2020.[3]  In fact, according to its express terms, the SAA will not terminate

19 ████████, and it remains in full force and effect.

20 ## LEGAL STANDARD

21       To obtain an *ex parte* temporary restraining order, a plaintiff must meet both the general

22 standard for temporary restraining orders and the requirements for *ex parte* orders set forth in

23 Federal Rule of Civil Procedure 65(b).  The standard for obtaining a temporary restraining order

24 is identical to the standard for obtaining a preliminary injunction, but a TRO's requirements are

25 less rigid since a TRO's duration is much shorter than a preliminary injunction.  *L.A. Unified*

26 *Sch. Dist. v. U.S. Dist. Ct.*, 650 F.2d 1004, 1008 (9th Cir. 1981).  A district court has broad

[3] https://www.theinformation.com/briefings/587402; *see also* https://www.uctoday.com/unified-communications/zoom-is-suing-ringcentral/; https://www.law360.com/articles/1364292/zoom-hits-former-partner-with-tm-suit-after-deal-sours;

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR

discretion to issue a TRO.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 n.8 (9th Cir. 2001).   In both instances, Plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent a preliminary injunction; (3) that the balance of equities tips in favor of issuing an injunction; and (4) that an injunction is in the public's interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In the Ninth Circuit, courts use a "sliding scale" approach to these factors, "according to which 'a stronger showing of one element may offset a weaker showing of another.'"  *HiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).  Thus, for example, "when the balance of hardships tips sharply in the [movant's] favor, the [movant] need demonstrate only 'serious questions going to the merits.'"  *Id.*

## ARGUMENT

RingCentral will succeed on its claim for declaratory judgment that its contractual rights under the SAA continue through the end of the ▮▮▮▮▮▮, and on its claim that, by blocking RingCentral from activating new Customers, Zoom is violating the SAA.  Given the balance of harms, RingCentral is entitled to a temporary restraining order.

## I.    RINGCENTRAL IS LIKELY TO SUCCEED ON THE MERITS

For every claim at issue in this action, the crux of the parties' dispute is whether the SAA "has been terminated," as Zoom alleges, Dkt. 1 at 1, or whether the SAA "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as the SAA explicitly states.  Ex. 1 at 68, SAA § 16(b).  The text of the SAA answers the question expressly.  And because all of Zoom's claims are based on its assertion that the SAA has been terminated, RingCentral is likely to succeed on the merits of *at least* its claims for declaratory relief.  This should lead the Court to issue a temporary injunction to maintain the status quo pending resolution of the parties' dispute.  *See T'Bear v. Forman*, 2020 U.S. Dist. LEXIS 24544, at *66 (N.D. Cal. Feb. 12, 2020) ("A declaratory judgment can be used as a predicate to further relief, including an injunction.") (internal quotations omitted, citing *Powell v. McCormack*, 395 U.S. 486, 499 (1969)); *Doe v. Gallinot*, 657 F.2d 1017, 1025 (9th Cir. 1982) (affirming grant of preliminary injunction based on

declaratory judgment claim).

A.      **The SAA Has Not Been Terminated**

In interpreting a contract, the "basic goal 'is to give effect to the parties' mutual intent."
*Colaco v. Cavotec SA*, 25 Cal. App. 5th 1172, 1201 (2018).  "When a contract is reduced to
writing, the parties' intention is determined from the writing alone, if possible.  The words of a
contract are to be understood in their ordinary and popular sense."  *Id*.  "If contractual language
is clear and explicit and does not involve an absurdity, the plain meaning governs."  *Id.*  Here, the
relevant SAA language is clear, and plain meaning governs.  Indeed, every relevant provision of
the SAA belies Zoom's contention that the SAA "has been terminated."  Dkt. 1 at ¶1.

Section 16 of the SAA



1   E█████████████████████████████████████████████   As this provision shows,

2   the parties expressly agreed that █████████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ██████████████████████████████████████████████████████████████

5   ███████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████

7   █████████████████████████████████████████████████████████████

8   ██████   In light of these provisions, Zoom's position that the SAA has been terminated is wrong.

