1   Douglas E. Lumish (CA 183863)
    doug.lumish@lw.com
2   Matthew Rawlinson (CA 231890)
    matt.rawlinson@lw.com
3   Arman Zahoory (CA 306421)
    arman.zahoory@lw.com
4   LATHAM & WATKINS LLP
    140 Scott Drive
5   Menlo Park, California 94025
    Telephone: 650-328-4600
6   Facsimile: 650-463-2600

7   Jennifer Barry (CA 228066)
    jennifer.barry@lw.com
8   LATHAM & WATKINS LLP
    12670 High Bluff Drive
9   San Diego, California 92130
    Telephone: 858-523-5400
10  Facsimile: 858-523-5450

11  *Attorneys for*
    *Zoom Video Communications, Inc.*
12

13              UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                     SAN JOSE DIVISION

16

17  ZOOM VIDEO COMMUNICATIONS, INC.,          CASE NO. 5:21-cv-1727-EJD

18                      Plaintiff,            **PLAINTIFF ZOOM VIDEO
                                              COMMUNICATIONS, INC.'S OPPOSITION
19          vs.                               TO DEFENDANT'S REQUEST FOR
                                              PRELIMINARY INJUNCTION**
20  RINGCENTRAL, INC.,
                                              **REDACTED VERSION OF DOCUMENT
21                      Defendant.            SOUGHT TO BE SEALED**

22                                            Date:  March 25, 2021
                                              Time:  9:00 a.m.
23  RINGCENTRAL, INC.,                        Judge: Hon. Edward Davila

24                      Counterclaimant,

25          vs.

26  ZOOM VIDEO COMMUNICATIONS, INC.,

27                      Counterdefendant.

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  RINGCENTRAL'S MOTION FOR A PRELIMINARY INJUNCTION
     SHOULD BE DENIED .................................................................................... 4

     A.   Pertinent Background.......................................................................... 4

     B.   All of the Preliminary Injunction Factors Favor Zoom ...................... 6

          1.   RingCentral Cannot Show a Substantial Likelihood of
               Success On the Merits.................................................................. 7

               a.   The Plain Language of the SAA Establishes That
                    RingCentral's License Has Expired.................................. 8

               b.   Section 16 of the SAA Confirms Zoom's
                    Interpretation.................................................................. 11

               c.   RingCentral's Interpretation Contradicts the Parties'
                    Intent, Ignores the Plain Language of the
                    Agreement, and Renders Numerous Provisions
                    Superfluous .................................................................... 14

               d.   RingCentral's Interpretation Would Lead To
                    Absurd Results............................................................... 16

          2.   RingCentral Cannot Demonstrate Irreparable Harm ............... 18

          3.   The Balance of the Equities Tips Sharply in Zoom's Favor.... 22

          4.   The Public Interest Weighs In Zoom's Favor.......................... 24

III. CONCLUSION.............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ........................................................................................4

*Am. Passage Media v. Cass Commc'ns, Inc.,*
    750 F.2d 1470 (9th Cir. 1985) ..................................................................................21, 22

*Amylin Pharm., Inc. v. Eli Lilly & Co.,*
    456 F. App'x 676 (9th Cir. 2011) ................................................................................21

*ASARCO, LLC v. Union Pac. R. Co.,*
    765 F.3d 999 (9th Cir. 2014) ...........................................................................14, 15, 16

*Bell Atl. Bus. Sys., Inc. v. Storage Tech. Corp.,*
    No. C-94-0235 MHP, 1994 WL 125173 (N.D. Cal. Mar. 31, 1994)......................................22

*Brandwein v. Butler,*
    218 Cal. App. 4th 1485 (2013) ..............................................................................7, 15, 16

*Café Found., Inc. v. Seeley,*
    No. 16-CV-00628-JST, 2016 WL 1258624 (N.D. Cal. Mar. 31, 2016) .................................21

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988) ...........................................................................19, 20, 21

*CopyTele, Inc. v. E Ink Holdings, Inc.,*
    962 F. Supp. 2d 1130 (N.D. Cal. 2013) .......................................................................7, 12

*CSNK Working Cap. Fin. Corp. v. Baxter, Bailey & Assocs., Inc.,*
    No. 5:16-CV-04234-EJD, 2016 WL 9176328 (N.D. Cal. Aug. 19, 2016) .............................21

*Dixon v. Cost Plus,*
    No. 12-cv-2721-LHK, 2012 WL 2499931 (N.D. Cal. June 27, 2012) ....................................4

*Dollar Rent a Car of Wash., Inc. v. Travelers Indem. Co.,*
    774 F.2d 1371 (9th Cir. 1985) ...................................................................................18

*Dotster, Inc. v. ICANN,*
    296 F. Supp. 2d 1159 (C.D. Cal. 2003) ........................................................................19

*Earth Island Inst. v. Carlton,*
    626 F.3d 462 (9th Cir. 2010) ........................................................................................4

*Ebates Performance Mktg., Inc. v. Integral Techs., Inc.,*
    No. 12-CV-06488-YGR, 2013 WL 75929 (N.D. Cal. Jan. 4, 2013) ....................................22

*Egg Works, Inc. v. Egg World, LLC*,
No. 2:10–cv–1013–LDG (RJJ), 2010 WL 3724206 (D. Nev. Sept. 14, 2010),
*aff'd*, 434 Fed. App'x 578 (9th Cir. 2011) .................................................................25

*ET Trading, Ltd. v. ClearPlex Direct, LLC*,
2015 WL 913911 (N.D. Cal. Mar. 2, 2015) ...............................................................19

*Facebook v. BrandTotal Ltd.*, No. 20-CV-07182-JCS, 2020 WL 6562349 (N.D.
Cal. Nov. 9, 2020) ......................................................................................................25

*Falkowski v. Imation Corp.*,
132 Cal. App. 4th 499 (2005) ....................................................................................12

*Feldenkrais Guild of N. Am. v. Wildman*,
No. 18-CV-2340-YGR, 2018 WL 2331905 (N.D. Cal. May 23, 2018) .....................25

*Fid. Brokerage Servs. LLC v. McNamara*,
No. 11 CV 1092 MMA RBB, 2011 WL 2117546 (S.D. Cal. May 27, 2011) ..............25

*Freedom Mortg. Corp. v. Madariaga*,
No. 219CV2432MCEDBPS, 2020 WL 6798062 (E.D. Cal. Nov. 19, 2020)................21

*Fremont Indem. Co. v. California Nat. Physician's Ins. Co.*,
954 F. Supp. 1399 (C.D. Cal. 1997) ..........................................................................14

*Harvey v. Landing Homeowners Ass'n*,
162 Cal. App. 4th 809 (2008) ......................................................................................7

*Idaho v. Coeur d'Alene Tribe*,
794 F.3d 1039 (9th Cir. 2015) ...................................................................................19

*Indem. Ins. Co. v. Pac. Clay Prods. Co.*,
13 Cal. App. 3d 304 (1970) ...................................................................................7, 10

*Int'l Medcom, Inc. v. S.E. Int'l, Inc.*,
No. 15-CV-03839-HSG, 2015 WL 7753267 (N.D. Cal. Dec. 2, 2015) .....................22

*Int'l Precision Prod., B.V. v. Staco Sys., Inc.*,
No. SACV1301831SJOJPRX, 2014 WL 12573363 (C.D. Cal. Feb. 6, 2014)..........7, 18

*Kashmiri v. Regents of Univ. of Cal.*,
156 Cal. App. 809 (2007) ..........................................................................................17

*KCG Americas LLC v. Zhengquan Zhang*,
*No.* 5:17-CV-01953-EJD, 2017 WL 8294011 (N.D. Cal. Apr. 10, 2017)................18

*Lopez v. Brewer*,
680 F.3d 1068 (9th Cir. 2012) .....................................................................................4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

PLAINTIFF'S OPPOSITION TO REQUEST FOR
PRELIMINARY INJUNCTION
CASE NO. 5:21-cv-1727-EJD

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1980) .............................................................................22

*Mastro v. Momot*,
    No. CV-09-01076-PHX-ROS, 2009 WL 1993772 (D. Ariz. July 9, 2009) ...................7, 8, 18

*Nicholson v. Thrifty Payless, Inc.*,
    819 Fed. App'x 559 (9th Cir. 2020) ....................................................................12

*Ojmar US, LLC v. Sec. People, Inc.*,
    No. 16-CV-04948-HSG, 2017 WL 2903143 (N.D. Cal. July 7, 2017) ..........................21, 22

*Qualcomm Inc. v. Compal Elecs., Inc.*,
    283 F. Supp. 3d 905 (S.D. Cal. 2017) ..................................................................24

*Regents of Univ. of Cal. v. Am. Broad Companies, Inc.*,
    747 F.2d 511 (9th Cir. 1984) ............................................................................25

