CLEMENT SETH ROBERTS (SBN 209203)
croberts@orrick.com
KAREN G. JOHNSON-MCKEWAN (SBN121570)
kjohnson-mckewan@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     +1 415 773 5700
Facsimile:      +1 415 773 5759

ROBERT L. URIARTE (SBN 258274)
ruriarte@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94021
Telephone:  +1 650 614 7400
Facsimile:  +1 650 614 7401

*Attorneys for Defendant*
*RingCentral, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZOOM VIDEO COMMUNICATIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> RINGCENTRAL, INC., <br><br> Defendant. | Case No. 4:21-cv-01727-DMR <br><br> **RINGCENTRAL, INC.'S EX PARTE MOTION FOR (1) TEMPORARY RESTRAINING ORDER AND (2) ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| RINGCENTRAL, INC., <br><br> Counterclaimant, <br><br> v. <br><br> ZOOM VIDEO COMMUNICATIONS, INC. <br><br> Counterdefendant. | Proposed Date:     March 17, 2021 <br> Proposed Time:     10:00 a.m. <br><br> **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

1   **TO THE CLERK OF THE COURT, ALL PARTIES, AND THEIR ATTORNEYS**

2   **OF RECORD:**

3       **PLEASE TAKE NOTICE**, that on March 17, 2021, at 10:00 a.m., or as soon thereafter

4   as the matter may be heard in United States District Court located at Oakland Courthouse,

5   Courtroom 4 – 3rd Floor; 1301 Clay Street, Oakland, CA 94612, Counterclaimant RingCentral,

6   Inc., will and hereby does move *ex parte*, pursuant to Local Rules 7-10 and 65-1, and Federal

7   Rules of Civil Procedure 26 and 65, for:

8       (1) a temporary restraining order enjoining Zoom Video Communications, Inc. ("Zoom")

9   from blocking activation of RingCentral customers, including (i) technological steps blocking the

10  provisioning API calls from RingCentral or its customers to Zoom;  (ii) technological steps

11  blocking API calls to Zoom's servers for provisioning test accounts from RingCentral or from its

12  customers; and (iii) any other technological steps designed to block, impair, or impede RingCentral

13  or its customer from accessing the service under the SAA; and

14      (2) an order to show cause why a preliminary injunction should not issue, pursuant to

15  Federal Rule of Civil Procedure 65, enjoining Zoom, its officers, agents, directors, affiliates,

16  servants, employees, and all persons acting in concert with it, from directly or indirectly

17  committing the above-described conduct during the pendency of this action.

18      Good cause exists for issuance of a temporary restraining order and order to show cause

19  for entry of a preliminary injunction in this case because Zoom's conduct is unlawful and is

20  designed to cause, and is causing, irreparable harm to RingCentral.  The hearing on this motion is

21  noticed for March 17, 2021, at 10:00 a.m. due to the exigent circumstances.  RingCentral

22  respectfully requests that, due to the nature of the expedited relief required and urgent need to

23  prevent further ongoing harm to RingCentral, this motion be heard at the Court's earliest

24  convenience.  Counsel for RingCentral provided Zoom with notice of this *ex parte* Motion on

25  March 15, 2021, pursuant to Local Rule 65-1(b).  RingCentral is also serving Zoom with a copy

26  of the pleadings, this motion, and all related papers in support thereof.  This motion is based on

27  this motion, the Memorandum of Points and Authorities and supporting materials attached thereto,

28  all papers on file, matters subject to judicial notice, and any oral argument the Court may hear.

**TABLE OF CONTENTS**

Page No.

INTRODUCTION ..................................................................................................- 1 -
FACTUAL BACKGROUND ................................................................................- 2 -
LEGAL STANDARD ...........................................................................................- 6 -
ARGUMENT .........................................................................................................- 7 -
I.       RINGCENTRAL IS LIKELY TO SUCCEED ON THE MERITS.........................- 7 -
         A.  The SAA Has Not Been Terminated.................................................- 8 -
         B.  Zoom is Obligated to Continue Activating Customers During the EOL
             Period ......................................................................................- 13 -
II.      RINGCENTRAL WILL SUFFER IRREPARABLE HARM ABSENT AN
         INJUNCTION....................................................................................- 14 -
III.     THE BALANCE OF EQUITIES FAVORS AN INJUNCTION.................- 15 -
IV.      HOLDING ZOOM TO ITS CONTRACTUAL PROMISES IS IN THE PUBLIC
         INTEREST ......................................................................................- 17 -
V.       CONCLUSION .................................................................................- 17 -

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alton & S. Ry. v. Bhd. of Maint. of Way Emples.*,
  883 F. Supp. 755 (1995)................................................................................17

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,
  571 U.S. 49 (2013).......................................................................................17

*BZ Clarity Tent Sub, LLC v. Ross Mollison Int'l Pty, Ltd.*,
  No. 2:15-CV-1065 JCM (CWH), 2015 U.S. Dist. LEXIS 76470 (D. Nev. June
  12, 2015) ...................................................................................................15

*Colaco v. Cavotec SA*,
  25 Cal. App. 5th 1172 (2018)..........................................................................8

*Dodocase VR, Inc. v. MerchSource, LLC*,
  2018 U.S. Dist. LEXIS 48654 (N.D. Cal. Mar. 23, 2018) ......................................15

*Doe v. Gallinot*,
  657 F.2d 1017 (9th Cir. 1982)..........................................................................7

*Epic Games v. Apple Inc.*,
  2020 U.S. Dist. LEXIS 188668 (N.D. Cal. Oct. 9, 2020) ......................................17

*ET Trading, Ltd v. ClearPlex Direct, LLC*,
  2015 WL 913911 (N.D. Cal. Mar. 2, 2015) ........................................................14

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000)........................................................................16

