CLEMENT SETH ROBERTS (SBN 209203)
croberts@orrick.com
KAREN G. JOHNSON-MCKEWAN (SBN 121570)
kjohnson-mckewan@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     +1 415 773 5700
Facsimile:     +1 415 773 5759

ROBERT L. URIARTE (SBN 258274)
ruriarte@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
MENLO PARK, CA 94021
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

*Attorneys for Defendant
RingCentral, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZOOM VIDEO COMMUNICATIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> RINGCENTRAL, INC., <br><br> Defendant. | Case No. 5:21-cv-01727-EJD <br><br> **REPLY TO ZOOM'S RESPONSE TO ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |
| RINGCENTRAL, INC., <br><br> Counterclaimant, <br><br> v. <br><br> ZOOM VIDEO COMMUNICATIONS, INC. <br><br> Counterdefendant. | |

The SAA states unequivocally that RingCentral may "defer the effective date of Termination" of the SAA by invoking its EOL Period rights, and that the SAA "shall be deemed to continue to remain in effect through the EOL Period." SAA § 16(d). Now that RingCentral has demonstrated the falsity of Zoom's allegation that the SAA is "terminated" (Dkt. 1 at 1), Zoom attempts to pivot to a new argument: that the EOL Period is not part of the "Term" as defined by the SAA in § 16(a). But that argument is simply irrelevant. None of the relevant rights and obligations are limited to the "Term." Instead, the relevant rights and obligations are limited only by the EOL Period and the eventual termination of the SAA.

Zoom concedes that the SAA is subject to plain meaning analysis, and this concession is dispositive. The Court got it right the first time: "Because RingCentral exercised its rights under the End of Life provision, RingCentral deferred the SAA's termination date...Thus pursuant to § 16(d), RingCentral retained its rights including its right to sell the Service to existing, prospective, and new customers." Dkt. 24 (TRO) at 7. And because Zoom submitted no competent evidence on any of the other injunction factors, it has failed to sustain its burden under the Court's order to show cause. By contrast, RingCentral has submitted evidence of threatened and actual irreparable harm, including new evidence of lost deals, worried customer calls, and reputational harm caused by Zoom's conduct within the past few weeks. Declaration of Carson Hostetter ("Hostetter Decl.") ¶¶8-17; Makagon Decl. (Dkt. 13-14) at 5-6.

**I.  The Court Correctly Determined RingCentral is Likely to Prevail on the Merits.**

The Court's TRO order correctly held that "RingCentral retained its rights including its right to sell the Service to existing, prospective, and new customers" by invoking the EOL Period. TRO at 7. "[T]here is no provision in the SAA suggesting that the parties intended to limit RingCentral's rights or Zoom's obligations under the SAA during the End of Life period." TRO at 6. "[T]he crux of the parties' dispute is whether the SAA has been terminated as Zoom alleges, or whether the SAA continues to remain in effect through the End of Life period described in § 16(d)." TRO at 6. Zoom's argument that the Court's likelihood of success analysis is based on "smoke-and-mirrors reconstruction of the SAA" that is "demonstrably false" fails for multiple reasons. Zoom's OSC Opposition ("Opp.") at 1-2.

*First,* contrary to Zoom's argument, a "dispute regarding the interpretation of the Agreement's terms" *does not* "preclude[] a finding of likelihood of success." Opp. at 12. If that were the rule, no injunction would issue in any contract case. *See, e.g.*, *Domain Name Comm'n Ltd. v. DomainTools*, LLC, 781 F. App'x 604, 606 (9th Cir. 2019) (affirming injunction on contract claim over disputes on relevant contractual terms); *Signal Hill Serv. v. Macquarie Bank, Ltd.*, 2011 U.S. Dist. LEXIS 165858, at *61 & n. 116 (C.D. Cal. June 29, 2011) (finding disputed term ambiguous but nevertheless granting injunction). RingCentral need not establish it *will* win on the merits of its SAA interpretation; it need only show a *likelihood* of success, or "serious questions" on the merits. *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 995 (9th Cir. 2019).

Zoom's cited authorities do not support its position, and the fact that Zoom's lead argument is based on mis-citations to inapposite cases telegraphs that Zoom's contract arguments lack merit. *Int'l Precision Prod., B.V. v. Staco Sys., Inc.*, 2014 WL 12573363, at *3 (C.D. Cal. Feb. 6, 2014), held that the merits of plaintiff's claim presented a "mixed question of fact and law" because of ambiguities in the parties' agreement, and the court found the plaintiff's interpretation to be "doubtful." Here, Zoom concedes that the SAA is subject to a plain meaning interpretation—so it is not ambiguous—and it is *Zoom's interpretation* that is doubtful (at best). TRO at 6-7. Likewise, the holding in *Mastro v. Momot*, 2009 WL 1993772, at *4 (D. Ariz. July 9, 2009) was based on the court's finding that the subject clause was ambiguous. No such ambiguity is at issue here: the SAA "shall be deemed to continue to remain in effect through the EOL Period." SAA § 16(d).

