1  CLEMENT SETH ROBERTS (SBN 209203)
   croberts@orrick.com
2  KAREN G. JOHNSON-MCKEWAN (SBN 121570)
   kjohnson-mckewan@orrick.com
3  NATHAN SHAFFER (SBN 282015)
   nshaffer@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
5  405 Howard Street
   San Francisco, CA 94105-2669
6  Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759
7
   ROBERT L. URIARTE (SBN 258274)
8  ruriarte@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
9  1000 Marsh Road
   Menlo Park, CA 94021
10 Telephone: +1 650 614 7400
   Facsimile: +1 650 614 7401
11
   *Attorneys for Defendant*
12 *RingCentral, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZOOM VIDEO COMMUNICATIONS, INC., | Case No. 5:21-cv-01727-EJD |
| Plaintiff, | **DECLARATION OF CARSON HOSTETTER IN SUPPORT OF RINGCENTRAL'S OSC RE: PRELIMINARY INJUNCTION** |
| v. | |
| RINGCENTRAL, INC., | |
| Defendant. | |
| RINGCENTRAL, INC., | |
| Counterclaimant,. | |
| v. | |
| ZOOM VIDEO COMMUNICATIONS, INC. | |
| Counterdefendant. | |

I, Carson Hostetter, declare as follows:

1. I am the Senior Vice President, Worldwide Field Sales at RingCentral, Inc. I state the following facts based on my personal knowledge, except as to facts stated on information and belief, which I believe to be true. I could and would testify to the facts in this declaration if called to do so.

2. I joined RingCentral in April 2016 as a Vice President, Worldwide Enterprise Sales. Prior to joining RingCentral, I held several VP-level sales positions at Avaya during a 7 career there. I held leadership positions in Nortel's sales organization for ten years before my time at Avaya. I hold a bachelor's degree in Material Science and Engineering from North Carolina State University.

3. As the SVP, Worldwide Field Sales, I lead all of RingCentral's worldwide field sales teams for various market segments, solutions engineering, and contact center sales. The sales teams I lead are competing with Zoom in a number of different market segments, including the commercial and enterprise market segments.

4. My duties require me to have an understanding of RingCentral's competitors and their respective sales strategies. I conduct regular meetings with my various teams where we share information about the competitive situation in the field, and I rely on the competitive intelligence gathered in these meetings to guide my teams. Among other competitors, I regularly receive reports about competition with Zoom, and I have been personally involved in a number of deals in which RingCentral competed against Zoom for business. I understand the competitive landscape between RingCentral and Zoom very well.

5. During the month of March 2021, I learned of several RingCentral customer relationships negatively impacted by statements from Zoom. On March 3, 2021, I received a report of a growing rumor mill from Zoom sales personnel about RingCentral losing access to Zoom in April. These Zoom-sales driven rumors appeared designed to encourage RingCentral customers to switch over to Zoom.

6. For example, on March 2, 2021, a Zoom sales representative emailed an existing RingCentral customer and stated that RingCentral "will be losing the agreement to utilize Zoom

1  at the end of April" and attempted to use this misinformation to convince the customer to switch
2  from RingCentral to Zoom.  A true and correct copy of this email, forwarded to RingCentral by
3  its customer, is attached to this declaration as **Exhibit 10.**

4      7.    Based on multiple reports from members of my teams, I believe that the March 2,
5  2021 message Zoom sent to RingCentral's customer is representative of the types of statements
6  Zoom has been making recently to RingCentral customers as Zoom attempts to win business
7  away from RingCentral.

8      8.    Statements to customers like those reflected in the March 2, 2021 Zoom sales
9  email and Zoom's widely publicized blocking of RingCentral customer activations earlier this
10 month have harmed RingCentral's relationships.  I am aware that several worried customers have
11 reached out to RingCentral to discuss the Zoom "problem" and to have "serious conversations"
12 about their continuity of service, and I am aware of multiple RingCentral Meetings (which is
13 powered by Zoom's video services) customers who have asked RingCentral for amendments to
14 their customer contracts to address a contingency in which Zoom shuts off their access to
15 RingCentral Meetings.  These customers have asked for amendments to their RingCentral
16 contracts because of fear that Zoom might shut off their video conferencing service, even though,
17 relying on our agreement with Zoom, RingCentral already promised in the customers' contracts
18 to provide that service.  I believe these requests for amendments demonstrate a loss of some
19 measure of trust or confidence in RingCentral.  RingCentral's written promise is no longer
20 sufficient to give these customer's peace of mind, so they require additional contractual
21 protections.

