# EXHIBIT A

2007 WL 9697777
Only the Westlaw citation is currently available.
United States District Court, N.D. Georgia, Atlanta Division.

DATAPATH, INC., Plaintiff,

v.

GENERAL DYNAMICS SATCOM TECHNOLOGIES, INC., Defendant.

CIVIL ACTION NO. 1:07-CV-2442-CAP
|
Signed 11/09/2007

**Attorneys and Law Firms**

George Daryl Wenick, Reginald Mark Jones, Smith Currie & Hancock, Atlanta, GA, for Plaintiff.

Kenneth B. Weckstein, Brown Rudnick Berlack Israels LLP, Washington, DC, Ryan Bradley Wilhelm, Epstein Becker & Green, Jeffrey Paul Lutz, The Lutz Law Group, LLC, Atlanta, GA, for Defendant.

ORDER

CHARLES A. PANNELL, JR., United States District Judge

*1 This matter is before the court on the plaintiff's motion for a preliminary injunction [Doc. No. 7].

**I. Statement of Facts**

In the instant case, the parties were competing bidders to supply satellite terminals to the U.S. Army Communications-Electronics Command ("Government") under the World-Wide Satellite Systems Program ("WWSS"). Under the WWSS, the Government solicited proposals for Base Contracts to provide six types of satellite terminals.

According to the plaintiff, the defendant did not have the experience and capability to prepare a proposal for and deliver Prime Mover/Trailer Mounted Satellite Terminals ("Type 5") and Deployable Satellite Earth Terminals ("Type 6"). Because the Government required the bidders to offer a proposal for all six terminal types, the defendant entered into an agreement with the plaintiff ("Teaming Agreement") relating to Type 5 and Type 6 terminals. It is the Teaming Agreement that is the subject of this civil action.

Based on the proposals submitted by the bidders, the Government awarded Base Contracts to six contractors. Essentially, the Base Contracts granted the contractors the right to submit bids in response to a Request for Task Execution Plan ("RTEP"). Both the plaintiff and the defendant were awarded Base Contracts. Thus, when the Government issued the first relevant RTEP, both the plaintiff and the defendant submitted proposals. Based on these proposals, the Government awarded the first delivery order to the defendant.

Pursuant to the Teaming Agreement, the defendant entered into a letter subcontract with the plaintiff, under which the defendant agreed to purchase from the plaintiff all Type 5 terminals that were called for in the first delivery order. While the parties had some disputes in completing the sale and delivery of these Type 5 terminals, their differences were resolved, and the plaintiff supplied the Type 5 terminals to the defendant for completion of the first delivery order.

The Government issued a second RTEP soliciting proposals for another delivery order. This second delivery order also included Type 5 terminals. Both the plaintiff and the defendant submitted proposals for this second delivery order. The Government awarded the second delivery order to the defendant.

In preparing its proposal for the second delivery order, the defendant did not seek information from the plaintiff. At the time this suit was filed, the plaintiff believed that the defendant was producing its own Type 5 terminals and intended to supply those to the Government in response to the second delivery order. According to the plaintiff, the defendant's supplying of its own Type 5 terminals to the Government would be a breach of the Teaming Agreement.

After extensive briefing and oral argument, it is evident that the defendant does not intend to procure the Type 5 terminals to satisfy the second delivery order from the plaintiff. Instead, the defendant intends to fulfill the delivery order using its own Type 5 terminals. The plaintiff filed this lawsuit alleging breach of contract seeking damages, a declaratory judgment, and specific performance. Additionally the plaintiff seeks a permanent injunction the would prevent the defendant from obtaining Type 5 or Type 6 terminals to be used to perform any delivery order awarded under the Base Contract from any source other than the plaintiff.

## II. Legal Analysis

### A. Preliminary Injunction Standard

**\*2** A district court may grant a preliminary injunction only upon the movant's showing that (1) it has a substantial likelihood of success on the merits, (2) the movant will suffer irreparable injury unless the injunction is issued, (3) the threatened injury to the movant outweighs the possible injury that the injunction may cause the opposing party, and (4) if issued, the injunction would not disserve the public interest. Horton v. City of St. Augustine, 272 F.3d 1318, 1326 (11th Cir. 2001). "It is well established in this circuit that a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to all four elements." Id. (citation and quotation marks omitted).