9          Zoom's complaint alleges that "Zoom terminated the SAA" when it "sent a letter to

10   RingCentral on July 27, 2020 invoking the termination provisions of the Eighth Amendment to

11   the SAA," Dkt. 1 at ¶ 17, but that allegation is demonstrably false.  Zoom had no right to

12   terminate the agreement on July 27, 2020, *see* SAA § 16(b) ███████████████████████

13   ██████████████████████████   and Zoom's letter is notably entitled

14   "Notice of Non-Renewal of Strategic Alliance Agreement."  Ex. 4.  Zoom's allegation that

15   "[*a*]*fter termination*, RingCentral invoked provisions of the SAA ████████████████████

16   is likewise demonstrably false.  Dkt. 1 ¶ 18 (emphasis added).   RingCentral █████████████

17   █████████████████, which is ***during*** the pendency of the Initial Term even under

18   Zoom's reading of the contract.  Ex. 1 at 68, SAA Amd. 8 § 15(a); Ex. 5.

19         Moreover nothing in SAA § 16(d) suggests that the parties intended to limit RingCentral's

20   rights or Zoom's obligations under the SAA during ███████████████.  Had the parties intended to

21   cut off RingCentral's rights to sell the Service during ████████████d, they would have said so.

22   Instead, they said the opposite, expressly agreeing that ███████████████████████████

23   ████████████████████████████████████████████████████████████████

24   █████████████████████████████████████████████████████

25   ██████████████████████████████████

26         Zoom's argument about SAA § 16(d) has been that RingCentral's interpretation violates

27   the "purpose" set forth in that section.  In particular, Zoom focuses on the portion of the provision

28

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR

1   highlighted in yellow below to argue that ███████ is "solely t███████

2   █████████████████████

3   ████████████████████████████████████████

4   ████████████████████████████████████████

5   ████████████████████████████████████████

6   ████████████████████████████████████████

7   ████████████████████████

8       First, reading the yellow highlighted text as Zoom suggests would conflict with every

9   other sentence of this paragraph – which makes it crystal clear that the ███████ will ███

10  ████████████████████████████████████████

11  ███████████████   And it is black letter law that contractual phrases should be

12  interpreted in context, not in isolation.  *Great Minds v. Off. Depot, Inc.*, 945 F.3d 1106, 1110 (9th

13  Cir. 2019) ("The terms of a contract must be construed in a manner that takes into account the

14  context of the language and is consistent with the contract as a whole.") (quotation marks and

15  alterations omitted).

16      Second, Zoom is reading the yellow-highlighted phrase as if it contained the word

17  "solely" or "exclusively" prior to ████████████████████

18  ████████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████

24  This point is also supported by §4 of the SAA which says that █████████████

25  ████████████████████████   Ex. 1.  In this section the term

26  "Customers" is clearly being used to refer to *prospective* customers – i.e. entities with whom

27  RingCentral *will* enter into an agreement in the future.

28

Third, as noted previously, for Ring Central to transition customers to RCV it needs to transition both *existing* customers and its sales pipeline.  Those two categories are not, however, distinct populations because, for example, existing customers sign renewals and add or drop services literally ***every day***.  Do *those* customers count as "Customers" under Zoom's reading?  Zoom's complaint doesn't say, and its position isn't logical.  If the SAA intended to treat some (e.g. prospective) "Customers" differently from others during the ▮▮▮▮▮▮▮, the parties would have said so—e.g. they would have specified how different types of customers would be treated.  But they didn't.  Instead the parties broadly (and unambiguously) agreed that the entire SAA would be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Fourth, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  As noted at the outset, the SAA has been a very long-lived business contract for which RingCentral spent literally millions of dollars on integration of the Zoom service into RCM every year of the SAA's existence.  Makagon Decl. ¶ 6.  In the enterprise software space, and especially in the carrier-grade telecommunications space, it takes time to replace a technology partner.  Makagon Decl. ¶ 13.  No reasonable person would think that the work of transitioning a sales pipeline could be accomplished in the six-months between a notice of non-renewal and the end of the Term.  RingCentral *knew* that it couldn't completely transition its sales pipeline on this timeline and expressly bargained for the right to extend ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮.