*Robertson v. Kaiser-Nevel*,
    No. 20-02523 BLF (PR), 2021 WL 629318 (N.D. Cal. Jan. 4, 2021) ...............................4

*Sampson v. Murray*,
    415 U.S. 61 (1974).........................................................................................19

*Sarieddine v. D & A Distrib., LLC*,
    No. CV172390DSFMRWX, 2017 WL 6940537 (C.D. Cal. July 13, 2017) ........................25

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
    240 F.3d 832 (9th Cir. 2001) ............................................................................19

*Swarmify, Inc. v. Cloudflare, Inc.*,
    No. C 17-06957 WHA, 2018 WL 1142204 (N.D. Cal. Mar. 2, 2018) ..............................18

*United States v. Irvine*,
    756 F.2d 708 (9th Cir. 1985) ............................................................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...........................................................................................4

**STATUTES**

Cal. Civ. Code § 1636.........................................................................................7, 12

# I.  INTRODUCTION

RingCentral's motion for a temporary restraining order (TRO) provided this Court with a misleadingly selective presentation of the terms of the parties' Strategic Alliance Agreement (SAA).  Based on RingCentral's one-sided articulation of the facts and smoke-and-mirrors reconstruction of the SAA, the Court issued an order compelling Zoom to provide its industry-leading video conferencing services to new RingCentral customers in a way that runs afoul of the plain language of the SAA and the clear intent of the parties.  RingCentral's interpretation of the SAA and its representations concerning the relationship are demonstrably false, and the Court should deny RingCentral's request to extend the TRO into a preliminary injunction.

RingCentral's motivation is easy to decipher.  Relying on confidentiality and non-competition provisions in the SAA to silence Zoom, RingCentral has spread misinformation designed to mislead customers, investors, and the public at large.  In particular, RingCentral has concealed the fact that Zoom elected not to renew the SAA, falsely suggesting instead that RingCentral is transitioning customers to RingCentral's competitive product, RingCentral Video (RCV), for illusory quality or feature-based reasons.  And despite having had a full six months to transition its product offering and "sales pipeline," it is apparent that RingCentral squandered that time and is not prepared to give up selling Zoom's products as its video conferencing solution.  On the contrary, RingCentral seeks to cling to Zoom's products, brand, and extraordinary goodwill for as long as possible and in flagrant violation of the SAA.  In a classic bait-and-switch, RingCentral is dangling Zoom's products in front of potential customers to lure them into signing multi-year contracts all the while knowing that RingCentral is no longer licensed to market Zoom products or services, and that it now must transition fully to RCV.

When the SAA is construed according to the governing rules of contract interpretation, it becomes clear that RingCentral's interpretation must be rejected, that RingCentral's license to sell Zoom products to new customers expired, and that RingCentral is now in breach with every new sale it makes.  The plain language of the provisions that are squarely on point (Sections 2(a) and (b)) establishes unambiguously that RingCentral's license to sell runs only "for *the term* of this Agreement," and that Zoom's obligation to provide its products to RingCentral likewise runs only

"throughout **the term** of this Agreement."  Declaration of Kira Makagon, Dkt. 14-2 ("Makagon Decl."), Ex. 1 ("SAA") at 2 (§ 2(b)). [1]  Nothing more need be shown:  RingCentral unequivocally concedes in its motion that the "Term" of the SAA has expired and that the SAA has now moved into a discrete, post-Term phase referred to as the "end of life" or "EOL Period."  *See* Dkt. No. 14 ("Mot.") at 11 (admitting that the "end of the Term" occurred 6 months after Zoom gave notice).  The acknowledged expiration of the Term leads inextricably to the expiration of RingCentral's license to sell Zoom products to new customers, and to Zoom's obligation to provide those products.  Conspicuously, RingCentral's motion largely ignores these provisions—it makes only passing reference to Sections 2(a) and (b) and then applies truncated quotes that omit the operative language—even though they are the only terms in the SAA that actually speak to the time period during which RingCentral is entitled to resell Zoom's products.

Instead, RingCentral strings together a series of other terms in an attempt to rewrite the EOL Period into a one-sided wholesale extension of the SAA for all purposes.  This revisionist history fails for myriad reasons.  For one, RingCentral's interpretation of the SAA is refuted by and incompatible with the express purpose of the EOL Period: "to transition Customers to an alternative to the [Zoom] Service."  *Id*. at 68 (4th Am. § 15(b)).  Moreover, it simply makes no sense to say that the parties agreed to a specific deadline for the "Term" of the SAA that built in a six months' notice period so that RingCentral could move on from selling Zoom products **before** the end of the Term, but then also agreed that RingCentral would have unilateral power to extend all of its privileges and all of Zoom's obligations for a full ███████ after the Term expired.  This reading of the SAA would effectively erase any distinction between the Term and the EOL Period, and destroy any point to having a defined notice or EOL Period to begin with, while similarly rendering numerous other terms redundant and superfluous, cardinal sins in contract interpretation.

Unsurprisingly, this nonsensical outcome is also debunked by the plain language of the SAA.  In Section 16(f)—which RingCentral never even mentions in its motion—the SAA sets out exactly to whom Zoom must provide its services "after the Term," *i.e.,* during the EOL Period: only "Customers who obtained a version of the Service available **prior [to] the end of the Term.**"

---

[1] Emphases supplied unless otherwise noted.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1    SAA at 13 (§ 16(f)).  In this way, Section 16(f) flatly refutes the conclusion to which RingCentral

2    led the Court, that nothing in the SAA suggests that the parties intended to limit RingCentral's

3    rights or Zoom's obligations under the SAA during the EOL period.  Mot. at 9.  Section 16(f) is

4    exactly that provision.  Critically, neither this provision of the SAA nor any other ever says that

5    Zoom must also continue to provide its service to new customers after the end of the Term.  Had

6    the parties wanted to agree that RingCentral's ability to sign up new customers to Zoom products

7    would continue unabated for the duration of the EOL Period, they could have written this into the

8    contract.  But they made no such agreement, and the Court should not manufacture one for

9    RingCentral now, especially in the context of a preliminary injunction.

10           Moreover, RingCentral's faulty construction would lead to absurd results—another

11   cardinal sin—such as, for example (according to RingCentral), permitting RingCentral to extend

12   Zoom's obligations indefinitely into the future with long-term contracts entered up until the very

13   last day of the EOL Period that the SAA expressly says exists to transition existing customers.

14           RingCentral's attempted showing of irreparable harm fares no better.  While telling the

15   public that its alternative solution, RCV, is ***better*** than Zoom's and has become the default choice

16   for all of its new customers, Declaration of Arman Zahoory ("Zahoory Decl."), Exh. E at 14,

17   RingCentral asks the Court in parallel to find that it desperately needs Zoom's solution for the

18   remaining ███████ of the EOL Period or else it will suffer untold irreparable harm.  Mot. at 14–

19   15.  But, RingCentral's claims of irreparable harm boil down to a series of purely conclusory

20   statements from its lawyers and one declarant who can only identify two customers that have even

21   voiced a concern about the transition (and no actual lost business).  *See id.; see also* Makagon

22   Decl. ¶ 14.  The remainder of RingCentral's irreparable harm argument comprises fatally vague

23   allegations that "some" prospective customers might not purchase RCV because it lacks features

24   that Zoom offers.  *See* Mot. at 14–15.  Beyond this, RingCentral offers only a catalog of types of

25   potential harm RingCentral might suffer, all of which are compensable in damages and so, not

26   irreparable at all.  These infirmities infect RingCentral's efforts to prove that the balance of the

27   equities and the public interest factors also break its way.  Its arguments for those factors are purely

28   derivative of its arguments for likelihood of success and for irreparable harm.  Once those factors

1  are rejected, as they should be, it is clear that RingCentral fails to meet its burden of proving these

2  last two factors as well.

3       In the end, as detailed further below, RingCentral cannot meet its burden of proof for a

4  single requisite factor for a preliminary injunction.  Accordingly, its motion should be denied.

5  **II.  RINGCENTRAL'S MOTION FOR A PRELIMINARY INJUNCTION**
   **SHOULD BE DENIED**

6

7       "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be

8  granted unless the movant, ***by a clear showing***, carries the burden of persuasion.'"  *Robertson v.*

9  *Kaiser-Nevel*, No. 20-02523 BLF (PR), 2021 WL 629318, at *1 (N.D. Cal. Jan. 4, 2021) (emphasis

10 in original) (citing *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation omitted)); *see*

11 *also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

12      The moving party must establish four factors: (1) that it has a substantial likelihood of

13 success on the merits; (2) that it will suffer irreparable harm if the injunction is not granted; (3) that

14 its threatened injury outweighs the harm caused to the opposing party as a result of the injunction;

15 and (4) that the injunction is not adverse to the public interest.  *Winter*, 555 U.S. at 24.  Given the

16 extraordinary nature of the requested remedy, the party seeking this relief bears the burden of

17 showing entitlement to an injunction under each of these elements.  *See Earth Island Inst. v.*

18 *Carlton*, 626 F.3d 462, 469 (9th Cir. 2010); *Dixon v. Cost Plus*, No. 12-cv-2721-LHK, 2012 WL

19 2499931, at *6 (N.D. Cal. June 27, 2012).  Failing to make a showing on any one of the factors

20 dooms a motion for a preliminary injunction, regardless of whether the other factors can be

21 satisfied.  *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

22      For the reasons set forth below, RingCentral cannot establish any of the required elements,

23 and its request for a preliminary injunction should be denied.