*Great Minds v. Off. Depot, Inc.*,
  945 F.3d 1106 (9th Cir. 2019)........................................................................10

*HiQ Labs, Inc. v. LinkedIn Corp.*,
  938 F.3d 985 (9th Cir. 2019)............................................................................7

*L.A. Unified Sch. Dist. v. U.S. Dist. Ct.*,
  650 F.2d 1004 (9th Cir. 1981)..........................................................................6

*Marblelife, Inc. v. Stone Res., Inc.*,
  759 F. Supp. 2d 552 (E.D. Pa. 2010) ...............................................................15

*Metalcraft of Mayville, Inc. v. Toro Co.*,
  848 F.3d 1358 (Fed. Cir. 2017)......................................................................15

*Newmark Realty Capital v. BGC Partners*,
2017 U.S. Dist. LEXIS 228902 (N.D. Cal. Nov. 16, 2017)......................................14

*Physicians Indem. Risk Retention Grp. v. Risk Mgmt. Ctr.*,
2009 U.S. Dist. LEXIS 149264 (D. Nev. Dec. 1, 2009) ........................................17

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991)................................................................................14

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*,
860 F.3d 844 (6th Cir. 2017)................................................................................15

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001)............................................................................7, 14

*T'Bear v. Forman*,
2020 U.S. Dist. LEXIS 24544 (N.D. Cal. Feb. 12, 2020)......................................7

*Traeger Pellet Grills LLC v. Dansons US LLC*,
2019 U.S. Dist. LEXIS 207921 (D. Ariz. Dec. 3, 2019)......................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..................................................................................................7

**Statutes**

Cal. Bus. & Prof. Code § 16600 ...........................................................................16

**Other Authorities**

Fed. R. Civ. P. 65 ....................................................................................................1

Fed. R. Civ. P. 65(b) ...............................................................................................6

Fed. R. Civ. P. 26 and 65 ........................................................................................1

Local Rule 65-1(b) ..................................................................................................1

Local Rules 7-10 and 65-1 ......................................................................................1

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

RingCentral, Inc. seeks an emergency *ex parte* restraining order to prevent its business partner Zoom Video Communications, Inc., from resorting to self-help tactics designed to harm RingCentral and its customers.  On Friday, March 12, 2021, Zoom declared its intention to use "technological steps" to block RingCentral from exercising its contractual rights under the parties' longstanding Strategic Alliance Agreement ("SAA"), which authorizes RingCentral to resell Zoom's services on a white-label basis, branded as RingCentral Meetings ("RCM").  Dkt. 1 ¶ 26.  Under the plain language of the SAA, RingCentral is entitled to resell RCM to its customers until ███████████.  By prematurely cutting off RingCentral customers from the Zoom service, Zoom is causing and will cause irreparable harm to RingCentral and its customer relationships. Among other things, absent an injunction, RingCentral will be unable to make good on commitments it has made to customers and resellers—commitments that Zoom is contractually obligated to help RingCentral fulfill.  Moreover, harming RingCentral's customer relationships appears to be the entire point of Zoom's scheme: Zoom hopes to scare RingCentral's customers into abandoning RingCentral and contracting with Zoom directly.

The purported basis for Zoom's resort to self-help tactics (as well as Zoom's lawsuit) is the patently false assertion that the parties' SAA is "terminated."  Dkt. 1 at ¶1.  It is not.  As Zoom concedes, before the end of the SAA's 2020 term, RingCentral "invoked provisions of the SAA to begin an 'end of life' period," Dkt. 1 ¶ 18, thereby "defer[ing] the effective date of termination" to ████████ Ex. 1 at 12, SAA § 16(d).  Zoom's judicial admission that RingCentral invoked the SAA's end of life provision is dispositive of this motion, as well as Zoom's claims.  The SAA remains in effect, and a temporary restraining order is required to stop Zoom from using technological blocking measures to destroy RingCentral's rights under the SAA.  As explained below, RingCentral is likely to prevail on the merits in this action, and it is entitled to an injunction under both the traditional four-factor test and the Ninth Circuit's "serious questions" standard.

## FACTUAL BACKGROUND

**Overview of the RingCentral-Zoom Business Relationship**

Founded in 1999, RingCentral is headquartered in Belmont, California, and employs more than 3,000 employees. RingCentral is a leading provider of enterprise cloud communications, collaboration, and contact center solutions. RingCentral provides unified voice, video meetings, team messaging, digital customer engagement, and integrated contact center solutions for enterprises of all sizes. Declaration of Kira Makagon ("Makagon Decl.") ¶ 3.

On October 18, 2013, RingCentral entered into a Strategic Alliance Agreement ("SAA") with Zoom, then a two-year-old video communications startup. Ex. 1 at 1.[1] The SAA gave RingCentral the right to "market, promote, and resell, as a bundle" Zoom's video meetings technology with RingCentral's cloud communications services. Ex. 1 at 20. RingCentral showed faith in the parties' partnership from the outset, making substantial revenue commitments to Zoom and undertaking a duty to market Zoom's services. Ex. 1 at 2, SAA § 2(a). In connection with these marketing efforts, the SAA grants to RingCentral (among other things) a "non-exclusive, non-transferable, sublicensable … royalty-free license to use, reproduce and display" Zoom's trademarks. Ex. 1 at 8, SAA § 9(a).

The SAA marked the beginning of a long and successful relationship between Zoom and RingCentral, as the parties extended the term and expanded the scope of the SAA on multiple occasions over the next six years. By the time the SAA expires on ███████, the parties will have done business together for nearly a decade. Ex. 1 at 1.