*Second,* Zoom's attempt to rely on a "distinction between the Term and the EOL Period" overlooks the actual language of the SAA. Opp. at 2. Under the SAA, "Term" (with a capital "T") is a specially defined phrase that includes the "Initial Term" and any "Renewal Terms." SAA § 16(a). The capitalized phrase Term is not coextensive with the actual term of the SAA, however, as the SAA contemplates that the agreement will remain in place after expiration of the Term. SAA § 16(d). Several passages of the SAA refer to the "Term," demonstrating that the parties knew how to use that specially defined term when needed. *See* SAA § 6 ("the same License Fees shall apply during the EOL Period (as defined below) as applied at the end of the Term."). In other passages of the SAA, the parties used the non-capitalized "term;" in these passages, the word is being used

in its plain an ordinary sense, such as to refer to "the time for which something lasts." https://www.merriam-webster.com/dictionary/term. The parties used both "Term" and "term" in the SAA—sometimes together in the same provision (SAA §6)—and when they wanted to tie substantive rights to the defined concept "Term," they did so expressly, consistently, and with clarity. *See* SAA §§ 6, 16(d), 16(f).

Zoom's position ignores the parties' distinct usage of the words Term and term. Zoom cites SAA § 2(a)&(b)—which both use the word "term," not the defined phrase "Term"—to support its argument that RingCentral's licenses "expired on January 31, 2021." Opp. at 9. But that is not what SAA § 2 says, and the more specific language of SAA § 16(e) speaks clearly as to when RingCentral's licenses expire: "*Upon termination* of this Agreement, all licenses granted hereunder will immediately terminate." The parties' agreement to tie termination of RingCentral's licenses to the ultimate termination of the SAA, rather than to the Term, is manifest. Ironically, Zoom's citation to SAA § 16(f) only serves to underscore the parties' true intent and undercut Zoom's argument. Unlike the rights and duties discussed in 16(d) and 16(e), which are expressly tied to *termination* of the SAA and EOL Period, the disparate language of 16(f) requires Zoom to provide particular versions of its service to customers after expiration of the "Term."

*Third*, Zoom's argument about the meaning of the phrase "Customers" is a red herring. RingCentral does not argue that "every prospective customer in the world" is a "Customer"—this is simply a straw man argument set up by Zoom. Opp. at 10. RingCentral's position is simply that nothing in the SAA restricts "Customers" to entities that purchase the Service during the Initial Term or a Renewal Term. SAA § 1(c). Instead, the definition of Customers is broad enough to cover entities that purchase the Service "prior to termination" of the SAA. SAA § 16(e).

Zoom's attempt to use SAA § 16(f) to redefine what a "Customer" is under the SAA lacks merit. SAA §16(f) is about requiring Zoom to use its "best efforts" to provide continuity of service to Customers who obtained older versions of the Service that existed prior to the end of the Term. It does not absolve Zoom of its mandatory duty to "continue to provide the Service" during the EOL Period under SAA § 16(d), nor does it impair RingCentral's or its customers' rights pursuant to "any Customer Agreements entered into prior to termination of [the SAA]," SAA § 16(e).

1  Section 16(f) reflects RingCentral's bargain for *enhanced* protection for Customers using older
2  versions obtained prior to expiration of the Term—because of Zoom's obvious disincentive to
3  support customers using older versions of Zoom's software once the EOL Period commences.
4  Thus, while the standard employed elsewhere in the SAA is "commercially reasonable efforts,"
5  SAA §§ 3(h), 8(a), 10(a), etc., RingCentral bargained for "best efforts" protection for the class of
6  customers using older versions obtained prior to expiration of the Term.  Because SAA §16(f)
7  imposes *different, additional obligations* on Zoom with respect to a discrete class of customers
8  using older versions, it has no import on the meaning of sections 16(d) and 16(e).[1]