22     9.    In addition to the damage to trust in RingCentral that I believe Zoom has caused, I
23 am aware of multiple deals that RingCentral has lost or had to change recently because of
24 customer fear about RingCentral's ability to deliver RingCentral Meetings.  In some instances,
25 customers shortened the length of the deal they were negotiating with us and/or negotiated early
26 termination clauses because of fear caused by Zoom.  Other customers have dropped RingCentral
27 Meetings from the deals they were negotiating with RingCentral altogether.  At least one existing
28 customer suddenly walked away from RingCentral entirely and switched to Zoom, which came as

a shock to the team because the customer had never indicated any dissatisfaction with RingCentral.

10. Some of the impacted customer relationships and deals I am aware of involve enterprise customers. Enterprise customer sales cycles are typically more resource intensive and can take anywhere from nine months to two years to close a deal. I recall several customer deals that I worked on that took eighteen months or more to close, and some that took two years. For some customers, security validation alone can take six months to a year. I am currently working on a deal now that has been in process for three years.

11. I believe that the harm to RingCentral's business caused by Zoom's conduct goes beyond the revenue lost because of Zoom's conduct. For example, when a customer decides to drop the video component of RingCentral's service, RingCentral loses more than the price of that video service. RingCentral also loses the opportunity to generate the unique level of goodwill and strategic partnership that comes from the synergy and simplicity of having RingCentral as a unified communications as a service (uCaSS) platform provider. The probability of converting that customer to RingCentral's video conferencing service in the future—and of making good on the promise of being the customer's true uCaaS provider—is also diminished. RingCentral's ability to provide a unified mobile, video, and phone solution is part of what differentiates it from competitors like Zoom, so when customers start cutting out portions of the service because of fears about continuity, it deprives RingCentral of a key business differentiator. This diminishes RingCentral's value proposition, causing RingCentral to lose both revenue and market share. When RingCentral loses a deal to a competitor like Zoom, it gives the competitor a foothold and the ability to compete as an incumbent, which could create a cascading effect resulting in further loss of business for RingCentral. I believe it is difficult to place a monetary value on this type of loss.

12. Likewise, when a customer shortens the length of their contract with RingCentral, I believe that RingCentral loses more than just the extra years' revenue. For example, even assuming things go well and that the customer renews their service, because of the shorter contract and more frequent sales cycles, RingCentral has to invest more sales resources to win the

1  same amount of business.  The odds of winning the same amount of business and revenue are also
2  comparatively lower due to shortened contract terms.  Having to close several deals is generally
3  harder to do than closing a smaller number of longer-term deals.  I believe it is difficult to place a
4  monetary value on the loss to RingCentral's expected value for these types of deals, although I do
5  believe RingCentral is suffering such a loss.

6         13.     Even as to those customers who do not ultimately fall for Zoom's tactics and do
7  not alter their deals with RingCentral, Zoom is causing harm.  Zoom's conduct has elongated
8  RingCentral's sales cycle and eroded bookings because of the increased level of effort required to
9  address Zoom's conduct.  There are several pending deals that I believe would have already
10 closed this month but for doubts about RingCentral Meetings created by Zoom's conduct.
11 Placing a value on this loss is difficult.

12        14.     I believe that RingCentral will suffer harm to its business and relationships unless
13 there is a court order that Zoom must continue to provide service to RingCentral and its
14 customers.  I do not trust Zoom to be a good contractual partner anymore, and several of
15 RingCentral's customers appear to have the same fear and are worried about their service.

16        15.     I also believe that Zoom's conduct is helping it take market share from
17 RingCentral during a time where there are very unique market conditions.  Due to COVID-19, the
18 migration to cloud services like RingCentral and Zoom has accelerated dramatically.  This means
19 that Zoom's actions are having a uniquely high impact because of the market share that is
20 currently up for grabs during a critical business window.

21        16.     In addition to harming relationships with RingCentral's customers, Zoom's
22 conduct is causing problems with RingCentral partners who refer business to RingCentral.
23 Earlier this month, I received a call from a concerned partner who was troubled by the prospect
24 that our mutual customers would lose access to the Zoom service.  This partner asked me point
25 blank whether they should sell Zoom directly, rather than RingCentral Meetings, in order to be
26 safe.  A high percentage of RingCentral's business comes from these partner referrals, and in my
27 opinion, Zoom's conduct threatens to disrupt partner referrals to RingCentral because of the
28 uncertainty Zoom's conduct has caused.  Measuring the loss of business from partner referrals is

HOSTETTER DECL. RE: RINGCENTRAL'S
REPLY TO ZOOM OSC RESPONSE
5:21-cv-01727-EJD

1  difficult, because we don't have visibility into when someone decided not to refer business to us.

2      17.    I am informed and believe that market analysts have mentioned Zoom's lawsuit and allegations in reports discussing the value of RingCentral's stock.  Attached hereto as **Exhibit 11** is a true and correct copy of one such analyst report which lowered RingCentral's stock price target to $410 from $530 due to uncertainty regarding "reputational damage" stemming from Zoom's allegations.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.  Executed this 24th day of March, 2021 at Milton, Georgia.

*Carson Hostetter*
_____
Carson Hostetter