### B. Application of the Standard to the Facts

Pursuant to the Teaming Agreement, Virginia law governs this dispute. Ex. A to Compl., at ¶ IX(C). Accordingly, both parties cite and rely upon Virginia law in their briefs.

**1. Likelihood of Success on the Merits**

Under Virginia law, "a [t]eaming [a]greement is an enforceable contract if it is clear that the parties intended to enter into a binding contractual relationship and the agreement contains sufficient objective criteria to enforce." EG&G, Inc. v. Cube Corp., 2002 WL 31950215, \*7 (Va. Cir. Ct. December 23, 2002). There is no cause of action for breach of a teaming agreement, however, if the agreement shows by its express terms that it is not enforceable. W.J. Schafer Assoc., Inc. v. Dordant, Inc., 493 S.E.2d 512, 515 (Va. 1997).

The Teaming Agreement at issue in this case provides that Datapath "shall act as subcontractor to [General Dynamics]". See Ex. A to Compl., at ¶ III(A). Pursuant to the Teaming Agreement, Datapath was to provide a proposal for the work described in the Statement of Work ("SOW"), including costs, and to assist General Dynamics in preparing the proposal to submit to the Government. See id. at ¶¶ B-D. General Dynamics was to conduct all negotiations with the Government and recommend that Datapath be its subcontractor for the portion of the prime contract assigned to Datapath by the SOW. See id. at ¶ E-F.

The SOW provides in its entirety:

As first-tier subcontractor, [Datapath] shall be responsible for the following portions of the Program as described below.

> **Proposal Preparation Activities**: In support of the WWSS proposal effort Datapath will provide descriptions of the terminals addressing the requirements in the sample tasks.
>
> **Subcontract Performance Responsibilities**: Datapath will be the exclusive provider of the complete terminals in accordance with the requirements stated in sample tasks 5 and 6 of the WWSS solicitation. Additional services in support of these terminals will be mutually agreed upon with further discussions.
>
> [General Dynamics] will also consider any specific Delivery Order proposal from Datapath for the other terminals in accordance with the requirements stated in sample tasks 1-4 of the WWSS solicitation on a case-by-case basis. Specific preference will be given to a DataPath Delivery Order proposal for these terminals where DataPath has an existing customer relationship and has been influential in the development of the specifications for the Delivery Order requirements.
>
> **General Areas**
>
> **Specific Areas by WBS**
>
> **Methodology to Establish Pricing:** DataPath shall also provide pricing for the terminals and agree [sic] services to support the WWSS pricing proposal.

Attach. 1 to the Teaming Agreement, Ex. A to the Compl.

It is Paragraph 3 of the SOW upon which the plaintiff relies in making the argument that the Teaming Agreement required General Dynamics to purchase all Type 5 and Type 6 terminals used to fulfil contracts within the WWSS program exclusively from DataPath. Additionally, the plaintiff argues that Paragraph V(B) of the Teaming Agreement supports its contention that the parties had a binding agreement requiring General Dynamics to subcontract all Type 5 and 6 terminals to DataPath. Paragraph V(B) states:

> **\*3** If the subcontract is subject to Government approval, [General Dynamics] shall take reasonable actions, including providing the opportunity for [DataPath] to discuss with Government directly its qualification, to obtain Government's approval of the proposed subcontract. In the event the Government does not approve the proposed subcontract, [General Dynamics] shall have no liability to [DataPath] and may propose other entities for the work that would otherwise have been subcontracted to [DataPath].

According to DataPath, this paragraph indicates that General Dynamics would have liability to DataPath should it subcontract work for Type 5 and Type 6 terminals to any other entity unless the Government fails to approve the subcontract between General Dynamics and DataPath.

In response to DataPath's assertion that it was General Dynamic's exclusive provider of all Type 5 and 6 terminals used in fulfilling orders under the WWSS, General Dynamics points out that the Teaming Agreement expressly precluded either party from being bound on an exclusive basis. See Teaming Agreement, Ex. 1 to Compl., at ¶ IV(A). Additionally, General Dynamics directs the court to the portion of the Teaming Agreement that provides:

> Nothing in this Agreement shall restrict either Party from marketing, promoting, quoting, leasing, licensing, or selling (or offering to do any of the foregoing) its standard items or services that it regularly offers for sale.