Zoom's argument that the contract has been terminated is also inconsistent with and contradicted by § 16(e) of the SAA.  That section provides, in relevant part ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.This defeats Zoom's argument in two ways.

First, this section is incompatible with Zooms assertion that RingCentral cannot ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

Second, § 16(e) conclusively establishes that Zoom's assertion that RingCentral "needs to

transition customers to non-Zoom products" ██████████████████████████ is wrong.  Dkt. 1 at

¶¶23-25.  To the contrary ██████████████████████████████████████████████████████

████████████████████████████████.  This command could not be any clearer:  "██████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████.[4]

Zoom's citation (Dkt. 1 ¶ 15) to the text of a 2017 amendment to SAA § 18(b) —which

grants RingCentral rights to ████████████████████████████████████████████████████████

████████████████████████████████ Ex. 1 at 70, SAA Amd. 5 § 18(b).  As an

initial matter, nothing about that amendment purports to *limit* RingCentral's other rights under the

SAA.  And because the Zoom APIs and SDKs are *part of how* RingCentral integrates Zoom's

service with RingCentral's service and have no utility to RingCentral outside of that context,

Makagon Decl. ¶ 21, it makes no sense for the parties to agree to that unless they had *already*

agreed that RingCentral could resell Zoom's Service during the ████████████.  Similarly, because

RingCentral's RCM branding is hard-coded—by Zoom—in the Zoom SDK to display "powered

_____

[4] For this reason, Zoom's attempt to depict RingCentral as engaging in "bait and switch" with
respect to is resales of Zoom's services is completely false; the SAA could not be any more clear
that Zoom must ████████████████████████████████████████████████████.

by Zoom" in all RingCentral meeting windows, it is hard to imagine how RingCentral could go about selling Zoom's APIs and SDKs during the ███████████ without using Zoom's trademarks. Zoom's argument that the only right RingCentral has during the ███████ is the right to sell Zoom's APIs and SDKs, rather than the Service itself (which the APIs and SDKs facilitate), therefore defies common sense.  In any event, the more specific and directly applicable provisions of SAA § 16 control the question of RingCentral's rights during the ███████, and nothing in Amendment 4 suggests an intent to amend or modify SAA § 16 or any other relevant provision. *E.g.*, *Shivkov*, 974 F.3d at 1063 ("It is a standard rule of contract interpretation that specific terms control over general ones.") (quotation marks omitted).

**B.     Zoom is Obligated to Continue Activating Customers During** ██████████

Because the SAA has not yet terminated, RingCentral retains its rights ██████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ Similarly, Zoom's obligations to ███████████████████████████ ███████████████████████ remains intact.

Accordingly, the "technological steps" that Zoom has taken to deny RingCentral the ability to activate new Customers (Dkt. 1 ¶ 26) amount to a clear and willful breach of multiple SAA provisions.  First, ███████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ████████████████████████████ ███████████████████████████████████ ███████████████████████████████ ███████████████████████████████ ██████████████████████████ ███████████████████████████████████ ███████████████████████████████

## II.   RINGCENTRAL WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Zoom's blocking of new RingCentral customer activations threatens significant loss of goodwill and the loss of market share by RingCentral.  Makagon Decl. ¶¶ 19-20.  Many customer deals and contract extensions that RingCentral is currently working to close have been in process for months, and RingCentral will face great reputational harm and loss of trust if it is unable to make good on the commitments contemplated for those deals.  *Id*.  RingCentral relied on the SAA and ██████████ in making these customer commitments.  *Id*.  And because some customers will believe that RCV is not an acceptable substitute for RCM, RingCentral will also lose a number of customers who will decide, instead, to purchase their communications services from another vendor or directly from Zoom.  *Id*.

"Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001); *see also, e.g.*, *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (same).  A showing of "threatened loss of prospective customers alone may establish a likelihood of irreparable harm … because the harm resulting from loss of customers is difficult to measure."  *Newmark Realty Capital v. BGC Partners*, 2017 U.S. Dist. LEXIS 228902, at *72-73 (N.D. Cal. Nov. 16, 2017) (quotation marks omitted and citing *Sloane v. Karma Enterprises, Inc*., 2008 WL 11340286, at *2 (C.D. Cal. Nov. 3, 2008) and *ET Trading, Ltd v. ClearPlex Direct, LLC*, 2015 WL 913911, at *3 (N.D. Cal. Mar. 2, 2015).  Here, Zoom's conduct is having an immeasurable negative impact on RingCentral's reputation and standing with customers and prospective customers.  RingCentral will certainly lose business if Zoom is permitted to renege on its promises and block RingCentral Customer activations, particularly among classes of customers who require features that are presently unavailable in RCV, such as Webinar capability, which is uniquely important to some

prospective Commercial MSA and Enterprise MSA customers given working conditions during the COVID-19 pandemic.[5]  Makagon Decl. ¶ 20.  Zoom's conduct also harms RingCentral's relationships by depriving it of its right to sell the Service as an essential component of RingCentral's offerings.  *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 853 (6th Cir. 2017) ("When a distributor loses a unique product…it threatens their relationship with the retailers that have come to rely on the distributor for the in-demand product…This loss of customer goodwill is a prime example of intangible, irreparable harm") (citation omitted)).

No monetary award will ever make RingCentral whole if Zoom's conduct is not enjoined, because it will be practically impossible to identify each lost customer and quantify the total injury to RingCentral.  "Where the injury cannot be quantified, no amount of money damages is calculable, and therefore the harm cannot be adequately compensated and is irreparable." *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017)

### III.    THE BALANCE OF EQUITIES FAVORS AN INJUNCTION

The balance of harms could not be more one-sided.  The only consequence to Zoom of RingCentral's requested injunction would be that Zoom continues to make money from new RingCentral Customers who sign Customer Agreements during ███████████ and existing Customers who purchase more Services during ██████████.  Zoom has nothing to place on the scales to balance against the significant irreparable injuries to RingCentral, because Zoom suffers no harm from an order requiring it to comply with its contractual obligations.  *See, e.g., Dodocase VR, Inc. v. MerchSource, LLC,* 2018 U.S. Dist. LEXIS 48654, at *38 (N.D. Cal. Mar. 23, 2018) ("Defendants should not be heard to argue that the enforcement of the contract into which it freely entered would cause hardship." (quotation marks omitted)); *Marblelife, Inc. v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010) (similar); *accord BZ Clarity Tent Sub, LLC v. Ross Mollison Int'l Pty, Ltd.,* No. 2:15-CV-1065 JCM (CWH), 2015 U.S. Dist. LEXIS 76470, at *18 (D. Nev. June 12, 2015) ("the balance of hardships favors a business attempting to

---

[5] It appears that even after the pandemic is under control, some things will change for good.  *See, e.g*., https://www.cnbc.com/2021/03/11/one-year-into-covid-working-from-home-is-here-to-stay.html

enforce a contract with a co-producer of a popular and successful show in order to maintain its business goodwill and client relationships/customer satisfaction.").  Zoom simply has no legitimate interests at stake: all of its relevant affirmative claims against RingCentral require Zoom to prove that the SAA is terminated, so they are each doomed to fail.[6]  Section II, *supra*.