24 **A.    Pertinent Background**

25      For the past seven-plus years, Zoom has supported RingCentral by providing Zoom's

26 enormously popular video conferencing services for RingCentral to resell under its own

27 "RingCentral Meetings" brand.  The terms governing this arrangement are set forth in an

28 October 2013 Strategic Alliance Agreement ("SAA" or "agreement").

1   The parties entered into the SAA in October 2013, while Zoom was still a fledgling

2   company little known in the marketplace.  Under the SAA, RingCentral was granted a license to

3   "market and resell" Zoom's web meeting and video conference services.  *Id.* at 1-2 (§§ 1(h), 2(a)).

4   The license is express that it exists only "for the term of this Agreement."  *Id.* at 2 (§ 2(a)).  Since

5   its inception, the SAA has been amended ten times to add additional products and services, to

6   extend the Term of the SAA, and to modify myriad other terms of the agreement.  As the Court

7   will see, these many amendments have led to inconsistencies in the language and complexity in

8   the overall terms of the parties' agreement.  But, as shown below, one thing has remained clear

9   throughout: None of these amendments extended RingCentral's license to market or resell Zoom's

10   solutions beyond the SAA's  "Term," which the parties agree expired on January 31, 2021.

11   On July 27, 2020, Zoom sent a letter to RingCentral starting a six-month notice period after

12   which the Term of the SAA expired on January 31, 2021.  Makagon Decl., Exh. 4.  The notice

13   period gave RingCentral a full 6 months to take any technological or business steps required to

14   transition to its RingCentral Video (RCV) product—the competitive video conferencing product

15   RingCentral released in April 2020 and has been selling as an alternative to Zoom's products for

16   nearly a year now—including to migrate its sales pipeline to RCV.  *See* SAA at 83 (8th Am. § 1).

17   On July 29, 2020, RingCentral invoked the SAA's "end of life" (EOL) period that would

18   begin after the Term expired on January 31, 2021.  Makagon Decl., Exh. 5.  This EOL Period

19   permits RingCentral to "defer the effective date of termination by up to ███████████ from

20   the end of the Term," but by its express language this deferral is solely "***to transition Customers***

21   ***to an alternative to the Service.***"  SAA at 68 (4th Am. § 15(b)).  That is, during the EOL Period,

22   Zoom is obligated (and will continue) to support RingCentral's existing customers to the extent

23   necessary for RingCentral to transition those customers to RCV.  But, the EOL Period does not

24   override the clear language of the SAA limiting RingCentral's license to sell Zoom's technology

25   to new customers to the now-expired Term.  *Id.* at 2 (§ 2(a)) (license is "for the term of this

26   Agreement").[2]

27

28   [2] "Term" and "termination" are given two importantly different meanings in the SAA.  The Term, as explained throughout, is defined in Section 16(a) and ran from inception until January 31, 2021,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1      Nevertheless, and despite having an alternative product on sale, RingCentral has continued

2  to resell Zoom's products to new customers after the Term on January 31, 2021.  In response to

3  demands by Zoom that RingCentral stop this breach of the SAA, RingCentral stated that "the SAA

4  has not been terminated yet, and it remains in full force.  When and how RingCentral choses [sic]

5  to transition customers from Zoom's product to another product is RingCentral's prerogative."

6  Makagon Decl. Exh. 8.  At the same time, RingCentral has been misleading its customers and

7  investors by suggesting that (1) it has already transitioned its sales pipeline away from Zoom's

8  products, and (2) the reason for this transition was to improve the quality of its video conferencing

9  offering, not because it had no choice in light of the expiration of its license under the SAA.  *See*

10  Zahoory Decl., Exhs. A, E at 14.

11      Faced with this untenable situation, Zoom had no alternative but to bring suit—the first

12  suit Zoom has ever brought—to stop RingCentral's ongoing breach of the SAA.  Within days of

13  being served with Zoom's complaint, RingCentral filed its motion for a temporary restraining

14  order, which fails to mention any of the language that undermines the arguments it presented to

15  the Court.  Having only this misleadingly incomplete picture of the issues, the Court granted that

16  motion before receiving a response from Zoom.  Dkt. 24.  For the reasons set forth herein, it is

17  RingCentral that is in breach of the SAA, the TRO should not be extended, and RingCentral's

18  request for a preliminary injunction should be denied.

19  **B.    All of the Preliminary Injunction Factors Favor Zoom**

20      While RingCentral's failure to prove any one preliminary injunction factor would suffice

21  to allow the Court to deny its motion, it ultimately cannot prove any of the requisite factors.  As

22  shown below, RingCentral is not likely to succeed on the merits because its argument hinges on

23  an interpretation of the SAA that wars with the express language of the agreement and contravenes

24  several tenets of contract interpretation, including the legal proscriptions against rendering contract

25  language superfluous and against reading a contract in a way that would lead to absurd results.

26  RingCentral's case for irreparable harm is no better and offers only empty and conclusory

27

28  the date set by the 8th Amendment.  The effective date of "termination" occurs when the SAA is
concluded for all purposes at the end of the EOL Period.  *See* SAA §§ 16(b), (c), (d) and (e).

1    allegations of harm that cannot meet the heavy burden for a preliminary injunction as a matter of

2    law. And RingCentral's perfunctory arguments concerning the balance of the hardships and public

3    interest suffer from the same infirmities. Accordingly, RingCentral's motion should be denied.

4         **1.    RingCentral Cannot Show a Substantial Likelihood of Success On the Merits**

5         When properly construed under the governing law, the plain language of the SAA

6    establishes that RingCentral's license to sell Zoom to new customers has expired with the Term,

7    and the current EOL Period does not extend that license. As such, RingCentral is in breach and

8    cannot meet its burden of proving that it is substantially likely to succeed on its claims.

9         "Under California law, '[a] contract must be so interpreted as to give effect to the mutual

10   intention of the parties as it existed at the time of contracting, so far as the same is ascertainable

11   and lawful." *CopyTele, Inc. v. E Ink Holdings, Inc*., 962 F. Supp. 2d 1130, 1137 (N.D. Cal. 2013)

12   (quoting Cal. Civ. Code § 1636). "The language of the [contract] governs if it is clear and explicit,

13   and [courts] interpret the words in their ordinary and popular sense unless a contrary intent is

14   shown." *Harvey v. Landing Homeowners Ass'n*, 162 Cal. App. 4th 809, 817 (2008). Thus, "[a]

15   contract should receive such interpretation as will make it reasonable and avoid absurdities."

16   *Indem. Ins. Co. v. Pac. Clay Prods. Co*., 13 Cal. App. 3d 304, 313 (1970). And, "when interpreting

17   a contract, we strive to interpret the parties' agreement to give effect to all of a contract's terms,

18   and to avoid interpretations that render any portion superfluous, void or inexplicable." *Brandwein*

19   *v. Butler*, 218 Cal. App. 4th 1485, 1507 (2013).

20        RingCentral's interpretation of the SAA bucks this governing law and should be rejected.

21   At a minimum, there is "a significant dispute regarding the interpretation of the [] Agreement's

22   terms," which precludes a finding of likelihood of success. *Int'l Precision Prod., B.V. v. Staco*

23   *Sys., Inc*., No. SACV1301831SJOJPRX, 2014 WL 12573363, at *3 (C.D. Cal. Feb. 6, 2014)

24   (agreement "not a model of clarity" so "Plaintiff has failed to demonstrate a likelihood of success")

25   (internal quotation marks omitted); *see also Mastro v. Momot*, No. CV-09-01076-PHX-ROS, 2009

26   WL 1993772, at *4 (D. Ariz. July 9, 2009) (ambiguity "weighs against a finding that Petitioners

27   have met the high burden necessary for preliminary injunctive relief").

28

a.   **The Plain Language of the SAA Establishes That RingCentral's License Has Expired**

The plain language of the SAA definitively establishes that RingCentral's right to sell Zoom products to new customers does not extend into the current "end of life" period.

As mentioned above, the SAA creates and distinguishes between two separate, distinct, and non-overlapping periods: (1) the Term, during which RingCentral is permitted to sell Zoom products to new customers, and (2) the EOL (end of life) Period, which starts when the Term expires and during which Zoom is obliged to continue to support existing RingCentral customers while RingCentral transitions those existing customers to an alternative service. *See, e.g.,* SAA at 83 (8th Am. § 1) ("For the avoidance of doubt, *following the end of the Term* the Agreement shall enter into the EOL Period set forth in Section 16(d)."). "Termination" occurs at the expiration of the EOL Period (or, had RingCentral not invoked the EOL Period, simultaneously with the end of the Term). *Id.*; *see also id.* at 13 (§§ 16(d) and (e)). In addition, the initial SAA required 150 days' notice if a party wanted to avoid the automatic renewal of the SAA. *Id.* at 12 (§ 16(a)). The obvious reason for this advance notice was to ensure that RingCentral enjoyed a notice period with sufficient warning to shift its businesses as needed so that it had an alternative service in place when the Term expired. Years later, in 2017, after RingCentral had deployed Zoom products at numerous customer sites, RingCentral requested, and Zoom agreed, to increase this notice period from 150 days to a full six months to ready its sales pipeline and take whatever other steps were necessary to switch to an alternative product at the end of the Term. *Id.* at 68 (4th Am. § 15(a)). The SAA's timeline can be shown graphically as follows:



1        Each element of this timeline can be seen in the plain language of the agreement.  Under

2   the SAA, RingCentral was granted a license to "market and resell" Zoom's web meeting and

3   video conference service, and later amendments gave similar rights for other Zoom products.

4   *See id.* at 1-2 (§§1(h) and 2(a)).  The SAA is unambiguous that this license to sell Zoom products

5   runs only "***for the term*** of this Agreement":

> Zoom hereby grants RingCentral and its Affiliates a … license to use, copy,
> distribute, display, perform, import, make, sell, offer to sell, and exploit (and have
> others do any of the foregoing on or for RingCentral's or any of its Affiliates' behalf
> or benefit) the Service in the Territory ***for the term of this Agreement***, as permitted
> by this Agreement.

9   *Id.* at 2 (§ 2(a)); 13 (§ 16(e)).  Hence, this license expired on January 31, 2021 as shown.

10        Mirroring this, the next provision of the SAA is entitled "Provision of the Service."  *Id.* at

11   2 (§ 2(b)).  This section too is unambiguous that, like RingCentral's license to sell the service,

12   Zoom's obligation to provide the service runs only "throughout ***the term*** of this Agreement":

> **Provision of the Service**. ***Throughout the term of this Agreement***, Zoom shall
> provide the Service to RingCentral and its Affiliates and its and its Affiliates'
> Customers in accordance with the SLA.

15   *Id.*  This obligation also ended on January 31, 2021.

16        Then, in the same provision that creates the EOL Period, the SAA contains Section 16(f),

17   which reflects the parties' intent that there be no new customers after the end of the Term:

> **Customer Transition After the End of the Term.**  Zoom shall use its best efforts
> to ensure that any Customers who obtained a version of the Service available ***prior
> [to] the end of the Term*** may continue to use the Service after the Term.

20   *Id.* at 13 (§ 16(f)).  Thus, in explaining what Zoom's obligations are during the "Customer

21   Transition After the End of the Term"—*i.e.,* during the EOL Period—the SAA expressly sets out

22   the operative rule: if one is a "Customer who obtained a version of the Service available ***prior [to]***

23   ***the end of the Term,***" Zoom must ensure that that customer "***may continue to use*** the Service after

24   the Term."  *Id.*  But, naturally, if an entity did not already receive a version of the service (any

25   version) before the end of the term, then Zoom has no such obligation to ensure that entity could

26   "continue to use the Service," much less to make its service available to that entity in the EOL

27   Period.  Notably, the SAA does not say here, or anywhere, that Zoom must also ensure that new

28   customers RingCentral signs up ***after*** the end of the Term must also be able to use the service.

1    Rather, this provision confirms the opposite—Zoom is obliged to provide the Service only to those

2    customers who obtained at least one version "***prior [to] the end of the Term***."  *Id.*

3            RingCentral repeatedly attempts to confuse this issue by using the phrase "*prospective*

4    *Customers.*"  *See*, *e.g.*, Mot. at 11.  But this argument backfires.  "Customer" is a defined term in

5    the SAA:  "'**Customer**' shall mean a third party ***that purchases the Service*** from RingCentral or

6    its Affiliates."  SAA at 1 (§ 1(c)).  This definition makes clear that one is a customer only if it

7    actually purchases the service, not if it is considering potentially purchasing the service in the

8    future.  By referring to "Customers ***who obtained*** a version," Section 16(f) uses "Customer" in

9    exactly the same way to describe an entity that has already purchased the service, not one that

10   might do so later.  *See id.* at 13 (§ 16(f)).  And "Customer" is used consistently throughout the

11   SAA in a manner that establishes someone "is" a customer, not a prospective customer.  For

12   example, Section 3(d) states that "Contact by Zoom of Customers … is prohibited," *id.* at 3

13   (§ 3(d)), which according to RingCentral would mean Zoom is prohibited from contacting anyone

14   who one day might potentially purchase the service.  This would cover every prospective customer

15   in the world, and is obviously not what the parties intended.  *Indem. Ins.*, 13 Cal. App. 3d at 313

16   ("A contract should receive such interpretation as will make it reasonable and avoid absurdities.").

17   Had they meant what RingCentral argues, the parties could easily have referred to "prospective

18   customers," or required Zoom to make its products available to customers obtained "after the end

19   of the Term," but they did not.  Instead, the parties restricted Zoom's obligation only to "ensur[ing]

20   that any ***Customers*** who obtained a version of the Service available ***prior to the end of the Term***

21   may ***continue to use*** the Service after the Term."  *Id.* at 13 (§ 16(f)).

22           These clear provisions should end the inquiry.  There is no dispute that Zoom gave notice

23   of its election not to renew, and so the Term expired on January 31, 2021 and the SAA moved into

24   its EOL Period the next day.  *See* Mot. at 11 (admitting the "end of the Term" occurred 6 months

25   after Zoom gave notice); *see also id. at* 9 (quoting SAA 4th Am. § 15(b)).  As shown in the graphic

26   above, the simple language of the SAA plainly establishes that Zoom has no obligations to provide

27   the service to new customers after the Term, nor does RingCentral have the rights to sell it to them.

28           RingCentral fails to point to a single provision that contradicts this plain meaning of the

1   agreement (because no such language exists), and, as shown next, its contrary interpretation runs

2   counter to numerous other provisions of the SAA, to common sense, and to the parties' clear intent.

3                   **b.        Section 16 of the SAA Confirms Zoom's Interpretation**

4          In the SAA's Eighth Amendment, the Term provision was amended to state "[f]or the

5   avoidance of doubt, following the end of the Term the Agreement shall enter into the EOL Period

6   set forth in Section 16(d)." SAA at 83 (8th Am. §1). It is in this basket that RingCentral places all

7   of its eggs. It argues: "before the end of the SAA's 2020 term, RingCentral 'invoked the provisions

8   of the SAA to begin an "end of life" period,' Dkt. 1 ¶ 18, thereby 'defer[ring] the effective date of

9   termination' to ███████████[.]" Mot. at 1. This argument conflates the final "termination" of the

10  SAA, which occurs when the EOL Period ends, and the "Term," which expired when the EOL

11  Period began. Of course RingCentral "deferred the ultimate termination" of the agreement when

12  it invoked the EOL Period; the SAA would have terminated for all purposes at the end of the Term

13  otherwise. *See* SAA at 83 (8th Am. § 1). But this is ultimately irrelevant because nothing in the

14  SAA extends the license or "Provision" obligations of Sections 2(a) or (b) into the EOL Period.

15         Moreover, RingCentral's selective quotation omits critical language that is fatal to its

16  cause. Section 16(d), as amended in the 4th Amendment to the SAA, reads as follows:

17         **End of Life**. RingCentral may, in its sole discretion, defer the effective date of
       termination by up to ████████████  from the end of the Term *in order to*
18     *transition Customers to an alternative to the Service* (the "EOL Period").

19  *Id.* at 68 (4th Am. § 15(b)) (amending §16(d)). This provision does not, as RingCentral would

20  have it, defer the effects of termination for all purposes. Rather, it states expressly that the purpose

21  of deferral is "*to transition Customers to an alternative to the Service*," and even defines "EOL

22  Period" by incorporating this express purpose. *Id.*

23         RingCentral argues against this explicit purpose in alternating and inconsistent ways.

24         In its counterclaims, RingCentral first contends that "'the purpose' of the EOL Period is

25  irrelevant." Dkt. 11 ("Counterclaims") at 10. But that is not the law. California law requires that

26  a "contract must be so interpreted as to give effect to the mutual intention of the parties as it existed

27  at the time of contracting." Cal. Civ. Code § 1636; *see also CopyTele*, 962 F. Supp. 2d at 1137.

28  Moreover, California law establishes that when one proposed interpretation is consistent with the

stated purpose of the agreement, whereas a competing interpretation is inconsistent, the consistent construction governs as the one intended by the parties.  *Falkowski v. Imation Corp.*, 132 Cal. App. 4th 499, 512 (2005) ("[P]laintiffs' interpretation would run counter to [the stated purpose of retaining employees], while defendants' interpretation is consistent with them. Accordingly, we must conclude that defendants' interpretation was the one intended by the parties."); *see also Nicholson v. Thrifty Payless, Inc.,* 819 Fed. App'x 559, 560 (9th Cir. 2020) (rejecting interpretation that contradicted agreement's "stated purpose").

In its motion, RingCentral argues that the purpose of the "in order to transition Customers to an alternative to the Service" language in Section 16(d) was to give RingCentral a full ███ to "transition its sales pipeline" from Zoom to RingCentral's RCV product; 6 months from the notice period plus ███████ from the EOL Period.  Mot. at 5, 11.  But this is exactly what the six-month notice period was for, and nothing in the SAA extends that notice period further.  If RingCentral were correct, and the EOL Period was somehow the extension of the notice period by a factor of three, **then there would be no need for a notice period to begin with**—the parties could have just agreed that, ███████ after written notice of an intent not to renew, the Term would end and the Agreement would be over for all purposes.  But of course that is not what the SAA says; instead, as shown above, it lays out (1) the Term, (2) the six month notice period providing RingCentral with ample time to adjust its business before the Term expires, and (3) the EOL Period during which Zoom must continue to service existing customers, RingCentral must transition those existing customers, but no new customers should be signed up.  *See* Figure above.  The SAA also does not say that the purpose of the EOL Period is to help RingCentral manage its sales pipeline— indeed the SAA never mentions a sales pipeline at all.  Nor does it say that the purpose of the EOL Period is to permit RingCentral "to continue to sell the Service to new customers" or to prevent Zoom from "gain[ing] a competitive advantage over RingCentral."  Counterclaims ¶ 25.[3] RingCentral's reimagining of the SAA to say otherwise should thus be given no weight.

---

[3] It is worth noting that RingCentral admits that the real issue here is not that it "needs time to build up its pipeline," as if there were some phantom enormous lead time in the software products at issue, but "because some customers will believe that RCV is not an acceptable substitute for RCM, RingCentral will also lose a number of customers…."  Mot. at 14.  In other words, RingCentral just wants to be able to sell two products instead of one.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1    Particularly here, where the actual purpose (to transition customers to an alternative service) is

2    expressly stated in the substantive provisions at issue and is the only interpretation that it is

3    consistent with the rational application of the plain language and the clear intent of the parties.

4           Then, in its motion, RingCentral contends that other language in the SAA confirms that the

5    parties agreed to grant RingCentral an unfettered license to continue selling Zoom products for a

6    full ███████ after the Term expired. Mot. at 9. But the language of the SAA as a whole supports

7    Zoom's interpretation of the SAA and refutes RingCentral's.

8           First, the other provisions of Section 16 on which RingCentral relies are of no moment.

9    When the SAA notes that "[a]t the end of the initial term and each renewal term, this Agreement

10   shall automatically renew for successive, additional one (1) year terms," (Mot. at 8, citing SAA §

11   16(a)), it proves **Zoom's** point. This language shows that the Term of the SAA "ends" unless

12   renewed (it was not). The same is true for the language RingCentral highlights stating that

13   "following **the end of the Term** the Agreement shall enter into the EOL Period set forth in Section

14   16(d)." Mot. at 8. In emphasizing the language in Section 16(d) stating that "Zoom shall continue

15   to provide the Service" during the EOL Period, RingCentral ignores that the sentence goes on to

16   say "in accordance with this Agreement during this time…" (SAA at 12 (§ 16(d))—the SAA makes

17   clear, as shown above, that "during this time" the Term has ended, the license to sell has expired,

18   and the EOL Period is in effect, *see id.* Accordingly, while Zoom continues to have obligations to

19   "provide the service" to customers who signed up *before* the Term of the SAA expired (and has

20   the right to be paid for that service), it has no obligations to provide the service to *new* customers

21   RingCentral signs up during the EOL period as discussed above. *Id.* at 12 (§ 16(f)). Any such new

22   customers should be signed up to RCV, RingCentral's alternative service, during this period. The

23   same is true for the remainder of §16(d) requiring Zoom to "comply with the SLAs" and noting

24   that "[t]his Agreement shall be deemed to continue to remain in effect through the EOL Period."

25   *Id.* (§ 16(d)). Both parties have ongoing rights and obligations as set forth in the SAA, which

26   remain in effect during the EOL Period, including all of the rights and obligations concerning

27   existing customers, which remain in full force during the EOL Period. But, with the exception of

28   the provision of SDKs and APIs and a few other specified obligations discussed further below, the

1   Agreement is clear in establishing that RingCentral's license to sell (and Zoom's obligation to

2   provide) Zoom products to new customers expired with the end of the Term on January 31, 2021.

3        Notably, RingCentral ignores other provisions of Section 16 that cannot be squared with

4   its argument.  For one, as mentioned above, the parties expressly agreed that Zoom would be paid

5   for any services provided during the EOL Period.  *Id.* ("[D]uring this time [the EOL Period]" Zoom

6   "shall be entitled to any amounts due for use of the Service.").  If the EOL Period were just an

7   extension of the Term, this provision (and, indeed, the entire existence of the EOL Period) would

8   be entirely unnecessary, redundant, and superfluous—a result the Court should avoid in construing

9   the SAA as discussed in detail below.  *See ASARCO, LLC v. Union Pac. R. Co*., 765 F.3d 999,

10  1009-10 (9th Cir. 2014) (rejecting interpretation that rendered language superfluous); *see also*

11  *Fremont Indem. Co. v. California Nat. Physician's Ins*. *Co.*, 954 F. Supp. 1399, 1403–4 (C.D. Cal.

12  1997) (rejecting interpretation that would render a term superfluous).

13       Moreover, presumably because it has no explanation that is consistent with its theory,

14  RingCentral ignores entirely the language of Section 16(f) discussed above which expressly lays

15  out that, during the EOL Period, Zoom must only ensure that customers "who obtained a version

16  of the Service available ***prior to the end of the Term*** may continue to use the Service after the

17  term."  SAA at 13 (§ 16(f)).  Curiously, RingCentral argues that if "Zoom were right about the

18  SAA," the SAA would say that "Zoom must only honor Customer Agreements in effect at the start

19  of the EOL Period."  Mot. at 12.  But, ***that is exactly what the SAA says***.  *See* SAA  at 13 (§16(f)).

20       In short, the language relied upon by RingCentral ultimately establishes the unremarkable

21  point that the SAA remains in effect during the EOL Period.  But that means ***all of the Agreement***,

22  including the language that limits the license to the Term, that limits Zoom's obligations to those

23  who purchased "prior to the end of the Term," and, as discussed in the next section, that repeatedly

24  and consistently calls out obligations that extend beyond the Term and into the EOL Period.

25          **c.**    **RingCentral's Interpretation Contradicts the Parties' Intent,**
     **Ignores the Plain Language of the Agreement, and Renders**

26             **Numerous Provisions Superfluous**

27       The fundamental error in RingCentral's conflation of the Term, the notice period, and the

28  EOL Period (so as to make the notice period useless and the EOL Period indistinguishable from

the Term) runs counter to numerous other provisions of the SAA.  As shown below, throughout the SAA the parties expressly and consistently distinguished between the rights and responsibilities that extend into the EOL Period and those that do not.  RingCentral's rights to sell Zoom products to new customers is plainly one that does not.

For example, in describing the license granted by Zoom to RingCentral for APIs and SDKs, the SAA expressly notes that that license shall extend "during the Term **and EOL Period**."  SAA at 70 (4th Am. § 18(b)).[4]  If RingCentral's interpretation of the SAA were correct (and all licenses automatically extended into the EOL Period), this language would be entirely redundant, unnecessary, and superfluous.  *ASARCO,* 765 F.3d at 1009-10; *see also Brandwein*, 218 Cal. App. 4th at 1507  ("[W]e strive to interpret the parties' agreement to give effect to all of a contract's terms, and to avoid interpretations that render any portion superfluous, void or inexplicable.").

This is not a one-off passing reference that could be chalked up to error or carelessness. Rather, the parties deliberately established which specific obligations extended into the EOL Period, and, by omission, which did not.  This is seen in at least the following places in the SAA:

- 3rd Am. § 11(d):  "For the avoidance of doubt, the foregoing revenue-share terms may not be modified during the Term **or the EOL Period** except by mutual written agreement of the Parties."

- 4th Am. § 11(a):  "Zoom agrees to deploy and host BCS and XMPP servers for the Term **and EOL Period** as follows."

- 4th Am. § 18(f):  "at all times during the Term **and EOL Period**, the Zoom APIs and SDKs will function on the Required Platforms."

- 4th Am. § 18(h):  "During the Term **and EOL Period**, Zoom shall provide reasonable documentation to RingCentral and its Affiliates to assist in the use, support, debugging, and integration of the Zoom SDK into the Integrated Applications."

---

[4] An API is an Application Programmers Interface—software that enables Zoom's products to interoperate with other software programs.  SDK stands for Software Developer's Kit and is essentially a set of tools that allow Zoom customers to develop their own applications using Zoom products.  As noted by RingCentral, Zoom's SDKs and APIs are necessary to "integrate access to the Service into RingCentral websites and other products," and RingCentral would not be able to provide any Service, even to existing Customers, without them.  *See* Mot. at 12 (explaining that "the Zoom APIs and SDKs are *part of how* RingCentral integrates Zoom's service with RingCentral's service and have no utility to RingCentral outside of that context…").  As explained below, this is one reason the parties extended the license for these components, but not others, into the EOL Period.

- 8th Am., Sched. A7-1 at § 1.16:  "'Termination Date' means the last day of the Term (or, if RingCentral elects an EOL Period under Section 16(d) of the Agreement, the last day of *the EOL Period*)."

The same distinction carried forward into July of 2020 when the parties entered into a separate agreement to resolve other disputes.  Zahoory Decl. Exh. B ("July Agreement").  In that Agreement, too, the parties recognized the clear distinction between the Term and the EOL Period and were explicit when extending any obligations into the EOL Period.  *See, id.* at § 3 ("[A]ny version of the Service provided to RingCentral under the SAA and released to RingCentral in the ordinary course during the remainder of the Term *and EOL Period* shall have at least the same material features and functions as the business and personal versions of the Service offered by Zoom generally to customers ('Feature Parity')."); *id.* (agreeing to extend Zoom's obligations to provide support for existing customers into the EOL Period).  Once again, if RingCentral's core contention were correct, these obligations would flow into the EOL Period automatically, there would be no need for an EOL Period at all, and the language in the July Agreement would be meaningless and superfluous.  This interpretation cannot stand.  *ASARCO,* 765 F.3d at 1009-10; *Brandwein*, 218 Cal. App. 4th at 1507.

Contrasted with these repeated and carefully delineated distinctions between provisions that extend past the Term and into the EOL Period, it is striking that RingCentral does not—and cannot—cite any similar language extending its license to "sell" the service to new customers into the EOL Period.  There is no such language, because there was no such agreement.  Put differently, had the parties intended to extend RingCentral's rights to sell Zoom products into the EOL Period, surely they would have said so just as they did for SDKs, APIs, documentation, webinar functionality, referrals, revenue sharing, and feature parity.  Instead, the SAA provides that RingCentral's licenses extend for "the term," without any reference to the EOL Period. SAA at 2 (§ 2(a)) (providing that RingCentral's license to sell runs only "for *the term* of this Agreement"); *see also id.* (§ 2(b)) ("Throughout *the term* of this Agreement, Zoom shall provide the Service.").

### d.    RingCentral's Interpretation Would Lead To Absurd Results

RingCentral's faulty interpretation would lead to absurd results that cannot be justified.  *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 809, 842 (2007) ("The interpretation of a

1   contract 'must be fair and reasonable, not leading to absurd conclusions.'"); *United States v. Irvine*,

2   756 F.2d 708, 710 (9th Cir. 1985) ("The language of the contract is to be read as a whole and given

3   a reasonable interpretation . . . not an interpretation that would produce absurd results.").

4         As discussed above, RingCentral argues that it has the unilateral right to extend the notice

5   period from 6 months to ██, and so to extend the SAA for all purposes by a full year and a half.

6   From that, RingCentral contends that it not only has the right to sign new customers throughout

7   the "End of Life Period," but that it has an unfettered right to sign contracts *of any term* that Zoom

8   is then required to continue to service indefinitely.  Mot. at 12 ("Zoom must honor the **entire term**

9   of Customer Agreements entered into prior to termination of the SAA … regardless of whether

10  those terms end before or after the SOL [*sic*] Period").   Taken to its logical conclusion,

11  RingCentral's faulty read of the SAA would permit it to sign a new customer to a 20-year contract

12  on ██████████—the day before it says its license to sell to new customers expires—and Zoom

13  would then be compelled to provide Zoom products, support, and service to that customer, against

14  its will, until ███.  This is plainly not what the SAA says, not what Zoom ever would have agreed

15  to, and the exact type of quintessential absurd results the law proscribes.

16        In fact, the SAA actually precludes RingCentral from binding Zoom to service agreements

17  that extend past the final termination of the EOL Period on ██████████.  SAA § 16(e) ("Upon

18  termination of this Agreement, all licenses granted hereunder will immediately terminate."); *id*. at

19  § 4 ("RingCentral may not obligate Zoom to any agreements, contracts, terms, conditions,

20  obligations or warranties.").  Because any RingCentral customer agreements for Zoom products

21  necessarily cannot continue past ██████████, under RingCentral's interpretation it could sell

22  Zoom products to a new customer on the very last day of the EOL Period, only to have to switch

23  that customer to RCV or some alternative on the very next day.  This too is an absurd result that

24  would harm RingCentral's unsuspecting new customers, and makes clear RingCentral is wrong.

25                                        *   *   *

26        In sum, the plain reading of the SAA confirms Zoom's interpretation and refutes

27  RingCentral's.   RingCentral already had 6 months to convert its sales pipeline, to ready its

28  alternative product (which it launched months before Zoom even gave notice), and to do whatever

else it needed to do to compete with Zoom post-Term.  Now that the Term has expired and the parties are in the separate and discrete EOL Period, RingCentral's license to sell Zoom products has expired and it is in breach with every new customer it signs up.  This is all dictated by the plain language of the SAA and the clear intent of the parties.  But, even if the Court were to find the SAA ambiguous on this dispositive point—and Zoom maintains that the SAA unambiguously compels its interpretation and that RingCentral's interpretation is not reasonable—RingCentral's motion still must be denied.  *See Int'l Precision Prod.*, 2014 WL 12573363, at *3 (denying preliminary injunction based on a finding that "the Sales Agreement is 'not a model of clarity.'"); *see also Mastro*, 2009 WL 1993772, at *4 (contractual ambiguity "weighs against a finding that Petitioners have met the high burden necessary for preliminary injunctive relief").

For these many consistent and independent reasons, RingCentral's interpretation is not supportable, much less unambiguously correct, and it therefore falls far short of shouldering the heavy burden required to prove a "likelihood of success on the merits."

### 2.    RingCentral Cannot Demonstrate Irreparable Harm

RingCentral has failed to meet its heavy burden of showing any specific and imminent harm, proffering unsupported conclusions and attorney argument which fail as a matter of law. And, to the extent it has categorized any particular harms in its motion, such harms are fully compensable in damages and so insufficient to support RingCentral's motion.

"Irreparable harm is arguably the single most important prerequisite for the issuance of a preliminary injunction." *KCG Americas LLC v. Zhengquan Zhang, No*. 5:17-CV-01953-EJD, 2017 WL 8294011, at *2 (N.D. Cal. Apr. 10, 2017) (Davila, J.); *Dollar Rent a Car of Wash., Inc. v. Travelers Indem. Co*., 774 F.2d 1371, 1375 (9th Cir. 1985); *Swarmify, Inc. v. Cloudflare, Inc.,* No. C 17-06957 WHA, 2018 WL 1142204, at *6 (N.D. Cal. Mar. 2, 2018) ("failure to show a likelihood of irreparable harm is a showstopper").[5]

---

[5] RingCentral misstates the standard when it claims that "'Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.'"  Mot. at 14 (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001)).  "The Ninth Circuit's 'possibility' of irreparable harm standard as applied in *Stuhlbarg* was explicitly overruled by the Supreme Court in *Winter*." *ET Trading, Ltd. v. ClearPlex Direct, LLC*, 2015 WL 913911, at *3 (N.D. Cal. Mar. 2, 2015).

1     "Irreparable injury is an injury that is not remote or speculative, but actual and imminent

2  and for which monetary damages cannot adequately compensate." *Dotster, Inc. v. ICANN*, 296 F.

3  Supp. 2d 1159, 1162 (C.D. Cal. 2003).   Importantly, a movant must show more than mere

4  "subjective apprehensions and unsupported predictions."   *Caribbean Marine Servs. Co. v.*

5  *Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).   "Purely economic harms are generally not

6  irreparable, as money lost may be recovered later, in the ordinary course of litigation." *Idaho v.*

7  *Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (citing *Sampson v. Murray*, 415 U.S.

8  61, 61–62, 89–92 (1974)).

9     In its brief, RingCentral spends little more than a page to prove up this critical factor, likely

10  because there was little for it to say on the subject.   Ultimately, RingCentral can do no more than

11  proffer a handful of vague, conclusory, and unsupported allegations of harm, none of which passes

12  muster to support the extraordinary and drastic relief of a preliminary injunction.

13     As an initial matter, RingCentral's claims that it is suffering dire irreparable harm

14  contradicts its multiple public statements stating the opposite.   For example, just last week, after

15  convincing the Court to enter the TRO in this case, RingCentral made a public statement that it

16  really only seeks to keep Zoom's service as one option for its customers, and that most of its new

17  customers have already transitioned to its alternative RCV product:   "While the majority of our

18  new customers are choosing RingCentral Video, we believe in giving customers choices."

19  Zahoory Decl., Exh. C ("RingCentral Gets Temporary Court Approval to Keep Reselling Zoom

20  Software"); *see also id.* (analyst stating that the "risks to Ring from the lawsuit appear limited and

21  that most of the company's distribution partnerships are focused on reselling RingCentral Video,

22  and not the Zoom-based meetings product.").   As another example, on January 19, 2021,

23  RingCentral sent its partners an "Important Announcement" stating that RingCentral "will soon

24  be transitioning customers currently on RingCentral Meetings over to RingCentral Video." *Id.*

25  Exh. A (RingCentral Announcement).   Contradicting its arguments here that it is not ready and is

26  lacking crucial features, RingCentral then went on to tout its RCV product as "the best possible

27  video meeting experience," and as providing "a number of features not available with RingCentral

28  Meetings." *Id.*   Similarly, when describing the transition to RCV on its webpage, RingCentral

1    boasted "Your video meetings are about to get even better." *Id.* Exh. D (RingCentral webpage).

2    In its February 16, 2021 earnings call, RingCentral announced that "right now every customer who

3    we acquire new defaults to RingCentral Video." *Id.* Exh. E at 14 (February 16, 2021 Earnings

4    Call).   Even 7 months ago, in its August 3, 2020 earnings call RingCentral was already telling the

5    public that "most new customers are now getting RCV [RingCentral Video]," and that "we expect

6    [the] overall customer base to migrate from RingCentral Meetings, which is powered by another

7    provider, to migrate to RCV over time." *Id.* Exh. F at 9 (August 3, 2020 Earnings Call).  That was

8    over seven months ago, and yet RingCentral still looks to sell Zoom's product to new customers

9    instead of providing them with its replacement product, RingCentral Video.  The only explanation

10   for this is that, despite its public assertions to the contrary, RingCentral has recognized that its own

11   service is inferior to Zoom's product and so it looks to hold onto Zoom's product for as long as it

12   possibly can, despite the expiration of the needed licenses.

13       Further, RingCentral alleges vaguely that "because *some* customers will believe that RCV

14   is not an acceptable substitute for RCM, RingCentral will also lose *a number of* customers who

15   will decide, instead, to purchase their communications services from another vendor or directly

16   from Zoom." Mot. at 14; *see also id.* ("*Many* customer deals and contract extensions….").

17   Similarly, RingCentral alleges that it will lose an unspecified amount of business from "*classes of*

18   *customers* who require features that are presently unavailable in RCV, such as Webinar

19   capability." *Id.* at 14-15.  In this way, RingCentral leaves the Court to guess how many customers

20   RingCentral has actually lost or is likely to lose, and whether that number is in truth merely a small

21   handful.  This alone should doom RingCentral's motion.[6]  *See, e.g., Caribbean Marine Servs. Co.*

22   *v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Subjective apprehensions and unsupported

23   predictions . . . are not sufficient to satisfy a [movant's] burden of demonstrating an immediate

24   threat of irreparable harm."); *Café Found., Inc. v. Seeley*, No. 16-CV-00628-JST, 2016 WL

25   1258624, at *7 (N.D. Cal. Mar. 31, 2016) ("A moving party cannot merely produce evidence of

26

27

28
_____

[6] Later, RingCentral alleges in equally speculative terms that Zoom's technological measures "threaten to block" customers who bought RCM before January 31, 2021.  Mot. at 16.  But RingCentral offers no evidence for this, and its bare attorney argument should not be credited.

'unsupported and conclusory statements regarding harm [a movant] might suffer'").[7]

The Makagon declaration RingCentral submitted in support fares no better. Ms. Makagon refers to only *two* customers (neither identified by name) whom she claims have even expressed concern about being shut off from purchasing RCM and having to transition to RCV instead, but makes no representation that RingCentral actually lost their business. Makagon Decl. ¶ 14. Beyond that, Ms. Makagon follows the blueprint in RingCentral's brief, making vague and conclusory claims that unspecified "customers have been upset," *id.* "[c]ustomer deals and contract extensions … have been in process for months," *id.* ¶ 19, and "Zoom's conduct will prevent RingCentral from winning new business from customers who require features that are presently unavailable in RCV," *id.* ¶ 20. Here too, the court should reject these conclusory allegations as pure speculation and conjecture. *Caribbean Marine,* 844 F.2d at 674; *Café Found.*, 2016 WL 1258624, at *7; *see also Am. Passage Media v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) ("Conclusory affidavits are insufficient to demonstrate irreparable harm.").

Moreover, the harm RingCentral alleges is not irreparable at all; it is compensable in damages (assuming for the sake of argument that any relief is available to RingCentral in the first place). *See, e.g., Amylin Pharm., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 678 (9th Cir. 2011) ("lost profits due to lost sales generally constitutes the type of harm that is fully compensable through money damages and therefore does not support injunctive relief."); *CSNK Working Cap. Fin. Corp. v. Baxter, Bailey & Assocs., Inc.*, No. 5:16-CV-04234-EJD, 2016 WL 9176328, at *3 (N.D. Cal. Aug. 19, 2016) (J. Davila) (damages for harm caused by interference with contractual relations can be fully compensable by an award of monetary damages).[8] In fact, RingCentral

---

[7] *See also, Ojmar*, 2017 WL 2903143, at *3 (rejecting irreparable harm argument when movant "fail[ed] to provide any non-conclusory statements as to how the exclusivity contracts will damage its reputation or customer goodwill"); *Freedom Mortg. Corp. v. Madariaga*, No. 219CV2432MCEDBPS, 2020 WL 6798062, at *3 (E.D. Cal. Nov. 19, 2020) ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").

[8] *See also Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (temporary loss of revenue not irreparable injury); *Bell Atl. Bus. Sys., Inc. v. Storage Tech. Corp.*, No. C-94-0235 MHP, 1994 WL 125173, at *3 (N.D. Cal. Mar. 31, 1994) (loss of customers and resulting loss of revenue not irreparable); *Int'l Medcom, Inc. v. S.E. Int'l, Inc.,* No. 15-CV-03839-HSG, 2015 WL 7753267, at *5 (N.D. Cal. Dec. 2, 2015) ("the loss of business relationships is an economic harm that can be valued."); *Ojmar*, 2017 WL 2903143, at

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1   agrees that its loss of access to Zoom products could be remedied through a monetary payment.

2   *See* SAA at 33-34 (Exh. G § 6) (requiring Zoom to provide RingCentral with "Non-Performance

3   Compensation" in case of "failure of the Zoom Network resulting in RingCentral or any Customer

4   being unable to use the Service").[9]

5          Last, RingCentral argues vaguely that Zoom's conduct will have a "negative impact on

6   RingCentral's reputation and standing with customers and prospective customers" who "require

7   features that are presently unavailable in RCV, such as Webinar capability" and Breakout rooms.

8   Mot. at 5, 14.  But here again this cannot be squared with RingCentral's public statements to the

9   contrary, and RingCentral's lack of support or specificity is fatal to its claim of irreparable harm.

10  *See, e.g., Ojmar US, LLC v. Sec. People, Inc*., No. 16-CV-04948-HSG, 2017 WL 2903143, at *3

11  (N.D. Cal. July 7, 2017); *Ebates Performance Mktg., Inc. v. Integral Techs., Inc*., No. 12-CV-

12  06488-YGR, 2013 WL 75929, at *2 (N.D. Cal. Jan. 4, 2013) (loss of reputation or erosion of trust

13  not irreparable without evidence that it could not be regained).

14         In sum, RingCentral offers little more than bald attorney argument and a conclusory

15  affidavit that each fall far short of the high bar RingCentral was required to meet.  Consequently,

16  RingCentral's motion should be denied for failure to establish irreparable harm.

17     **3.     The Balance of the Equities Tips Sharply in Zoom's Favor**

18         RingCentral's contention that Zoom will suffer "no harm" is false.  Rather, if an injunction

19  were to issue, Zoom would suffer greater harm than RingCentral alleges it would experience in

20  the absence of an injunction.

21         It is RingCentral, in fact, that is harming Zoom.  As set out in Zoom's complaint,

22  RingCentral has been using Zoom as the bait in a bait-and-switch scheme that leverages Zoom's

23

24  *3 ("loss of prospective business opportunities is generally an economic harm that can be valued
    and compensated upon later success at trial.").

25  [9] In the rare instances courts find irreparable injury because of a loss in revenue, it is where the
    lost revenue threatens the movant's *entire business*.  *See Am. Passage Media Corp.*, 750 F.2d at

26  1473 ("Without a sufficient showing that these contracts threatened [movant's] existence, any loss
    in revenue due to an antitrust violation is compensable in damages"); *Ojmar*, 2017 WL 2903143

27  at *3 (declining sales and expected loss insufficient to establish irreparable harm where they did
    not establish a "threat to the company's short-term survival").  RingCentral claims no such threat

28  here, nor could it.

brand, Zoom's goodwill, and the quality and features of Zoom's technology to get customers into RingCentral's door while, at the same time, openly disparaging Zoom's products and business and competing directly with Zoom.

To this end, RingCentral has invoked confidentiality and non-competition provisions in the SAA to contend that Zoom cannot discuss publicly the fact that Zoom elected not to renew the SAA and to bar Zoom from competing for RingCentral's customers, all the while maintaining that RingCentral somehow has free rein to say whatever it wants about the partnership and to make every effort to steal away Zoom's customers.  As one example, RingCentral has sought to compel Zoom to adhere to Section 3(d) which reads as follows:

> **Customer Contact by Zoom Prohibited.**  Contact by Zoom of Customers in any form, direct or indirect, including but not limited to face-to-face contact, telephone contact, e-mail contact, and written contact, is prohibited unless RingCentral first provides written consent in its sole discretion.  Zoom's failure to comply with this Section 3(d) will be considered a material breach of this Agreement, and RingCentral may, in addition to remedies available under this Agreement and in law or equity, immediately terminate this Agreement.  Notwithstanding the foregoing, Zoom is free to communicate with persons, who may include Customers, to the extent Zoom has acquired contact information for such persons independently of this Agreement, provided that Zoom shall not knowingly attempt to convert Customers from RingCentral to Zoom.

SAA at 3 (§ 3(d)).  Leveraging this constraint, RingCentral has concealed the fact that the SAA was not renewed by Zoom, falsely suggesting instead that RingCentral is transitioning customers to RingCentral Video for illusory quality or feature-based reasons.  *See* Zahoory Decl., Exhs. A, D.  And for new customers that the parties are competing over, RingCentral is claiming Zoom cannot discuss the status of the SAA or its end date because this would reveal its "business information."  *See* RingCentral's Administrative Motion to Seal, Dkt. 13 at 8-9; *see also* Makagon Decl., Exh. 5.  These statements are belied, of course, by this motion and by RingCentral's insistence on continuing to sell Zoom's products despite having its own available alternative.

Moreover, given Zoom's obligations to provide feature parity to RingCentral, a preliminary injunction would leave Zoom in the inequitable position of having to continue to improve RingCentral's product offering by providing RingCentral's new customers with feature updates for the duration of the injunction, all while RingCentral admittedly will continue to work furiously

1    to add features to its own product with the intent of improving its competitive position against

2    Zoom.  This posture is unfair to Zoom, and is unwarranted as a consequence of preliminary relief.

3          Maintaining this status for the months, or years, it will take to get this case through trial,

4    would unjustly harm Zoom and force it to remain in business with a company that affirmatively

5    tarnishes its reputation, brand, and goodwill in the marketplace.  And it would permit RingCentral

6    to perpetuate misinformation in its efforts to confuse customers and the public at large about

7    whether they are getting Zoom or RingCentral products, about the timing during which Zoom

8    products will be available through RingCentral, and about the reasons RingCentral will ultimately

9    be unable to continue to sell Zoom products.  This is true irreparable harm, and Zoom respectfully

10   asks the Court to put a stop to it.  *Qualcomm Inc. v. Compal Elecs., Inc*., 283 F. Supp. 3d 905, 924

11   (S.D. Cal. 2017) (denying prelim. injunction because "Qualcomm is [not] the only party facing

12   hardship" and "[g]ranting Qualcomm the relief that it seeks would effectively require the Contract

13   Manufacturers to make royalty payments that they dispute as illegal and anticompetitive.").

14       **4.     The Public Interest Weighs In Zoom's Favor**

15         RingCentral's request for preliminary injunction is antithetical to the public interest.

16   RingCentral's only argument that its requested injunction would serve the public interest is that

17   "[t]he public 'has a strong interest in holding private parties to their agreements,'" and "it is in the

18   public interest to prevent a party that has not obtained a judgment to take coercive actions as if it

19   had a judgment." Mot. at 17.  But this assumes that RingCentral's interpretation of the SAA is

20   correct (it is not) and ultimately cuts both ways—the interest "in holding private parties to their

21   agreements" is exactly why this Court should deny RingCentral's request and hold it to the plain

22   language of the SAA as set forth above.

23         In addition, RingCentral's interpretation of the SAA, which it admits is meant to prevent

24   Zoom from "gain[ing] a competitive advantage over RingCentral," Counterclaims ¶ 25,

25   undermines the public's interest in fair and open competition. *See, e.g.*, *Regents of Univ. of Cal. v.*

26   *Am. Broad Companies, Inc.*, 747 F.2d 511, 521 (9th Cir. 1984) (from "the Supreme Court's

27   perspective, the public interest is served by preserving the competitive influence of consumer

28   preference"); *Egg Works, Inc. v. Egg World, LLC*, No. 2:10–cv–1013–LDG (RJJ), 2010 WL

1    3724206, *9 (D. Nev. Sept. 14, 2010), *aff'd*, 434 Fed. App'x 578 (9th Cir. 2011) (the public interest

2    factor "favors competition"); *Fid. Brokerage Servs. LLC v. McNamara*, No. 11 CV 1092 MMA

3    RBB, 2011 WL 2117546, at *7 (S.D. Cal. May 27, 2011); *see also Sarieddine v. D & A Distrib.,*

4    *LLC*, No. CV172390DSFMRWX, 2017 WL 6940537, at *6 (C.D. Cal. July 13, 2017)  (denying

5    injunctive relief where the request "strike[s] the Court as particularly anti-competitive").

6             Further, RingCentral's requested relief undermines the ability of consumers to make

7    informed choices, which is a significant matter of public concern.  Specifically, as discussed above,

8    RingCentral attempts to muzzle Zoom to prevent it from responding to RingCentral's false

9    statements about quality and features, to conceal from the public's view the end-date of the Term

10   and the EOL Period, and to sign up customers who desire the Zoom service for long-term

11   RingCentral contracts despite knowing it will be unable to provide those services to the customers

12   after the EOL Period.  These actions flatly contradict the public interest.  *See, e.g., Feldenkrais*

13   *Guild of N. Am. v. Wildman*, No. 18-CV-2340-YGR, 2018 WL 2331905, at *6 (N.D. Cal. May 23,

14   2018) (explaining that the "public has a right to choose services knowing that they are not being

15   misled as to whether those services are offered by parties authorized by FGNA to hold themselves

16   out as being associated with the FGNA."); *see also id.* ("The public interest favors issuance of a

17   preliminary injunction to protect the public from being harmed or deceived by defendants

18   representing their services as authorized by, certified by, endorsed by, or associated with FGNA").

19            Ultimately, RingCentral's intention is to ride out the EOL Period to corner as many

20   customers in the market before the truth is revealed, while simultaneously restricting Zoom from

21   even entertaining a phone call from a RingCentral customer considering making a switch.  This

22   unfairly prohibits customers from making informed choices, and unreasonably restricts customers

23   from seeking services from RingCentral's competitor.  This true status quo runs strongly counter

24   to the public interest and should be stopped.  *See Facebook v. BrandTotal Ltd.*, 2020 WL 6562349,

25   at *18 (actions that were "deceptive" or that "misled users" were against the public interest).

26   **III.       CONCLUSION**

27            For the foregoing reasons, Zoom respectfully asks the Court to deny RingCentral's motion

28   for preliminary injunction.

Dated:  March 23, 2021                          LATHAM & WATKINS LLP


                                                By */s/ Douglas E. Lumish*
                                                   Douglas E. Lumish
                                                   Matthew Rawlinson
                                                   Jennifer Barry
                                                   Arman Zahoory
                                                   of Latham & Watkins LLP

                                                *Attorneys for Plaintiff*
                                                *Zoom Video Communications, Inc.*