The SAA provides that Zoom is responsible for providing, hosting, and managing the "Service," originally defined to include what Zoom called its "Unified Meeting Experience" for meetings of up to 25 persons per meeting. Ex. 1 at 1, SAA § 1(h); Ex. 1 at 18. As Zoom's capabilities expanded over the years, the parties amended the definition of Service to reflect those new capabilities, such as Large Meeting Capacity and Webinars. Ex. 1 at 62, SAA § 2(a). Some

---

[1] The SAA and its amendments have been compiled into a single PDF comprising Exhibit 1. Page citations refer to Exhibit 1 page numbers. All citations to exhibits herein are to the exhibits attached to the Index of Evidence filed concurrently with this motion.

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR

of these amendments were accompanied by further revenue commitments from RingCentral to Zoom.   Ex. 1 at 64, SAA § 5(c) and SAA § 6(c).

The SAA required Zoom to develop software clients to enable the Service for RingCentral.  Ex. 1 at 4, SAA § 3(f).  Zoom developed this software and provided RingCentral with periodic updates to fix bugs, patch security vulnerabilities, and add new functionality. RingCentral also devoted substantial resources to integrating Zoom's software and technology into RingCentral's offerings, Makagon Decl. ¶ 6, and has delivered the Service to many thousands of RingCentral "Customers," which are defined in the SAA as including any "third party that purchases the Service from RingCentral or its Affiliates."  Ex. 1 at 1, SAA § 1(c). RingCentral has also driven millions of dollars in revenue to Zoom under the SAA's revenue-sharing provisions, Makagon Decl. ¶ 5, provided input to Zoom about its product roadmap, and strived to be a good partner throughout their relationship, including by attempting to resolve Zoom's numerous contractual breaches over the years privately and through negotiation. *See* Exs. 2, 3, and 6.

**The SAA's Term, End of Life, and Post-Termination Provisions**

The initial term of the SAA ran from October 2013 to October 2016, with successive automatic one-year terms thereafter.  Ex. 1 at 12, SAA § 16(a).  The SAA gives each party the ability to avoid automatic renewal by providing notice to the other six months before the end of the current term.  *Id.*

The parties mutually agreed to extend the term on multiple occasions, most recently via SAA Amendment 8 in 2019, which extended the term to January 31, 2021.  Amendment 8 contained another automatic-renewal provision and an optional end of life provision which would (if elected) defer the termination of the SAA for a further ████████████  Ex. 1 at 83, SAA § 1; Ex. 1 at 68, SAA § 15(b).  SAA § 16(d) (the "End of Life Provision") provides, in pertinent part:

> RingCentral may, in its sole discretion, **defer the effective date of termination by up to** ████████████ from the end of the Term in order to transition Customers to an alternative to the Service (the "EOL Period").  **Zoom shall continue to provide the Service** in accordance with this Agreement during this time and shall be entitled to any amounts due for use of the Service.  During the

EOL Period, **Zoom shall continue to comply with the SLAs.  This Agreement shall be deemed to continue to remain in effect through the EOL Period**.

Ex. 1 at 68 (emphasis added).

This provision is crystal clear that by choosing the End of Life provision RingCentral could "defer the effective date of termination by up to ██████████ and that the "Agreement shall be deemed to continue to remain in effect through the EOL Period."

The provision also says that "during the EOL Period, Zoom shall continue to comply with the SLAs."  The applicable Service Level Agreement ("SLA") provides that (1) the "Service shall be available twenty-four (24) hours a day, seven (7) days per week, three hundred sixty-five (365) days per year (three hundred sixty-six (366) days during leap years)"; and (2) "Zoom shall provide RingCentral with ██████████████ with "unavailability" defined as an outage "resulting in RingCentral or *any Customer* being unable to use the Service." Ex. 1 at 31, SAA §§ 2.1 and 2.2 (emphasis added).

Section 16(e) of the SAA is also relevant to this motion.  It sets forth Zoom's "surviving obligations" and states when licenses granted under the SAA will terminate:

The termination or expiration of this Agreement will not operate to discharge any liability that had been incurred by either Party prior to any such termination or expiration. **The termination of this Agreement will not terminate or affect any Customer Agreements entered into *prior to termination* of this Agreement** for the term of each such Customer Agreement in effect at the time of Termination. The following provisions shall survive expiration or termination of this Agreement: Sections 1, 3(c), 3(d), 3(j), 6 (for fees incurred prior to termination), 11, 12(a), 13, 15, 16(c), and 18 of this Agreement.

Ex. 1 at 13, SAA § 16(e) (emphasis added).  Under this provision, Zoom is required to honor all Customer Agreements which RingCentral enters into before the termination of the SAA for the life of those contracts.

On July 27, 2020, Zoom sent a letter to RingCentral notifying it of Zoom's election to decline the SAA's automatic renewal period after expiration of the term ending on ██████████ ████.  Ex. 4.  The July 27 letter is entitled "Notice of Non-Renewal of Strategic Alliance Agreement"—contrary to Zoom's allegations (Dkt. 1 ¶17), the July 27 letter *was not* a termination notice.  *Id.*

In response to Zoom's July 27 Notice of Non-Renewal, on July 29, 2020, RingCentral wrote to Zoom to provide notice of RingCentral's election to exercise its "EOL Period" rights and expressly deferring termination of the SAA to ████████  Ex. 5.  Zoom did not respond to this notice.

**Zoom Breaches the SAA in Response to Competitive Pressure from RingCentral**

Over the past few years, Zoom and RingCentral began to compete directly as Zoom attempted to offer VOIP telephone services that compete with RingCentral's, and RingCentral began offering its own video conferencing solution, RingCentral Video ("RCV").  RCV is relatively new, but it already provides some advantages over RCM.[2]  But RCV also lacks some features that are important to certain classes of customers.  For example, RCV does not currently have a Webinar capability or offer breakout rooms.  Thus, there are some existing and prospective customers who want RingCentral's leading VOIP and messaging capabilities but want to pair it with RCM.

Zoom understands this dynamic and that the EOL period represents a critical transition period for Ring Central.  In particular, Zoom knows that RingCentral was and is relying on the EOL Period to transition its sales pipeline to RCV.  To complete that transition, RingCentral needs to complete the RCV feature set by, for example, delivering a Webinar capability and adding breakout rooms.  As everyone who has ever built software knows, standing up a competing product (especially something as complicated as a carrier-grade telecommunications product) takes time, and that is *why* Ring Central negotiated for an extended EOL Period.  Makagon Decl. ¶ 13.

Nevertheless, on February 24, 2021, Zoom sent a letter to RingCentral asserting that RingCentral's efforts to sell the Service during the EOL Period breach the SAA and violate unidentified "intellectual property" rights.  Ex. 7.  Zoom's letter discussed Zoom's view that the "purpose" of the EOL Period does not include continued sales of RCM.  Ex. 7.

---

[2] For example, RCV allows one-click phone audio connections to video meetings, which is extremely useful for users who need to join video meetings using telephone-based audio connections due to unstable internet connections.  By contrast, to join a Zoom video meeting using phone audio, a user typically must enter up to 30 digits into their phone.

RingCentral responded to Zoom's letter on February 26, 2021. Ex. 8. RingCentral's letter pointed out that Zoom's position is irreconcilable with the plain text of the SAA and fundamental cannons of contract interpretation. RingCentral's letter invited a constructive dialogue on an amicable path forward but made clear RingCentral's intent to protect itself and its Customers from Zoom's misconduct. *Id.*

On Tuesday, March 9, 2021, RingCentral's outside counsel Clement Roberts reached out to Zoom's outside counsel Douglas Lumish and asked that the parties "work together to avoid" formal legal action. Ex. 9. Counsel for the parties spoke later that evening. After not hearing back from Mr. Lumish on Wednesday, Mr. Roberts followed up on Thursday, March 11 to ask whether Zoom would be getting back to RingCentral the following day about the various frameworks for potential resolution that RingCentral had proposed. Zoom did not get back to RingCentral the following day. Instead, Zoom filed a lawsuit, after which Mr. Lumish sent an email apologizing for not getting back to Mr. Roberts and asking him to convey Zoom's lawsuit to RingCentral. *Id.*

Zoom's heavily redacted complaint predictably generated inaccurate press reports spreading Zoom's false narrative to the market, including at least one article discussing "previously unreported news" that Zoom "terminated its seven-year partnership with RingCentral" in July 2020.[3] In fact, according to its express terms, the SAA will not terminate until █████ and it remains in full force and effect.

## LEGAL STANDARD

To obtain an *ex parte* temporary restraining order, a plaintiff must meet both the general standard for temporary restraining orders and the requirements for *ex parte* orders set forth in Federal Rule of Civil Procedure 65(b). The standard for obtaining a temporary restraining order is identical to the standard for obtaining a preliminary injunction, but a TRO's requirements are less rigid since a TRO's duration is much shorter than a preliminary injunction. *L.A. Unified Sch. Dist. v. U.S. Dist. Ct.*, 650 F.2d 1004, 1008 (9th Cir. 1981). A district court has broad

---

[3] https://www.theinformation.com/briefings/587402; *see also* https://www.uctoday.com/unified-communications/zoom-is-suing-ringcentral/; https://www.law360.com/articles/1364292/zoom-hits-former-partner-with-tm-suit-after-deal-sours;

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR

1   discretion to issue a TRO.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841

2   n.8 (9th Cir. 2001).   In both instances, Plaintiff must demonstrate: (1) a likelihood of success on

3   the merits; (2) a likelihood of irreparable harm absent a preliminary injunction; (3) that the

4   balance of equities tips in favor of issuing an injunction; and (4) that an injunction is in the

5   public's interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In the Ninth

6   Circuit, courts use a "sliding scale" approach to these factors, "according to which 'a stronger

7   showing of one element may offset a weaker showing of another.'"  *HiQ Labs, Inc. v. LinkedIn

8   Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (citing *Alliance for the Wild Rockies v. Cottrell*, 632

9   F.3d 1127, 1131 (9th Cir. 2011)).  Thus, for example, "when the balance of hardships tips

10  sharply in the [movant's] favor, the [movant] need demonstrate only 'serious questions going to

11  the merits.'"  *Id.*

12                              **ARGUMENT**

13          RingCentral will succeed on its claim for declaratory judgment that its contractual rights

14  under the SAA continue through the end of the EOL Period, and on its claim that, by blocking

15  RingCentral from activating new Customers, Zoom is violating the SAA.  Given the balance of

16  harms, RingCentral is entitled to a temporary restraining order.

17  **I.      RINGCENTRAL IS LIKELY TO SUCCEED ON THE MERITS**

18          For every claim at issue in this action, the crux of the parties' dispute is whether the SAA

19  "has been terminated," as Zoom alleges, Dkt. 1 at 1, or whether the SAA "continue[s] to remain

20  in effect through the EOL Period," as the SAA explicitly states.  Ex. 1 at 68, SAA § 16(b).  The

21  text of the SAA answers the question expressly.  And because all of Zoom's claims are based on

22  its assertion that the SAA has been terminated, RingCentral is likely to succeed on the merits of

23  *at least* its claims for declaratory relief.  This should lead the Court to issue a temporary

24  injunction to maintain the status quo pending resolution of the parties' dispute.  *See T'Bear v.

25  Forman*, 2020 U.S. Dist. LEXIS 24544, at *66 (N.D. Cal. Feb. 12, 2020) ("A declaratory

26  judgment can be used as a predicate to further relief, including an injunction.") (internal

27  quotations omitted, citing *Powell v. McCormack*, 395 U.S. 486, 499 (1969)); *Doe v. Gallinot*,

28  657 F.2d 1017, 1025 (9th Cir. 1982) (affirming grant of preliminary injunction based on

declaratory judgment claim).

## A.        The SAA Has Not Been Terminated

In interpreting a contract, the "basic goal 'is to give effect to the parties' mutual intent." *Colaco v. Cavotec SA*, 25 Cal. App. 5th 1172, 1201 (2018). "When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. The words of a contract are to be understood in their ordinary and popular sense." *Id.* "If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs." *Id.* Here, the relevant SAA language is clear, and plain meaning governs. Indeed, every relevant provision of the SAA belies Zoom's contention that the SAA "has been terminated." Dkt. 1 at ¶1.

Section 16 of the SAA is entitled "Term and Termination." The SAA originally contemplated an initial three-year term ("Initial Term"), followed by automatic successive renewal terms:

> The initial term of this Agreement shall commence on the Effective Date and, unless terminated earlier in accordance with Section 16(b), expire three (3) years thereafter. **At the end of the initial term and each renewal term, this Agreement shall automatically renew for successive, additional one (1) year terms**, unless either Party sends written notice to the other of its intent not to renew at least one hundred fifty (150) days prior to the end of the initial term or renewal term (the initial term and all renewal terms together, the "Term").

Ex. 1 at 12, SAA § 16(a) (emphasis added). The original SAA thus contemplated that, by default, the SAA *would not* terminate upon expiration of the Initial Term or any renewal term. Likewise, when the parties amended the SAA six years into their relationship the extended the Initial Term to January 2021, and maintained the default rule of non-termination at the end of the Initial Term or any Renewal Term through 2023:

> The initial term of the Agreement shall commence on the Effective Date and, unless earlier terminated in accordance with Section 16(b), expire on January 31, 2021 (the "Initial Term"). The Agreement shall then automatically renew for two (2) additional one- (1-) year terms (each, a "Renewal Term," with the Initial Term and all Renewal Terms (if any) collectively the "Term"); provided, however, if RingCentral or Zoom provides written notice to either party at least six (6) months before the end of the Initial Term or first Renewal Term, as applicable, of its intention not to renew the Agreement, the Agreement shall terminate at the end of such Initial Term or first Renewal Term, as applicable. **For the avoidance of doubt, following the end of the Term the Agreement shall enter into the EOL Period set forth in Section 16(d)**.

Ex. 1 at 12, SAA § 16(a); Ex. 1 at 83, SAA Amd. 8 (emphasis added).  As this provision shows, the parties expressly agreed that any termination—including a decision ***not to renew***—would be subject to RingCentral's right to an 18-month end of life period ("EOL Period"), as set forth in SAA § 16(d), which unequivocally permits RingCentral to "*defer the effective date of termination by up to* ███████████ *from the end of the Term*."  Ex. 1 at 12, SAA § 16(d); Ex. 1 at 83, SAA Amd. 8, § 1 (emphasis added).  SAA § 16(d) also unequivocally states that the SAA "shall be deemed to continue to remain in effect through the EOL Period."   Ex. 1 at 68, SAA Amd. 8 § 15(b).  In light of these provisions, Zoom's position that the SAA has been terminated is wrong.

Zoom's complaint alleges that "Zoom terminated the SAA" when it "sent a letter to RingCentral on July 27, 2020 invoking the termination provisions of the Eighth Amendment to the SAA," Dkt. 1 at ¶ 17, but that allegation is demonstrably false.  Zoom had no right to terminate the agreement on July 27, 2020, *see* SAA § 16(b) (discussing conditions precedent to Zoom's termination right, none of which ever existed), and Zoom's letter is notably entitled "Notice of Non-Renewal of Strategic Alliance Agreement."  Ex. 4.  Zoom's allegation that "[*a*]*fter termination*, RingCentral invoked provisions of the SAA to begin an 'end of life' period" is likewise demonstrably false.  Dkt. 1 ¶ 18 (emphasis added).   RingCentral invoked the SAA's EOL Period on July 29, 2020, which is ***during*** the pendency of the Initial Term even under Zoom's reading of the contract.  Ex. 1 at 68, SAA Amd. 8 § 15(a); Ex. 5.

Moreover nothing in SAA § 16(d) suggests that the parties intended to limit RingCentral's rights or Zoom's obligations under the SAA during the EOL Period.  Had the parties intended to cut off RingCentral's rights to sell the Service during the EOL Period, they would have said so.  Instead, they said the opposite, expressly agreeing that (i) the SAA "shall be deemed to continue to remain in effect through the EOL Period," (ii) Zoom shall continue to provide the Service to *all* Customers in accordance with the SLAs, and (iii) Zoom will be paid amounts due for use of the Service by such Customers.  Ex. 1 at 68, SAA Amd. 8 § 15(b).

Zoom's argument about SAA § 16(d) has been that RingCentral's interpretation violates the "purpose" set forth in that section.  In particular, Zoom focuses on the portion of the provision

1    highlighted in yellow below to argue that the EOL period is "solely to permit RingCentral 'to

2    transition Customers to an alternative to the Service,'" Dkt. 1 ¶ 18.

3            RingCentral may, in its sole discretion, **defer the effective date of termination by
         **up to** ████████████ from the end of the Term in order to transition

4        Customers to an alternative to the Service (the "EOL Period"). **Zoom shall**
         **continue to provide the Service** in accordance with this Agreement during this

5        time and shall be entitled to any amounts due for use of the Service. During the
         EOL Period, **Zoom shall continue to comply with the SLAs.** **This Agreement**

6        **shall be deemed to continue to remain in effect through the EOL Period**.

7    But this phrase does not support Zoom's position.

8            First, reading the yellow highlighted text as Zoom suggests would conflict with every

9    other sentence of this paragraph – which makes it crystal clear that the EOL Period will "defer the

10   effective date of termination" and that the "Agreement shall be deemed to continue to remain in

11   effect through the EOL Period."  And it is black letter law that contractual phrases should be

12   interpreted in context, not in isolation.  *Great Minds v. Off. Depot, Inc.*, 945 F.3d 1106, 1110 (9th

13   Cir. 2019) ("The terms of a contract must be construed in a manner that takes into account the

14   context of the language and is consistent with the contract as a whole.") (quotation marks and

15   alterations omitted).

16           Second, Zoom is reading the yellow-highlighted phrase as if it contained the word

17   "solely" or "exclusively" prior to "in" and "existing" prior to "Customers."  But it does neither.

18   To the contrary, the SAA defines "Customers" as "a third party that ***purchases*** the Service from

19   RingCentral or its Affiliates."  Ex. 1 at 1, SAA § 1 (emphasis added).  Put differently, the SAA

20   defines customers *prospectively* (using the future tense) therefore covers anyone who purchases

21   the Service while the Agreement is in effect.  Indeed, when the parties signed the SAA there were

22   no customers for RCM, and it makes no sense to suggest that the word "Customers" was intended

23   only to cover entities that *had* purchased the product in the past as Zoom attempts to do here.

24   This point is also supported by §4 of the SAA which says that "RingCentral will enter into a

25   Customer Agreement for the Service with Customers."  Ex. 1.  In this section the term

26   "Customers" is clearly being used to refer to *prospective* customers – i.e. entities with whom

27   RingCentral *will* enter into an agreement in the future.

28

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR

Third, as noted previously, for Ring Central to transition customers to RCV it needs to transition both *existing* customers and its sales pipeline.  Those two categories are not, however, distinct populations because, for example, existing customers sign renewals and add or drop services literally **every day**.  Do *those* customers count as "Customers" under Zoom's reading?  Zoom's complaint doesn't say, and its position isn't logical.  If the SAA intended to treat some (e.g. prospective) "Customers" differently from others during the EOL period, the parties would have said so—e.g. they would have specified how different types of customers would be treated.  But they didn't.  Instead the parties broadly (and unambiguously) agreed that the entire SAA would be *extended* throughout the EOL period.

Fourth, ███████ EOL Period makes sense in this context.  As noted at the outset, the SAA has been a very long-lived business contract for which RingCentral spent literally millions of dollars on integration of the Zoom service into RCM every year of the SAA's existence.  Makagon Decl. ¶ 6.  In the enterprise software space, and especially in the carrier-grade telecommunications space, it takes time to replace a technology partner.  Makagon Decl. ¶ 13.  No reasonable person would think that the work of transitioning a sales pipeline could be accomplished in the six-months between a notice of non-renewal and the end of the Term.  RingCentral *knew* that it couldn't completely transition its sales pipeline on this timeline and expressly bargained for the right to extend the term of the entire Agreement for a further ███ (███).

Zoom's argument that the contract has been terminated is also inconsistent with and contradicted by § 16(e) of the SAA.  That section provides, in relevant part, that "[t]he termination of this Agreement will not terminate or affect any Customer Agreements entered into prior to termination of this Agreement for the term of each such Customer Agreement in effect at the time of Termination." Ex. 1 at 13, SAA § 16(e).  This section, therefore, unambiguously states that Zoom must honor all Customer Agreements which RingCentral enters into "prior to termination of this Agreement" for the entire term of those contracts. This defeats Zoom's argument in two ways.

First, this section is incompatible with Zooms assertion that RingCentral cannot sell additional contracts during the EOL Period.  Indeed, if that is what the parties intended they would not have (i) said that the EOL Period defers termination (in 16d) and (ii) required Zoom to service all contracts entered into prior to termination *for the life of those contacts* (in 16e).  Put differently, if Zoom were right about the SAA, § 16(e)  would *not* require Zoom to honor Customer Agreements entered into ***prior to termination*** but would, instead, say the opposite – e.g. that Zoom must only honor "Customer Agreements in effect at the start of the EOL period."

Second, § 16(e) conclusively establishes that Zoom's assertion that RingCentral "needs to transition customers to non-Zoom products" before the end of the EOL Period is wrong.  Dkt. 1 at ¶¶23-25.  To the contrary, § 16(e) is clear that Zoom must honor *all* contracts which RingCentral enters into for the life of those contracts.  This command could not be any clearer:  "The termination of this Agreement will not terminate or affect any Customer Agreements entered into *prior to termination* of this Agreement for the term of each such Customer Agreement in effect at the time of Termination."  § 16(e).  Put differently, because Zoom must honor the *entire term* of Customer Agreements entered into prior to termination of the SAA, Customers are allowed to use RCM to the end of their contractual terms –regardless of whether those terms end before or after the SOL Period.[4]

Zoom's citation (Dkt. 1 ¶ 15) to the text of a 2017 amendment to SAA § 18(b) —which grants RingCentral rights to "sell, offer to sell, and exploit" the Zoom APIs and SDKs "during the EOL Period"—also does not support Zoom's position.  Ex. 1 at 70, SAA Amd. 5 § 18(b).  As an initial matter, nothing about that amendment purports to *limit* RingCentral's other rights under the SAA.  And because the Zoom APIs and SDKs are *part of how* RingCentral integrates Zoom's service with RingCentral's service and have no utility to RingCentral outside of that context, Makagon Decl. ¶ 21, it makes no sense for the parties to agree to that unless they had *already* agreed that RingCentral could resell Zoom's Service during the EOL Period.  Similarly, because RingCentral's RCM branding is hard-coded—by Zoom—in the Zoom SDK to display "powered

---

[4] For this reason, Zoom's attempt to depict RingCentral as engaging in "bait and switch" with respect to is resales of Zoom's services is completely false: the SAA could not be any more clear that Zoom must honor all Customer Agreements for the entire term of *each* of those contracts.

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR

by Zoom" in all RingCentral meeting windows, it is hard to imagine how RingCentral could go about selling Zoom's APIs and SDKs during the EOL Period without using Zoom's trademarks. Zoom's argument that the only right RingCentral has during the EOL Period is the right to sell Zoom's APIs and SDKs, rather than the Service itself (which the APIs and SDKs facilitate), therefore defies common sense.  In any event, the more specific and directly applicable provisions of SAA § 16 control the question of RingCentral's rights during the EOL Period, and nothing in Amendment 4 suggests an intent to amend or modify SAA § 16 or any other relevant provision. *E.g.*, *Shivkov*, 974 F.3d at 1063 ("It is a standard rule of contract interpretation that specific terms control over general ones.") (quotation marks omitted).

**B.      Zoom is Obligated to Continue Activating Customers During the EOL Period**

Because the SAA has not yet terminated, RingCentral retains its rights under the SAA, including its right to sell the Service to existing, prospective, and new Customers (Ex. 1 at 2, SAA § 2(a)), to use Zoom trademarks in the course of accurately describing and identifying the Service (Ex. 1 at 8, SAA § 9(a)), and to transition Customers to RCV (Ex. 1 at 13, SAA § 16(d)). Similarly, Zoom's obligations to provide the service to Customers, including those who sign Customer Agreements during the EOL Period, remains intact.

Accordingly, the "technological steps" that Zoom has taken to deny RingCentral the ability to activate new Customers (Dkt. 1 ¶ 26) amount to a clear and willful breach of multiple SAA provisions.  First, Zoom's conduct breaches SAA § 16(d), which states that the SAA remains in force during the EOL period.  Ex. 1 at 13, SAA § 16(d).  Second, Zoom's conduct breaches SAA § 16(e), which requires Zoom to honor "Customer Agreements entered into *prior to termination* of this Agreement."  Ex. 1 at 13, SAA § 16(e).  Third, Zoom's conduct breaches SAA § 2(a), which grants RingCentral the right to "market and resell the Service" as "incorporated into RingCentral's or its Affiliates own services."  Ex. 1 at 2, SAA § 2(a).  Zoom's conduct also breaches SAA § 2(a)'s license to RingCentral to "use, copy, distribute, display, perform, import, make, sell, offer to sell, and exploit…the Service" under the SAA.  *Id.*  Fourth, Zoom's conduct breaches SAA § 2(b), which requires Zoom to "provide the Service to RingCentral and its Affiliates and its and its Affiliates' Customers in accordance with the SLA,"

as well as the SLA itself, which requires Zoom to provide "Network Availability" to *any* "Customer," i.e., any "third party that purchases the Service from RingCentral." Ex. 1 at 2, SAA § 2(b).

## II. RINGCENTRAL WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Zoom's blocking of new RingCentral customer activations threatens significant loss of goodwill and the loss of market share by RingCentral. Makagon Decl. ¶¶ 19-20. Many customer deals and contract extensions that RingCentral is currently working to close have been in process for months, and RingCentral will face great reputational harm and loss of trust if it is unable to make good on the commitments contemplated for those deals. *Id*. RingCentral relied on the SAA and EOL Period in making these customer commitments. *Id*. And because some customers believe that RCV is not an acceptable substitute for RCM, RingCentral will also lose a number of customers who will decide, instead, to purchase their communications services from another vendor or directly from Zoom. *Id*.

"Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001); *see also, e.g.*, *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (same). A showing of "threatened loss of prospective customers alone may establish a likelihood of irreparable harm … because the harm resulting from loss of customers is difficult to measure." *Newmark Realty Capital v. BGC Partners*, 2017 U.S. Dist. LEXIS 228902, at *72-73 (N.D. Cal. Nov. 16, 2017) (quotation marks omitted and citing *Sloane v. Karma Enterprises, Inc*., 2008 WL 11340286, at *2 (C.D. Cal. Nov. 3, 2008) and *ET Trading, Ltd v. ClearPlex Direct, LLC*, 2015 WL 913911, at *3 (N.D. Cal. Mar. 2, 2015). Here, Zoom's conduct is having an immeasurable negative impact on RingCentral's reputation and standing with customers and prospective customers. RingCentral will certainly lose business if Zoom is permitted to renege on its promises and block RingCentral Customer activations, particularly among classes of customers who require features that are presently unavailable in RCV, such as Webinar capability, which is uniquely important to some

1    prospective Commercial MSA and Enterprise MSA customers given working conditions during

2    the COVID-19 pandemic.[5]  Makagon Decl. ¶ 20.  Zoom's conduct also harms RingCentral's

3    relationships by depriving it of its right to sell the Service as an essential component of

4    RingCentral's offerings.  *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860

5    F.3d 844, 853 (6th Cir. 2017) ("When a distributor loses a unique product…it threatens their

6    relationship with the retailers that have come to rely on the distributor for the in-demand

7    product…This loss of customer goodwill is a prime example of intangible, irreparable harm")

8    (citation omitted)).

9            No monetary award will ever make RingCentral whole if Zoom's conduct is not enjoined,

10   because it will be practically impossible to identify each lost customer and quantify the total

11   injury to RingCentral.  "Where the injury cannot be quantified, no amount of money damages is

12   calculable, and therefore the harm cannot be adequately compensated and is irreparable."

13   *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017)

14   **III.    THE BALANCE OF EQUITIES FAVORS AN INJUNCTION**

15           The balance of harms could not be more one-sided.  The only consequence to Zoom of

16   RingCentral's requested injunction would be that Zoom continues to make money from new

17   RingCentral Customers who sign Customer Agreements during the EOL Period and existing

18   Customers who purchase more Services during the EOL Period.  Zoom has nothing to place on

19   the scales to balance against the significant irreparable injuries to RingCentral, because Zoom

20   suffers no harm from an order requiring it to comply with its contractual obligations.  *See, e.g.,*

21   *Dodocase VR, Inc. v. MerchSource, LLC,* 2018 U.S. Dist. LEXIS 48654, at *38 (N.D. Cal. Mar.

22   23, 2018) ("Defendants should not be heard to argue that the enforcement of the contract into

23   which it freely entered would cause hardship." (quotation marks omitted)); *Marblelife, Inc. v.*

24   *Stone Res., Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010) (similar); *accord BZ Clarity Tent Sub,*

25   *LLC v. Ross Mollison Int'l Pty, Ltd.,* No. 2:15-CV-1065 JCM (CWH), 2015 U.S. Dist. LEXIS

26   76470, at *18 (D. Nev. June 12, 2015) ("the balance of hardships favors a business attempting to

27   ───────────────

[5] It appears that even after the pandemic is under control, some things will change for good.  *See,*
28   *e.g*., https://www.cnbc.com/2021/03/11/one-year-into-covid-working-from-home-is-here-to-stay.html

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR

enforce a contract with a co-producer of a popular and successful show in order to maintain its business goodwill and client relationships/customer satisfaction.").  Zoom simply has no legitimate interests at stake: all of its relevant affirmative claims against RingCentral require Zoom to prove that the SAA is terminated, so they are each doomed to fail.[6]  Section II, *supra*.

Zoom will not suffer any harm by an injunction maintaining the status quo *ante litem*. Here, "the last uncontested status which preceded the pending controversy" was that RingCentral was selling the Service under the SAA, while Zoom was providing the Service and receiving revenue share from RingCentral based on the number of Customers using the Service.  *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (citing *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963) (quoting *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958)).  Allowing the status quo to continue undisturbed while the parties litigate their dispute will not harm Zoom—indeed Zoom will continue to receive revenue share payments for the user of its services, just as it has over the last seven-plus years.  On the other hand, Zoom's self-help tactic of imposing technological blocks on RingCentral's Customer activations will harm RingCentral and Customers alike.

Zoom's technological measures violate the contract in another way as well.  In particular, because the technological measures that Zoom has implemented block any entity that Zoom has not previously configured from setting up new lines, they threaten to block Customers who (1) purchased RingCentral service bundles including the Service prior to Jan 31 2021; and (2) had not configured the Service prior to Jan 3 2021. Because some customers may not configure portions of their service until weeks or months after the service is first acquired, Zoom's technological measures block implementation of the Service even for customers that Zoom acknowledges it must serve.  For this reason as well, Zoom's actions must be enjoined

---

[6] Zoom's claim for declaratory judgment regarding Cal. Bus. & Prof. Code § 16600 is not relevant to whether Zoom should be permitted to engage in its self-help "technological steps" to block new Customer activations, and there is no justiciable controversy presented by that claim in any event, because RingCentral has never sought to enforce it.

RINGCENTRAL'S EX PARTE MOTION FOR TRO AND OSC
4:21-cv-01727-DMR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.**     **HOLDING ZOOM TO ITS CONTRACTUAL PROMISES IS IN THE PUBLIC INTEREST**

The public "has a strong interest in holding private parties to their agreements." *E.g., Epic Games v. Apple Inc.*, 2020 U.S. Dist. LEXIS 188668, at *62 (N.D. Cal. Oct. 9, 2020) (citing *S. Glazer's Distrib. of Ohio, LLC v. Great Lakes Brewing Co.,* 860 F.3d 844, 853 (6th Cir. 2017)); *accord Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62–63 (2013) ("the interest of justice" is served by holding parties to their bargain).  Relatedly, there is a significant public interest in requiring parties to resolve business disputes through judicial proceedings, rather than by resorting to self-help such as Zoom's "technological steps" to block RingCentral customer activations.  *See id.* at *63; *Alton & S. Ry. v. Bhd. of Maint. of Way Emples.*, 883 F. Supp. 755, 765 (1995) ("any attempt by the BMWE to alter the status quo by exercising self help would be quite premature, would cause irreparable harm, and would be contrary to the public interest.").  "[I]t is generally in the public interest to uphold parties' contractual arrangements and prevent the sort of self-help [Zoom] threatened here.  Similarly, it is in the public interest to prevent a party that has not obtained a judgment to take coercive actions as if it had a judgment, as [Zoom] threatened to do here.  *Physicians Indem. Risk Retention Grp. v. Risk Mgmt. Ctr.*, 2009 U.S. Dist. LEXIS 149264, at *25 (D. Nev. Dec. 1, 2009).  There is also a public interest in allowing consumers to choose their providers.  *See, e.g., Traeger Pellet Grills LLC v. Dansons US LLC*, 2019 U.S. Dist. LEXIS 207921, at *16 (D. Ariz. Dec. 3, 2019) (discussing public interest in consumer choice).

<u>CONCLUSION</u>

For the foregoing reasons, RingCentral respectfully requests a temporary restraining order prohibiting Zoom from blocking new RingCentral customers from accessing Zoom's services, and an order to show cause why a preliminary injunction should not issue.

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR

1

Dated: March 15, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLEMENT SETH ROBERTS
KAREN G. JOHNSON-MCKEWAN
ROBERT L. URIARTE
NATHAN SHAFFER
Orrick, Herrington & Sutcliffe LLP

By:   */s/ Clement Seth Roberts*
CLEMENT SETH ROBERTS
Attorneys for Defendant,
RingCentral, Inc.

RINGCENTRAL'S EX PARTE MOTION FOR
TRO AND OSC
4:21-cv-01727-DMR