*Fourth*, Zoom's argument about its view of the "purpose" of SAA § 16(d) is irrelevant. The subjective understanding of one party does not control contract construction; instead, the Court must look to the objective words of the unambiguous SAA to ascertain what the parties agreed to. *E.g., United Com. Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992). Whatever the parties subjectively believed about the purpose of SAA § 16(d), one thing is unmistakably clear: the parties agreed that the SAA would "continue to remain in effect through the EOL Period." Thus, while RingCentral agrees with Zoom that SAA § 16(d) contemplates transition of Customers to an alternative to Zoom, it disagrees with Zoom about the mechanics of that transition. The SAA is silent as to when, how, and why RingCentral may transition its Customers, leaving RingCentral with substantial discretion.  RingCentral's substantial discretion under SAA § 16(d), and the extended EOL Period RingCentral negotiated for exercising that discretion, is something RingCentral bargained for precisely because it understood that transitioning away from a critical technology partner was not something that could be accomplished on short notice. Makagon Decl. ¶ 13.  Zoom's unsupported attorney argument that six months is "ample time" to transition all RingCentral customers is belied by RingCentral's sworn testimony. Opp. at 12.

Critically, Zoom concedes that "the SAA remains in effect during the EOL Period," and "that means all of the Agreement." *Id*. at 14. This concession is dispositive of RingCentral's

---

[1] Zoom faults RingCentral for not addressing SAA § 16(f) in its *ex parte* motion, but Zoom's criticism is misplaced because (1) Zoom did not discuss § 16(f) in its Complaint, see Dkt. 1; and (2) SAA § 16(f) is irrelevant to the issues presented.

success on the merits. "There is no provision in the SAA suggesting that the parties intended to limit RingCentral's rights or Zoom's obligations under the SAA during the End of Life period." TRO at 6. Zoom's argument that the SAA "limits [RingCentral's] license to the Term" is simply wrong—SAA §§ 2(a)&(b) do not limit RingCentral's rights to the "Term," as discussed above.

*Fifth,* Zoom's argument that "the parties deliberately established…by omission" which obligations do not extend to the EOL Period is plainly incorrect. Opp. at 16. For one thing, it is now undisputed that the language of SAA § 16(d) establishes that "the SAA remains in effect during the EOL Period," and "that means all of the Agreement." Opp. at 14. Moreover, all of the SAA provisions Zoom points to in support of its implied-exclusion-by-omission theory are contained in amendments to the SAA—these terms evidence discrete *additions* to the SAA, not *omissions* from the original text. Nothing in the text of any amendment suggests an intent to scale back RingCentral's EOL Period rights under the original agreement.

*Sixth,* there is nothing "absurd" about the results of RingCentral's interpretation. As set forth in RingCentral's declaration, a long EOL Period in which RingCentral is permitted to transition its sales pipeline is totally rational and reasonable in the context of the parties' long relationship and the millions of dollars RingCentral invested to integrate Zoom technology. Makagon Decl. ¶¶ 6, 13. Zoom's farfetched hypothetical about a twenty-year deal inked on the last day of the EOL Period would never happen; if it did, it would surely invoke the protections of the covenant of good faith and fair dealing. The only absurd result in play here is the one sought by Zoom, *i.e.*, an interpretation of the SAA that re-writes the EOL provision to drastically limit RingCentral's rights and renders section 16(e) a nullity. For example, under Zoom's view of the world, RingCentral would have had to divine Zoom's intended future conduct and start shortening the length of its standard three-year customer contracts *before* Zoom tendered its notice of non-renewal in 2020. Otherwise, RingCentral would be in the position of selling a three-year term to customers only to find out after the fact that Zoom would not honor the three-year commitment. This untenable situation is precisely what SAA §16(d) and (e) are designed to prevent.

## II.   The Court Correctly Found a Risk of Irreparable Harm

The "loss of prospective customers or goodwill" are irreparable harm where it is not

1  possible to place a specific value on the lost relationships. Dkt. 24 (TRO) at 7–8. Zoom submits
2  no evidence that shows it is in any way possible to place a monetary value on the harm to
3  RingCentral's reputation or the value of its lost customer relationships, and thus there is no basis
4  on which to revisit the Court's initial holding on this point. At best, Zoom points to cases where
5  *evidence* was submitted showing that such a valuation was possible[2]—but those cases are
6  inapposite because Zoom submits no evidence and there is none showing that harm to RingCentral
7  is calculable and thus compensable in monetary damages. *See* Opp. Br. at 20–21. Zoom does not
8  dispute that the numbers of customers RingCentral will lose if Zoom is permitted to breach its
9  contractual obligations cannot be readily determined. Thus, the full scope of harm to RingCentral
10 *is not ascertainable* and is therefore *irreparable* absent injunctive relief. Zoom relies on a non-
11 performance payment in the SAA, which compensates RingCentral if Zoom fails to meet
12 contractual Network Availability rates. Opp. at 21–22. But that provision does not address harm
13 where RingCentral cannot sign up customers in the first place and there is no mechanism in the
14 SAA that helps to identify RingCentral's lost customers caused by Zoom's breach of the SAA and
15 certainly nothing that quantifies monetary harm in that situation. The fact that RingCentral will be
16 unable to determine *how many* customers it lost or accurately determine *whether* customers are lost
17 because Zoom breached the SAA and cutoff RingCentral's access to Zoom's service is the point
18 and what makes the imminent harm to Zoom irreparable via monetary damages in the first place.
19 *Sloane v. Karma Enters., Inc.*, 2008 WL 11340286, at *2 (C.D. Cal. Nov. 3, 2008) ("[A] loss of
20 customers … can constitute irreparable injury because the resulting damage is difficult to calculate
21 with reasonable certainty." (citing *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental,*
22 *Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).

23       The undisputed evidence on this motion was submitted by RingCentral and shows that *no*
24 *complete valuation of damages is possible* and RingCentral will be irreparably harmed absent a

---

[2] Such was the case in *Amylin Pharm., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 678 (9th Cir. 2011), where *evidence* in the record showed that standard economic models could be used to calculate the plaintiff's harm, and in *CSNK Working Capital Fin. Corp. v. Baxter, Bailey & Assocs., Inc.*, 2016 WL 9176328 (N.D. Cal. Aug. 19, 2016), where the record established that plaintiff's customers were transitioning to defendant on a direct and one-to-one basis that allowed monetary damages to be calculated.

permanent injunction. *See* Dkt. 14 (Mot. for TRO) at 14–15 (citing Makagon Decl.); *see also, e.g.*, *Newmark Realty Capital, Inc. v. BGC Partners, Inc.*, No. 16-cv-01702-BLF, 2017 WL 8294175, at *23 (N.D. Cal. Nov. 16, 2017) ("A showing of threatened loss of prospective customers alone may establish a likelihood of irreparable harm." (quotation marks omitted)). Further, since RingCentral submitted its initial papers, more evidence has come to light to show RingCentral's irreparable harm absent an injunction, including harm to customer relationships, loss of market share, reduced bookings in an amount that is not readily calculable, increased opportunity costs, and a negative impact on RingCentral's reputation and stock price. Hostetter Decl. ¶¶ 5-17; Ex. 11. Zoom is also poaching RingCentral's customers by falsely claiming that RingCentral's access to Zoom's service is about to end. Hostetter Decl. ¶ 6, Ex. 10 (Zoom telling a "RingCentral customer" that "they will be losing the agreement to utilize Zoom by the end of April" and claiming that Zoom is "switching [RingCentral's customers] over daily."). With actual solicitation by Zoom, and in view of the harm to RingCentral's relationships, market share, and stock price that *has already occurred*, there is zero merit to Zoom's claim that harm to RingCentral is somehow speculative. *E.g.*, *Farmer Bros. Co. v. Albrecht*, 2011 WL 4736858, at *3 (D. Nev. Oct. 6, 2011) (holding that irreparable harm was established and "not speculative because [defendant] has solicited [plaintiff's] customers."). Moreover, solicitation of a partner's customers at the tail of and in breach of a licensing agreement is itself irreparable harm. *MetroPCS Pa., LLC v. Arrak,* 2015 WL 6738887, at *4 (W.D. Wash. Nov. 4, 2015) (direct competition in breach of agreement is irreparable harm).

Zoom's argument that RingCentral is in the process of developing a competing product is irrelevant because Zoom concedes that RingCentral cannot yet replace the feature set in Zoom's service. Opp. at 20 (arguing that "RingCentral has recognized that its own service is inferior to Zoom's product and so it looks to hold onto Zoom's product for as long as it possibly can"). Allowing Zoom to breach the SAA and deprive RingCentral of a product desired by its customers that Zoom itself admits is unique and irreplaceable in the immediate future is another *independent* source of irreparable harm. *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 853 (6th Cir. 2017) (finding irreparable harm in loss of product); *Optinrealbig.com, LLC*

1  *v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004) ("[W]here wrongful conduct
2  deprives a plaintiff of a unique contract right, there may be an irreparable harm.").

3        RingCentral's advertising and customer relations efforts do not erase the actual harm
4  RingCentral is experiencing. *See* Opp. at 19–20 (quoting RingCentral's marketing messages).
5  First, as the Hostetter declaration establishes, even the specter of RingCentral losing access to
6  Zoom's service at this time is causing irreparable harm in the form of new contractual terms
7  demanded by customers that were not required before because Zoom muddied the waters and called
8  RingCentral's trustworthiness into question. Hostetter Decl. ¶¶ 8–10. Moreover, lost customers,
9  even for just the video meeting component of RingCentral's services, causes RingCentral to lose
10 to develop goodwill and strategic partnerships—none of which is readily ascertainable in money
11 damages. *Id.* ¶ 10. Second, RingCentral has a duty to *try* to mitigate harm caused by Zoom's
12 conduct to the extent possible through truthful statements, even if it cannot in fact mitigate all the
13 harm caused by Zoom. *See Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 192–93 (S.D.N.Y. 1990)
14 ("Any party claiming an injury is under a duty to mitigate … irreparable harm."). Third,
15 RingCentral's advertising is entirely consistent with the purpose of the EOL period—to announce
16 and implement an orderly transition from Zoom's service to RingCentral's service pursuant to §
17 16(d) of the SAA. The fact that RingCentral started the transition process in good faith says nothing
18 about what harm will be caused if Zoom is permitted to block RingCentral's access to Zoom's
19 service in the midst of the EOL period before a replacement product is fully developed.

20 **III.    The Remaining Factors Are One-Sided in RingCentral's Favor**

21       The balance of equities favors RingCentral because there is no evidence of harm to Zoom
22 from the requested injunction. Zoom's OSC response contains nothing but unsupported attorney
23 argument about purported "harm" to Zoom caused by RingCentral "disparaging Zoom's products,"
24 and conclusory assertions that RingCentral is using the SAA's "confidentiality and non-
25 competition provisions…to bar Zoom from competing for RingCentral's customers." Opp. at 23.
26 Attorney argument is not evidence, and the fact that Zoom could not find a declarant to make these
27 assertions under penalty of perjury speaks volumes. Even accepting *arguendo* Zoom's attorney
28 argument, Zoom's purported harms do not flow from the injunction, which seeks only to maintain

the status quo and stop Zoom from using technical measures to block RingCentral customers. Likewise, Zoom's argument that an injunction "would leave Zoom in the inequitable position of having to continue … providing RingCentral's new customers with feature updates for the duration of the injunction" is not due to the injunction—it is Zoom's obligation under the SAA, which already require Zoom to provide feature parity to RingCentral's customers. Any claim that Zoom is harmed by an order permitting RingCentral to continue to use Zoom's technology is belied by the fact that Zoom just publicly announced that it is making its SDK available to all comers. https://blog.zoom.us/bring-industry-leading-video-to-your-application-with-zooms-video-sdk/.

Likewise, the public interest factor favors an injunction. Zoom has no response to the public strong public interest in requiring commercial parties to resolve business disputes through normal legal channels, rather than resorting to self-help tactics like Zoom's technological blocking measures. *Epic Games v. Apple Inc.*, 2020 U.S. Dist. LEXIS 188668, at *62 (N.D. Cal. Oct. 9, 2020); *Physicians Indem. Risk Retention Grp. v. Risk Mgmt. Ctr.*, 2009 U.S. Dist. LEXIS 149264, at *25 (D. Nev. Dec. 1, 2009). Zoom argues that there is a generalized public interest in *fair* competition, but nothing about the requested injunction implicates the concerns discussed in Zoom's cases. Zoom's claim that consumers are going to be misled into signing up for RingCentral's service in a bait-and-switch is not supported by any evidence and is contrary to the terms of the SAA. Zoom is obligated to honor all of RingCentral's subscriber agreements *for their term* without reference to the SAA. *See* Opp. at 25; Dkt. 24 (TRO) at 7 ("§ 16(e) of the SAA provides that termination of the SAA will not terminate or affect any Customer Agreements 'entered into prior to termination of this Agreement of each Customer Agreement in effect at the time of Termination.'"). And in any event, the requested injunction only seeks to stop Zoom's self-help technological blocking measures. There is no nexus between Zoom's alleged public interests and the terms of the proposed injunction.

## **CONCLUSION**

For the foregoing reasons, RingCentral respectfully submits that the Court should enter the requested preliminary injunction against Zoom.

Dated: March 24, 2021

CLEMENT SETH ROBERTS
KAREN G. JOHNSON-MCKEWAN
ROBERT L. URIARTE
NATHAN SHAFFER

ORRICK, HERRINGTON & SUTCLIFFE LLP


By: */s/ Clement Seth Roberts*
        Clement Seth Roberts
      Attorneys for RingCentral, Inc.