See id. at ¶ IV(B). According to General Dynamics, this clause allows it to fulfill the orders for Type 5 and 6 terminals itself because those are items it regularly offers for sale.

While "[c]ontracts are not rendered ambiguous merely because the parties disagree as to the meaning of the language employed by them in expressing their agreement," in the instant case, the court is unable to discern what the parties agreed to as evidenced by the Teaming Agreement. Wilson v. Holyfield, 313 S.E.2d 396, 398 (Va. 1984) (citing Manss-Owens Co. v. Owens & Son, 105 S.E. 543, 547 (Va. 1921)). "The language of a contract is ambiguous if it may be understood in more than one way or when it refers to two or more things at the same time." Video Zone, Inc. v. KF & F Properties, 594 S.E.2d 921, 923 (Va. 2004). "[N]o

writing is unambiguous if susceptible of two reasonable interpretations.... If there is more than one permissible inference as to intent to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact." Atalla v. Abdul-Baki, 976 F.2d. 189, 192 (4th Cir. 1992) (citation omitted).

The court, after reviewing the Teaming Agreement extensively and considering the written and oral arguments of the parties, concludes that there are a myriad of reasonable interpretations with respect to the provisions related to DataPath being General Dynamics exclusive supplier of Type 5 and Type 6 terminals. For example, because the clause relied upon by the plaintiff to establish the exclusive relationship is contained in a paragraph labeled Subcontract Performance Responsibilities, a reasonable interpretation of that clause—though not one asserted by either party—is that DataPath was required to supply all Type 5 and Type 6 terminals ordered by General Dynamics without subcontracting the order out to another entity. Furthermore, there is nothing within the terms of the Teaming Agreement to expressly prohibit General Dynamics from supplying Type 5 and Type 6 terminals to the Government itself. Rather, the Teaming Agreement could be interpreted to create an obligation for General Dynamics to use DataPath as its subcontractor when an outside entity is used to supply Type 5 and Type 6 terminals. Also, the Teaming Agreement, read as a whole, can be interpreted to be merely an agreement to negotiate in good faith in the future. And finally, the interpretation urged by the plaintiff, that the parties agreed that DataPath would be the exclusive provider of every Type 5 and Type 6 terminal supplied under the Base Contract, is a reasonable interpretation of the Teaming Agreement. As these numerous interpretations make evident, the meanings of the relevant provisions are fact questions to be determined by a jury.

 *4  In addition to presenting reasonable interpretations of the language contained in the Teaming Agreement, both parties have offered affidavit evidence of individuals involved in the negotiation and drafting of the Teaming Agreement. A review of this evidence leaves the court in much the same position it found itself after reading the actual language of the agreement: with two (or more) plausible interpretations of the parties' understanding and intent in entering into the Teaming Agreement. The court finds nothing offered by the plaintiff persuasive as to the likelihood of success on the merits. Rather, the plaintiff has offered a reasonable position that it can present to a trier of fact for final decision. This is an insufficient showing to allow the court to grant the extraordinary relief of a preliminary injunction.

**2. Irreparable Harm**

Turning to the second prong of the preliminary injunction analysis, the court will consider whether the plaintiff has demonstrated that it will suffer irreparable harm absent the grant of the injunction. An injury is irreparable only if it cannot be undone through monetary remedies. Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987) (citing Cate v. Oldham, 707 F.2d 1176, 1189 (11th Cir. 1983)).

DataPath argues that it faces irreparable harm if this court does not issue an injunction because the damages it will suffer are speculative and uncertain. In support of this argument, DataPath relies on the ongoing nature of contracts awarded under the WWSS. According to DataPath, because delivery orders by the Government may be issued for up to five years from the date of the Base Contract, the full extent of the harm caused by General Dynamics' alleged breach is unknown at this time and will not be discernable until the expiration of the Base Contract.

DataPath's position with regard to the speculative nature of the damages equating to irreparable harm is supported by the EG & G case in which a Virginia Circuit Court granted an injunction based on an alleged breach of a teaming agreement. EG & G, 2002 WL 31950215 at *13. That court found that:

> due to the award term feature of the [government contract], it is uncertain whether the contract will last for only four years, or up to ten years. If terminated by Cube, EG & G will have a difficult if not impossible task calculating and quantifying the earnings it might have received under the [government contract]. Moreover, EG & G's involvement is a factor that arguably affects the success of that contract and whether it is extended to its full ten-year potential.

Id. Likewise, the plaintiff in the instant case will not know the extent of its damages until some years down the road.

Before concluding that the speculative nature of the damages equates to irreparable harm in the context of a preliminary injunction, however, this court must consider what damages are available to the plaintiff under the terms of the Teaming Agreement. The parties agreed to a limitation of liability, which states as follows:

> IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES ARISING FROM ANY PROVISION OF THIS AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF USE, INCOME OR PROFITS, OR ANTICIPATED PROFITS OR LOST BUSINESS OR THE COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES.

Ex. A to the Compl., at ¶ VIII(D). Pursuant to this provision of the Teaming Agreement, the plaintiff has waived its right to seek indirect, incidental, consequential, special, punitive or exemplary damages and more specifically, loss of income or profits. Therefore, the speculative nature of damages that fall into this category is immaterial for purposes of determining whether the plaintiff has shown it will suffer irreparable harm absent the issuance of an injunction.

**\*5** The court finds that the irreparable harm alleged by the plaintiff consists almost entirely of damages that the plaintiff waived pursuant to the Teaming Agreement. While the plaintiff, alternatively argues that this bolsters its argument that it has no adequate remedy at law, the court will not, through the extraordinary remedy of injunction, provide the plaintiff relief that it waived in entering into the Teaming Agreement. Therefore, the court finds that the plaintiff has failed to carry its burden of demonstrating irreparable harm absent an injunction.

### 3. Balance of Injury

The third inquiry of the preliminary injunction analysis is whether the plaintiff can establish that the injury it would sustain if the defendant was not enjoined outweighs the harm an injunction would cause the defendant. The plaintiff makes a conclusory argument that the defendant would not be harmed by an injunction because the defendant can continue to perform the Government's second delivery order by simply substituting the DataPath Type 5 terminals rather than its own.

The defendant, on the other hand, has submitted affidavit testimony to establish that it has already spent $8 million in preparing to fulfill the second delivery order, money that would be lost if the plaintiff's motion for preliminary injunction is granted. See Shoemake Aff. I, at ¶ 15. Additionally, the defendant argues that an injunction could cause it to default on the second delivery order, which could, in turn, negatively affect its ability to win future contracts with the Government.

This court concludes that the harm to the defendant in the event of an injunction outweighs injury the plaintiff contends it will suffer in the absence of an injunction. Accordingly, the plaintiff has failed to carry its burden with respect to the third factor in the preliminary injunction analysis.

### 4. Public Policy

The fourth and final inquiry this court must make is whether the injunction sought by the plaintiff would disserve public policy. According to the plaintiff, the Government has rated its Type 5 and Type 6 terminals superior to those produced by the defendant. Therefore, the public interest would be served through an injunction requiring the defendant to provide the Government with the plaintiff's terminals.

On the other hand, the defendant argues denying the injunction would further the public interest because the second delivery order will be completed on time, meeting the Government's tight schedule for implementation of the terminals. Furthermore,

according to the defendant, granting the injunction would reduce competition for Government contracts, which would disserve the public interest.

In evaluating the arguments of the parties with respect to public policy, the court finds that public interests are evenly balanced. Therefore, the final factor is neutral in the determination of whether an injunction should issue.

### III. Conclusion

Based on the foregoing, the plaintiff failed to establish (1) a likelihood of success on the merits and (2) that it would suffer irreparable injury without an injunction. Additionally, the court found that the injury to the defendant outweighed the potential injury to the plaintiff should an injunction be issued. Therefore, the plaintiff's motion for preliminary injunction [Doc. No. 7] is DENIED.

SO ORDERED, this 9th day of November, 2007.

**All Citations**

Not Reported in Fed. Supp., 2007 WL 9697777

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.