Zoom will not suffer any harm by an injunction maintaining the status quo *ante litem*. Here, "the last uncontested status which preceded the pending controversy" was that RingCentral was selling the Service under the SAA, while Zoom was providing the Service and receiving revenue share from RingCentral based on the number of Customers using the Service.  *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (citing *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963) (quoting *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958)).  Allowing the status quo to continue undisturbed while the parties litigate their dispute will not harm Zoom—indeed Zoom will continue to receive revenue share payments for the user of its services, just as it has over the last seven-plus years.  On the other hand, Zoom's self-help tactic of imposing technological blocks on RingCentral's Customer activations will harm RingCentral and Customers alike.

Zoom's technological measures violate the contract in another way as well.  In particular, because the technological measures that Zoom has implemented block any entity that Zoom has not previously configured from setting up new lines, they threaten to block Customers who (1) purchased RingCentral service bundles including the Service prior to Jan 31 2021; and (2) had not configured the Service prior to Jan 3 2021. Because some customers may not configure portions of their service until weeks or months after the service is first acquired, Zoom's technological measures block implementation of the Service even for customers that Zoom acknowledges it must serve.  For this reason as well, Zoom's actions must be enjoined

---

[6] Zoom's claim for declaratory judgment regarding Cal. Bus. & Prof. Code § 16600 is not relevant to whether Zoom should be permitted to engage in its self-help "technological steps" to block new Customer activations, and there is no justiciable controversy presented by that claim in any event, because RingCentral has never sought to enforce it.

1

**IV.      HOLDING ZOOM TO ITS CONTRACTUAL PROMISES IS IN THE PUBLIC
INTEREST**

2

3          The public "has a strong interest in holding private parties to their agreements." *E.g., Epic*

4   *Games v. Apple Inc.*, 2020 U.S. Dist. LEXIS 188668, at *62 (N.D. Cal. Oct. 9, 2020) (citing *S.*

5   *Glazer's Distrib. of Ohio, LLC v. Great Lakes Brewing Co.,* 860 F.3d 844, 853 (6th Cir. 2017));

6   *accord Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62–63 (2013)

7   ("the interest of justice" is served by holding parties to their bargain).  Relatedly, there is a

8   significant public interest in requiring parties to resolve business disputes through judicial

9   proceedings, rather than by resorting to self-help such as Zoom's "technological steps" to block

10  RingCentral customer activations.  *See id.* at *63; *Alton & S. Ry. v. Bhd. of Maint. of Way*

11  *Emples*., 883 F. Supp. 755, 765 (1995) ("any attempt by the BMWE to alter the status quo by

12  exercising self help would be quite premature, would cause irreparable harm, and would be

13  contrary to the public interest.").  "[I]t is generally in the public interest to uphold parties'

14  contractual arrangements and prevent the sort of self-help [Zoom] threatened here.  Similarly, it is

15  in the public interest to prevent a party that has not obtained a judgment to take coercive actions

16  as if it had a judgment, as [Zoom] threatened to do here.  *Physicians Indem. Risk Retention Grp.*

17  *v. Risk Mgmt. Ctr.*, 2009 U.S. Dist. LEXIS 149264, at *25 (D. Nev. Dec. 1, 2009).  There is also a

18  public interest in allowing consumers to choose their providers.  *See, e.g., Traeger Pellet Grills*

19  *LLC v. Dansons US LLC*, 2019 U.S. Dist. LEXIS 207921, at *16 (D. Ariz. Dec. 3, 2019)

20  (discussing public interest in consumer choice).

                                    **CONCLUSION**

21         For the foregoing reasons, RingCentral respectfully requests a temporary restraining order

22  prohibiting Zoom from blocking new RingCentral customers from accessing Zoom's services,

23  and an order to show cause why a preliminary injunction should not issue.

24

25

26

27

28

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR

Dated: March 15, 2021

CLEMENT SETH ROBERTS
KAREN G. JOHNSON-MCKEWAN
ROBERT L. URIARTE
NATHAN SHAFFER
Orrick, Herrington & Sutcliffe LLP


By: _/s/ Clement Seth Roberts_
CLEMENT SETH ROBERTS
Attorneys for Defendant,
RingCentral, Inc.

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR