⚠️ Caution
As of: March 25, 2021 11:23 PM Z

# *Beacon Assocs. v. Apprio, Inc.*

United States District Court for the District of Columbia

April 13, 2018, Decided

Case No. 1:18-cv-00576 (TNM)

**Reporter**
308 F. Supp. 3d 277 *; 2018 U.S. Dist. LEXIS 63034 **; 2018 WL 1784281

BEACON ASSOCIATES, Inc., Plaintiff, v. APPRIO, Inc., Defendant.

**Subsequent History:** Appeal dismissed by *Beacon Assocs. v. Apprio, Inc., 2018 U.S. App. LEXIS 34604 (D.C. Cir., Dec. 7, 2018)*

**Counsel:** **[**1]** For BEACON ASSOCIATES, INC., Plaintiff: James Y. Boland, PRO HAC VICE, VENABLE LLP, Tysons Corner, VA; Joseph L. Robbins, VENABLE LLP, Washington, DC.

For APPRIO, INC., Defendant: David Reese Warner, LEAD ATTORNEY, CENTRE LAW & CONSULTING LLC, Tysons, VA.

**Judges:** TREVOR N. MCFADDEN, United States District Judge.

**Opinion by:** TREVOR N. MCFADDEN

## Case Summary

### Overview
HOLDINGS: [1]-In an application for a preliminary injunction on alleged violations of the contract between the parties, a preliminary injunction was entered against the prime contractor because the subcontractor had met the high burden for the imposition of a preliminary injunction. The subcontractor was able to establish: that it was likely to succeed on the merits of both counts of breach of contract at issue – soliciting the subcontractor's employees and terminating the contract without legal justification; that it was likely to suffer irreparable harm - injury to its reputation, and inability to effectively compete for the forthcoming contract renewal; that equities favor the subcontractor, and that an injunction was in the public interest – preserving the integrity in federal contracting, and returning the parties to the prior status quo to preserve the object of the controversy.

### Outcome
The subcontractor's application for a preliminary injunction granted.

## Opinion

**[*280] MEMORANDUM OPINION**

Before the Court is an Application for a Preliminary Injunction filed by the Plaintiff Beacon Associates, Inc. Beacon alleges that the Defendant Apprio, Inc. solicited Beacon's employees in violation of a contract between the parties, and then terminated that contract without legal justification, destroying Beacon's ability to compete in a pending government contract competition. For the reasons that follow, I conclude that Beacon has met the high standards for imposition of a preliminary injunction, and will issue a corresponding order.

Case 5:21-cv-01727-EJD   Document 37-1   Filed 03/25/21   Page 2 of 10

Page 2 of 10

308 F. Supp. 3d 277, *280; 2018 U.S. Dist. LEXIS 63034, **1

## I. Preliminary Findings of Fact[1]

### A. Background

Beacon has been a subcontractor under Apprio's prime contract with the Federal [*281] Emergency Management Agency (FEMA) since 2014, "providing approximately [40 employees] to support the training [efforts] at FEMA's Center for Domestic Preparedness [FEMA Center] at Fort McClellan [**2] in Anniston, Alabama." Compl. 1. From 2009 to 2014, Beacon held the prime contract for these services, but graduated from the qualifying program for "small disadvantaged businesses" before "FEMA re-competed the [contract] in late 2013 and early 2014." *Id.* at ¶¶ 3-5. Beacon therefore teamed with Apprio to win the follow-on contract, "in exchange for a share of 49% of the work as a subcontractor." *Id.* at ¶¶ 6-7. On January 16, 2018, FEMA issued a "sources sought" notice, a "Request for Information" (RFI), and a "draft Performance Work Statement," giving formal notice that competition for the follow-up FEMA Center contract was about to begin. Declaration of Carol Koffinke, Application for Preliminary Injunction Ex. 2 ¶ 39-41 (Koffinke Decl.); Koffinke Decl. Ex. 11. Because neither Apprio or Beacon will qualify as a prime contractor in the next round, *id.* at ¶ 47, each is searching for a new contracting partner. *Id.* at ¶¶ 43-47.

### B. The Fall 2017 Dispute

For approximately the first three years of the subcontract, Beacon routinely paid for Other Direct Costs (ODCs), "such as conference expenses, bus transportation, overtime and incidental supplies and equipment." Compl. ¶¶ 43, 75. These ODCs [**3] were submitted as invoices from third party vendors, who were often engaged by Apprio without Beacon's prior knowledge. Koffinke Decl. ¶ 22. To get reimbursed after paying an ODC invoice, "Beacon would in turn submit an invoice for the ODCs to Apprio plus 1% [General and Administrative costs], and then Apprio would in turn pass Beacon's invoice directly to FEMA for payment before paying Beacon's invoice." Koffinke Decl. ¶ 22. Beacon allegedly paid an average of about $30,000 to $35,000 in ODCs per month, until "emergencies caused by Hurricanes Harvey, Maria[,] and Irma" caused FEMA's ODC expenses to rise dramatically in late 2017. Compl. at ¶¶ 76-80. When Beacon began receiving larger invoices from a bus company named Cline Tours, some of which "were in excess of $200,000," Beacon asked Apprio to pay some of the invoices. Koffinke Decl. ¶¶ 34-35. Apprio initially assented, and paid two of the Cline Tours invoices. *Id.* at ¶ 35; *see also id.* at Ex. 7.

But the parties eventually became frustrated about the issue. Apprio's president, Darryl Britt, sent an email to Beacon's president, Carol Koffinke on November 7, 2017, expressing "concern[] that Beacon has not made the payments for the [**4] ODC's for FEMA's surge." Koffinke Decl. Ex. 8 at 2. In part because "Beacon has been able to make payments to date, with the exception of the recent invoices that Apprio paid upon Beacon's request," Mr. Britt stated that "[i]t was not [Apprio's] intention to take over full payment of ODC's," and Apprio did "not consider the payments terms to Beacon to be onerous, nor abnormal." *Id.* In response, Ms. Koffinke said that Apprio had "[a]pparently . . . received a [modification] to support the hurricane effort that I am guessing [*282] was somewhere between $1.5M and $2M of ODC's," without ever informing Beacon or modifying the Apprio-Beacon subcontract accordingly. *Id.* at 1. Ms. Koffinke said that "[h]ad the communication and contract administration been handled correctly . . . we could have worked something out." *Id.* She emphasized that Beacon had "no contractual obligation to pay for the ODC's on this [modification]," and told Mr. Britt that "our contract for this Option Year had zero dollars funded for ODC's." *Id.* Ms. Koffinke avers that "Apprio never responded," and that "[a]fter November, Beacon paid other ODC invoices in line with past practice . . . without any further comment from Apprio." Koffinke [**5] Decl. ¶ 38.

### C. Relevant Contractual Provisions

Under the prime contract between Apprio and FEMA, ODCs were to be "Incrementally Funded," and ODCs had $650,000 budgeted in each option year of the potential four-year contract. Koffinke Decl. Ex. 1 at B-4. Under the subcontract between Apprio and Beacon, Koffinke Decl. Ex. 2 (Subcontract), Beacon was "not authorized to perform Services, make expenditures or incur obligations which exceed the costs as set forth in Appendix B, plus travel and other direct costs that are pre-approved by Apprio and funded through a separate modification." Subcontract § 5.2. Under Appendix B to the subcontract, Beacon was obligated to

---

[1] "In granting or refusing an interlocutory injunction," a court must "state the findings and conclusions that support its action." *Fed. R. Civ. P. 52(a)(2)*; *see also Fed. R. Civ. P. 65* ("Every order granting an injunction . . . must . . . state the reasons why it issued."). But since "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," *Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981)*, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id. at 395* (citations omitted).

Case 5:21-cv-01727-EJD   Document 37-1   Filed 03/25/21   Page 3 of 10

Page 3 of 10

308 F. Supp. 3d 277, *282; 2018 U.S. Dist. LEXIS 63034, **5

"satisfy ODC requirements as identified by Work Orders which are authorized by the customer." Subcontract App. B at § 2.2. Section 2 also said that "other direct costs . . . shall be funded through purchase orders, pursuant to Section 5.2 of this Agreement." Id. at § 2. Modification 9 to the contract between Apprio and Beacon, which covered Option Year 3 (from March 15, 2017 to March 14, 2018), stated that "ODCs are not included in the [budgeted] amounts and will be reimbursed at cost plus 1% additional for General & Administrative costs." Koffinke Decl. Ex. 3 [**6] at 2. In September 2017, FEMA twice modified its prime contract with Apprio, adding $231,257.50 and then $1,780,000.00 for ODCs. Koffinke Decl. Exs. 5-6. This totaled slightly over 2 million dollars in ODC funding in the prime contract for Option Year 3 alone, whereas the amount had previously been only $650,000.

The subcontract also prohibited solicitation of the parties' employees:

> During the term of this agreement and thereafter for a period of one (1) year, both the Subcontractor and Contractor shall not directly, for its own account or for the account of any other individual, corporation, partnership, association or firm, induce or attempt to induce any employee of the other party to leave his or her employment with the applicable party. This does not include individuals responding to media advertised employment opportunities or any individual who makes an unsolicited direct contact with a Party regarding employment.

Subcontract App. A, ¶ 5.

### D. Apprio Offers Retention Bonuses and Contingent Offer Letters to Beacon's Staff

About two weeks after FEMA released the contract competition notices, Mr. Britt sent an email to Carol Koffinke dated January 30, 2018, informing her that in "planning [**7] for the recompete of [FEMA Center] and now that the RFI is on the street," Mr. Bitt had offered "retention bonuses" to the "entire contract team." Koffinke Decl. Ex. 11. According to Ms. Koffinke, these bonuses were in the amount of $500. Koffinke Decl. ¶ 47. Mr. Britt's email said: "I want to make sure you are informed as some have already signed the paperwork I provided to them." Koffinke Decl. Ex. 11. Mr. Britt explained: "I heard through the [*283] grapevine that Beacon was not pursuing the contract, hence I figured it was of little consequence." Id. Apprio admits that it provided what it describes as "contingent offer letters" to "Beacon's staff on the [FEMA Center] Project." Opp. 20.

### D. Apprio Terminates the Subcontract with Beacon

Less than a month later, on February 27, 2018, Apprio terminated its subcontract with Beacon. Koffinke Decl. Ex. 14. The termination notice required Beacon's employees to stop work immediately, and stated that "Beacon [had] committed material breaches" by failing to pay two American Coach bus line invoices. Id. Beacon claims that it did not receive these invoices until the termination. Second Declaration of Carol Koffinke ¶¶ 1-3, Pl.'s Reply, ECF No. 12-1 (Second [**8] Koffinke Decl.). The notice also relied on "the material breaches described in the November Letter," id., referring to a letter dated November 24, 2017, and attached to the termination notice. See Koffinke Decl. Ex. 16. The November Letter—drafted by Apprio's attorney and addressed to Ms. Koffinke—claimed to be in response to her exchange with Mr. Britt regarding whether Beacon was required to pay for ODCs. Id. The letter argued that Beacon was contractually obligated to pay ODCs if "authorized by the customer," and that the issue of whether "Beacon's contract for the current option year of the Subcontract . . . [had] any funding for ODCs[] is irrelevant." Id. Given Apprio's payment of some ODC invoices from Cline Tours, the letter stated that "Beacon is currently in default," and that "Apprio affirmatively reserves its rights to seek any remedy." Id. at 2. Beacon asserts that it never received the November Letter until it was attached to the termination notice.[2]

After the termination notice on February 27, 2018, Beacon's 40 FEMA Center employees began working for Apprio the very next day, on February 28, 2018. Apprio claims that on the afternoon of February 27th, following the termination, [**9] "Beacon employees began *en masse* to apply for job openings on Apprio's website. Consequently, Apprio hired such Beacon employees to continue to staff and fulfill Apprio's obligations." Declaration of Darryl Britt ¶ 16, Def.'s Opp., ECF No. 10-2 (Britt Decl.). The termination occurred approximately two weeks before March 14, 2018, when FEMA formally exercised "the fourth and final option in the prime contract, extending Apprio's [prime] contract until March 14, 2019." Under past practice, (and, Beacon alleges, the subcontract's plain language[3]), Apprio would have extended Beacon's contract for that year as well unless the termination occurred. Koffinke Decl. ¶ 54.

---

[2] Despite knowing the receipt of this letter—which was ostensibly emailed to Ms. Koffinke—was in question, Apprio has not supplied evidence of its receipt. For purposes of this opinion and order, I find that the letter was never received by Ms. Koffinke.

[3] The subcontract commits Apprio to "utilize Subcontractor's services" in the performance of "Contract #HSFE20-14-R-0050," the prime contract that refers to all four Option Years. Subcontract 1; Koffinke Decl. Ex. 1 (the prime contract).

Case 5:21-cv-01727-EJD   Document 37-1   Filed 03/25/21   Page 4 of 10

Page 4 of 10

308 F. Supp. 3d 277, *283; 2018 U.S. Dist. LEXIS 63034, **9

## II. Legal Standards

Under *Winter v. Natural Resources Defense Council, Inc.*, "[a] preliminary injunction is an extraordinary remedy never awarded as of right," but as an exercise of discretion by "courts of equity." 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id. at 20*; see also [*284] [**10] Gordon v. Holder, 721 F.3d 638, 644, 406 U.S. App. D.C. 6 (D.C. Cir. 2013) (quoting *Winter* as the standard). These four factors are not considered in isolation from one another, and no one factor is necessarily dispositive as to whether preliminary injunctive relief is warranted. Rather, the factors "interrelate on a sliding scale and must be balanced against each other." *Morgan Stanley DW Inc. v. Rothe, 150 F. Supp. 2d 67, 72 (D.D.C. 2001)* (*Morgan Stanley*). Finally, "because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly," and "any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown." *Id. at 73* (citation omitted). Per the terms of the parties' subcontract, I will apply Delaware law in determining their contractual rights and responsibilities. Subcontract App. A § 29.

## III. Analysis

Beacon alleges that Apprio breached the subcontract in two ways: soliciting Beacon's employees, and terminating the contract without legal justification. Beacon seeks a preliminary injunction that would "immediately: (1) reinstate and restore the parties' subcontract through March 14, 2019; and (2) enjoin Apprio from employing or attempting to employ Beacon's employees in violation of Appendix A, Section 5 of the subcontract." Application 25. I conclude that Beacon [**11] "makes a strong showing on all four factors that [a] court must consider in the injunctive-relief analysis," *see Morgan Stanley, 150 F. Supp. 2d at 73*, and will issue a tailored injunction accordingly.[4]

### A. Beacon is Likely to Succeed on the Merits of Both Counts

*1. Termination of the Subcontract*

Apprio could only legally terminate the contract as it did, without notice, if Beacon had committed a "material breach." Subcontract App. A at § 13.[5] Instead of showing a material breach on Beacon's part, the evidence instead points to a termination for pretextual reasons, to in essence effect a hostile takeover of Beacon's work for the FEMA Center in an important contract competition year. The "material breaches" that Apprio cited in terminating the subcontract, Koffinke Decl. Ex. 14, if breaches at all, were certainly not material.[6]

[*285] Under Delaware law, whether a breach is material is a question "of degree[,] and is determined by weighing the consequences in the light of the actual custom of men in the performance of [similar] contracts." *BioLife Sols., Inc. v. Endocare, Inc., 838 A.2d 268, 278 (Del. Ch. 2003)*, as revised (Oct. 6, 2003). There are several factors to consider, including

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent [**12] to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the

---

[4] Because Beacon is a Maryland corporation with its principal address in that state, while Apprio is a Delaware corporation with its principal address in the District of Columbia, I am satisfied that complete diversity exists, and that I have subject matter jurisdiction. *See* 28 U.S.C. § 1332(a); Compl. ¶¶ 24-27.

[5] I agree with Apprio that under App. A, Section 13 of the subcontract, Apprio could terminate the subcontract without notice in the event of a material breach. I read the breach section to have two separate paths, each with its own paragraph: one path for non-material breach, which requires 15 days' notice (if the "Subcontracter fails to strictly adhere to the terms . . . [or] fails to maintain the progress of the work"), and which can only be utilized by the prime contractor, and the second path for "a material breach," which can be invoked by "[e]ither party" at any time. Subcontract App. A at § 13.

[6] I assume for purposes of this ruling that Beacon was contractually obligated to pay ODCs, although the contract is rather ambiguous on this point. Beacon was required to "satisfy ODC requirements as identified by Work Orders which are authorized by the customer," Subcontract App. B at § 2.2, but was "not authorized" to pay for ODCs unless they had been "funded through a separate modification." Subcontract § 5.2. Modification 9 to the subcontract, which contained budgeted amounts for Option Year 3, explicitly did "not include[]" ODC funds in the modification's listed amounts. Koffinke Decl. Ex. 3. However, the modification did say that ODCs would be "reimbursed at cost plus 1%." *Id.* A provision stating that ODCs could be "reimbursed" could conceivably be viewed as having "funded" ODCs, particularly in light of Beacon's consistent course of conduct in paying ODCs for the life of the subcontract, without specific, budgeted amounts for ODCs in a contract modification.

Case 5:21-cv-01727-EJD   Document 37-1   Filed 03/25/21   Page 5 of 10

Page 5 of 10

308 F. Supp. 3d 277, *285; 2018 U.S. Dist. LEXIS 63034, **12

party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id*. In other words, the breach must "go to the substance of the contract." *Matthew v. Laudamiel, 2012 Del. Ch. LEXIS 145, 2012 WL 2580572 at \*9 (Del. Ch. June 29, 2012)*.

Apprio's termination notice primarily relied on Beacon's failure to pay two American Coach invoices totaling $12,830.20. Koffinke Decl. Ex. 14 (the invoices were for $8,422.20 and $4,408.00, respectively). But the evidence currently supports Ms. Koffinke's claim that it never even received these invoices until the termination. The invoices were addressed to a "Charlies Williams" at "BEACON ASSOCIATES," but at a Government address. Koffinke Decl. Ex. 15, Second Koffinke Decl. ¶ 3. No person named "Charlie Williams" has worked at Beacon Associates. Second Koffinke Decl. ¶¶ 1-3. **[\*\*13]** Apprio's Controller was notified about the unpaid invoices by Dorothy Ping, one of Apprio's employees, who told him that "American Coach . . . resent statements to *us* from September 2017." Opp. Ex. G (emphasis added); Koffinke Decl. Ex. 7 (identifying Marvin Huber as the "Controller" of Apprio). And Kristi Ledbetter, Beacon's former Deputy Project Manager (now working the same job for Apprio) spends three paragraphs explaining that she was aware of the Cline Tours invoices, but conspicuously fails to mention any knowledge of the American Coach invoices. Declaration of Kristi Ledbetter ¶¶ 8-10, Opp., ECF No. 10-3 (Ledbetter Decl.).

And even if Beacon received the American Coach invoices, failure to pay them was not a material breach, justifying immediate termination of the subcontract. For one thing, Apprio could have easily asked Beacon for prompt payment. Mr. Tom Buzan, Apprio's Project Manager on the FEMA Center contract, says that he learned about the unpaid American Coach invoices from American Coach directly "[i]n or around early February 2018." Declaration of Tom Buzan ¶ 12, Opp., ECF No. 10-4 (Buzan Decl.). Mr. Buzan then "informed Apprio management of this issue," not Beacon. **[\*\*14]** *Id.* at ¶ 13. Second, Apprio had already been reimbursed for the expenses by its client, meaning that it had the funds to pay the invoices itself. Ms. Ping's email indicates that Apprio had already sent invoices to FEMA for the American Coach amounts, meaning that Apprio had probably already received those amounts within a few months of September 2017, and certainly before February 2018. *Id.*;

Reply 6 n.3. Because Apprio terminated Beacon's contract while the invoices remained outstanding, it has since presumably paid the invoices itself, further demonstrating its ability to pay. *See* Koffinke Decl. Ex. 14. Finally, the **[\*286]** insignificant amount of the American Coach invoices—totaling less than $13,000, when Apprio had recently received FEMA contract modifications providing over $2 million in ODC funding—also indicates that any American Coach breach was immaterial.

The termination notice also cites as "material breach[]" Beacon's failure in November 2017 to pay the significantly larger Cline Tours invoices. Koffinke Decl. Ex. 14 at 2. But the weight of the evidence indicates that the Cline Tours invoices presented no material issue in February 2018. Apprio had voluntarily paid two Cline Tours **[\*\*15]** invoices at Beacon's request, although the parties later disputed whose contractual duty was being discharged. Koffinke Decl. ¶¶ 34-35. Beacon then paid the remaining invoices without further discussion. *Id.* at ¶ 38. Apprio challenges this conclusion, citing the November Letter and Mr. Britt's statement that he terminated the contract because of Beacon's "repeated failure to fulfill its obligations," and broader concerns about the FEMA Center project. Op. 17-18. But Mr. Britt had guaranteed ODC funding from FEMA exceeding $2 million in Option Year 3, but apparently did not inform Beacon of these monies, undermining his claim that he was truly worried about Beacon's timely ODC payments. Koffinke Decl. Exs. 5-6; Koffinke Decl. Ex. 8. And the November Letter said nothing about invoices that *remained* unpaid. Instead it said that although Apprio had already paid the Cline Tours invoices, Beacon was somehow "currently in default." Koffinke Decl. Ex. 14. Weighing the evidence, Beacon appears likely to succeed on the merits of this issue. Invoices that have already been paid in full do not constitute a current or ongoing breach of contract—much less a *material* breach.[7]

In sum, Apprio's stated **[\*\*16]** reasons for terminating the subcontract—unpaid third-party invoices totaling less than $13,000, and larger invoices that had already been paid in full—did not constitute a material breach of this multi-million-dollar contract. These issues would not have "gone to the substance of the contract," *Laudamiel, 2012 Del. Ch. LEXIS 145, 2012 WL 2580572, at \*9*, or threatened Apprio with anything approaching a significant loss. *See* *BioLife*

---

[7] Apprio's termination notice also referred to "a material concern that Beacon's business has been and remains significantly unstable," and "Apprio's understanding from several staff that Beacon does not plan to pursue . . . the follow-on contract to the Prime Contract." Koffinke Decl. Ex. 14 at 2. These observations are legally irrelevant. Neither business instability or a disinterest in future contracts constitutes a breach of contract, and so neither cannot justify its termination.

Case 5:21-cv-01727-EJD   Document 37-1   Filed 03/25/21   Page 6 of 10

Page 6 of 10

308 F. Supp. 3d 277, *286; 2018 U.S. Dist. LEXIS 63034, **16

*Sols., 838 A.2d at 278*. In view of the full record, Apprio's grounds for termination were thin and pretextual. I find that any breach was not material, or at least that Beacon is likely to prevail on this point. And without a material breach, the termination itself violated the subcontract. Subcontract App. A § 13.

*2. Solicitation of Beacon's Employees*

The evidence before me is overwhelming and largely undisputed that Apprio deliberately "induced or attempted to induce" Beacon's employees to leave their employment with Beacon to join Apprio instead. *See* Subcontract App. A § 5. On January 30, 2018, Mr. Bitt offered "retention bonuses" to the "entire contract team," along with paperwork that some Beacon employees immediately signed. Koffinke Decl. Ex. 11. This flagrantly violated the subcontract's non-solicitation clause.

Apprio claims that that Mr. Britt **[**17]** did not "induce[] or attempt[] to induce" Beacon's employees to join Apprio, because the retention **[*287]** bonuses and offer letters were only a "potential *future* inducement for an individual to leave Beacon's employ . . . of no current effect." Opp. 20 (emphasis original). Not so: the letters had a very immediate effect. Addressed to Beacon's employees, the letters said:

> **Contingency(ies):** Your acknowledgment of this offer authorizes Apprio, Inc. (and affiliates/Teaming Partners) to use your name and resume in our Proposal to be submitted to FEMA (FEMA [Center] Training Support Services). Further, your acknowledgment confirms an exclusive agreement with Apprio to work on this engagement. All information about operations, systems, and procedures currently in place with the [FEMA Center] . . . contract will not be shared outside of Apprio or it's [sic] teaming partners for this proposal.

Koffinke Decl. Ex. 12. The immediate effect of these letters was explicitly to secure the names and resumes of *Beacon's* employees for *Apprio's* use in the 2018-2019 contract competition, along with any institutional knowledge they might possess. The quoted paragraph made future employment with Apprio contingent, **[**18]** certainly—but contingent on a current agreement to work with Apprio in the ongoing contract competition.[8]

Apprio next points out that damages are an element of a breach of contract claim under Delaware law, and argues that "no breach of contract claim can be stated because Beacon has identified no actual damages arising out of the same." Opp. 20. But Beacon *has* suffered damages, as will be discussed in more detail below. As a direct result of Mr. Britt's solicitation on January 30, 2018, "Beacon could not even use its own workforce in its proposal from the new [FEMA Center] contract," or discuss FEMA Center operations with its staff, "thereby handicapping Beacon's ability to develop a competitive proposal." Pl.'s Reply 16 (Reply). Because Apprio blatantly violated the non-solicitation clause on January 30, 2018,[9] I need not consider Beacon's claim that Apprio also breached the non-solicitation clause in late February 2018, by terminating the subcontract and immediately hiring all of Beacon's FEMA Center employees.

Considering all this evidence, I conclude that Beacon is likely to succeed on the merits of both of its breach of contract claims.

**B. Beacon is Likely to Suffer Irreparable Harm [**19]**

Beacon has also established that without an injunction, it will suffer irreparable harm. The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297, 372 U.S. App. D.C. 94 (D.C. Cir. 2006)*. "Such injury must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA, 787 F.3d 544, 555, 415 U.S. App. D.C. 295 (D.C. Cir. 2015)* (citing *Chaplaincy of Full Gospel Churches, 454 F.3d at 297*). Beacon alleges many forms of **[*288]** irreparable injury: "reputational harm, loss of goodwill, loss of longstanding clients, loss of ability to compete for and attract new clients and partners, incalculable lost profits, and consequential damages for which Beacon has no recourse at law." Application 18. In view of what Apprio's actions have accomplished, I find that Beacon is likely to suffer two basic irreparable injuries in the absence of an injunction: an injury to its reputation, and the consequential damages resulting from Beacon's inability to effectively

---

[8] Even if this damning paragraph did not exist, a contingent offer of future employment still constitutes an "attempt[] to induce an[] employee of the other party to leave his or her employment with the applicable party." Subcontract App. A § 5.

[9] Beacon has a high degree of likelihood of success on the merits of the solicitation claim, which factors into my thinking in balancing the remaining preliminary injunction prongs. *TK Services Inc. v. RWD Consulting, 263 F. Supp. 3d 64, 70 (D.D.C. 2017)* ("This Circuit has long adhered to the 'sliding scale' approach, where a strong showing on one factor could make up for a weaker showing on another.")

Case 5:21-cv-01727-EJD   Document 37-1   Filed 03/25/21   Page 7 of 10

Page 7 of 10

308 F. Supp. 3d 277, *288; 2018 U.S. Dist. LEXIS 63034, **19

compete for the forthcoming contract renewal.

Beacon's first winning argument is that Apprio's termination for default has left a black mark on Beacon's reputation, irreparable absent an injunction, that will result in many lost contract opportunities. Application [**20] 18-20; *see, e.g. Patriot, Inc. v. U.S. Dept. of Housing and Urban Dev't, 963 F.Supp.1, 5 (D.D.C. 1997)* ("plaintiffs have demonstrated irreparable harm in damage to their business reputation"); *Morgan Stanley, 150 F. Supp. 2d at 77* (loss of "customer trust and goodwill" constituted irreparable harm); *Armour & Co. v. Freeman, 304 F.2d 404, 406, 113 U.S. App. D.C. 37 (D.C. Cir. 1962)* (finding irreparable harm where defendant's conduct "could not fail to damage [plaintiff's] good name"). To bolster this claim, Ms. Koffinke lists specific government contract opportunities for which Beacon intended to compete, and explains Beacon's disadvantage in light of its reputational injuries. Koffinke Decl. ¶¶ 76-81.[10]

Apprio argues that Beacon's allegation of reputational harm is "speculative," claiming that subcontractor performance is not evaluated on Contractor Performance Assessment Reports, Opp. 9-12, and citing to *Toxco Inc. v. Chu*, which rejected "uncorroborated and speculative assertions" that the Energy Department's withdrawal of consent to a subcontractor's participation in project would "will lead to the assumption, within the industry, that DOE knows something they aren't telling about [the plaintiff." *724 F. Supp. 2d 16, 30 (D.D.C. 2010)*. But *Toxco* was a very different case, involving completely uncorroborated speculation about what industry might think about the mere withdrawal of consent to project participation. *Id.* This [**21] case involves an unambiguous termination for alleged default. And Apprio has no answer to the fact that binding regulations require evaluation of a subcontractor's performance history. *See 48 C.F.R. § 15.304(c)(3)(i)* ("Past performance . . . shall be evaluated in all source selections for negotiated competitive acquisitions"); *48 C.F.R. § 15.305(a)(2)(iii)* ("The evaluation should take into account past performance information regarding . . . subcontractors that will perform major or critical aspects of the requirement"). In fact, Apprio says that its own Contractor Performance Assessment Report "could be adversely affected by Beacon's breaches of the parties' Subcontract," implicitly conceding that a major subcontractor's past performance matters. Opp. 11 n.1. Accordingly, Beacon has made a strong showing of likely irreparable harm to its reputation in the absence of an injunction.

Beacon's second winning argument is that without a preliminary injunction restoring the terminated subcontract and its poached employees, Beacon will be almost entirely unable to compete for the renewed FEMA Center contract as part of a contract team. During the life of this litigation, Beacon will be deprived of its entire FEMA Center workforce. Without [*289] those [**22] incumbent employees, and their institutional knowledge and reputation, Beacon will be at a strategic disadvantage in finding a contracting partner, and competing for the next award of the contract. Apprio, in turn, will receive a strategic advantage, with Beacon's 40 incumbent employees sitting on Apprio's contracting 'resume' along with Apprio's own incumbent FEMA Center workforce. No other federal contractor besides Apprio—including Beacon—will likely be able to offer FEMA the option of hiring incumbent employees. And because Beacon has been terminated for default, Beacon will be considered "toxic" in an award competition. Koffinke Decl. ¶ 72; *see also 48 C.F.R. § 15.304(c)(3)(i)*; *48 C.F.R. § 15.305(a)(2)(iii)*.

This injury is imminent and actual, because Apprio *currently* has ongoing, exclusive use of the names, resumes, and institutional knowledge of Beacon's FEMA Center workforce. The final solicitation of proposals will likely be released in April, May, or June 2018, Koffinke Decl. ¶ 41, and the initial RFI suggests that final proposals will be due approximately 45 days thereafter. Koffinke Decl. Ex. 9 at 3. Contractors begin working on contract proposals as soon as an initial RFI is released, meaning that Beacon's competitors have been [**23] looking for teaming partners since January 2018. Koffinke Decl. ¶ 42; *see also* Koffinke Decl. Ex. 11 (in which Mr. Britt admits to soliciting Beacon's entire FEMA Center workforce because he is "planning for the recompete of [the FEMA Center contract] and . . . the RFI is on the street," and "[s]ome" of the FEMA Center team had "already been contacted by other firms."). Beacon cannot even enter the race. Without its incumbent workforce, and with the black mark of default on its current record, Beacon cannot effectively compete with Apprio or secure a teaming partner in the competition. And losing the FEMA Center contract would be a great loss to Beacon, as no party disputes. The subcontract represents 16% of Beacon's business, and millions of dollars in contract funds. Koffinke Decl. ¶ 71; Koffinke Decl. Exs. 1-2.

The injury is also irreparable, absent an injunction. Beacon's loss of the follow-on FEMA Center contract is likely reducible to a dollar figure, and economic damages ordinarily do not constitute irreparable harm unless "it threatens the very existence of [a plaintiff's] business." *Patriot, Inc., 963 F. Supp. at 5* (internal quotation marks and citation omitted). A 16% decrease in business, without more, [**24] cannot

---

[10] Although Apprio argues that the economic harms Beacon may sustain do not constitute irreparable injury, it expressly exempts Beacon's reputation claims from this argument. Opp. 7 ("Except for reputational harm . . . these alleged losses are merely other types of economic injury.")

Case 5:21-cv-01727-EJD   Document 37-1   Filed 03/25/21   Page 8 of 10

Page 8 of 10

308 F. Supp. 3d 277, *289; 2018 U.S. Dist. LEXIS 63034, **24

demonstrate a threat to Beacon's very existence. But when contract violations deprive a plaintiff of valuable institutional knowledge, the resulting damage can be irreparable. Morgan Stanley, 150 F. Supp. 2d at 77-78 (finding irreparable injury where a Morgan Stanley employee left for a competitor, taking confidential client information and using it to convince those clients to switch companies). As in Morgan Stanley, Apprio's contract violations have deprived Beacon of crucial institutional knowledge—embodied by Beacon's poached employees—thus jeopardizing Beacon's stature in the relevant business community.

And here, the subcontract itself would not allow recovery. Under Subcontract Appendix A § 16, neither party can recover for "special, consequential, indirect, or punitive damages," including "lost profits, lost revenues . . . [or] lost business opportunities." In addition, total liability is capped at the amount of the subcontract. *Id.* By force of the parties' binding contract, Beacon could not recover any damages from losing the FEMA Center contract, because it constitutes a lost business opportunity.

Beyond the contract's plain language, this conclusion finds support in the case [*290] law. In *Armour*, the D.C. Circuit found [**25] irreparable harm where a challenged agency regulation would have forced the plaintiff to either "grossly misbrand[]" its moisture-added "genuine ham as IMITATION HAM," which "could not fail to damage its good name," or else "[w]ithdraw[] from the interstate market . . . caus[ing] loss of profits which could never be recaptured." 304 F.2d at 406 (emphasis original); *see also* Nalco Co. v. EPA, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (finding irreparable injury because it will be difficult for the plaintiff to recover at least one long-standing client, and "will have no right of recourse against the federal government."). Although Apprio tries to cabin the application of *Armour* and *Nalco* to the principle of sovereign immunity, neither case relies on the mere fact of sovereign immunity, but rather on the fact that damages are unrecoverable at law. And there is precedent for applying the contract itself to determine which damages are recoverable. In another case involving private parties, where the contract at issue limited recovery to "direct compensatory damages," a district court held that the counter-claim plaintiff, who was seeking a preliminary injunction to prevent "unjustified termination" of the contract, had established irreparable harm because the [**26] parties had "contractually removed" the ability to recover lost fees from third-parties. Flex-Plan Servs., Inc. v. Evolution1, Inc., 2013 U.S. Dist. LEXIS 201868, 2013 WL 12092543 at *7 (W.D. Wash. Dec. 31, 2013).

At the end of the day, Apprio raises no persuasive argument that the loss of the upcoming FEMA Center contract is recoverable. As a matter of law, Beacon's imminent inability to compete for the contract cannot be remedied without an injunction.

## C. The Equities Favor Beacon

The equities in this case clearly favor Beacon.

First, I note that the parties appear to have bargained for injunctive relief rather than a damages remedy, when a breach of contract will create any damages beyond the amount of the subcontract. Not only does the subcontract cap liability at the amount of the subcontract and make "special, consequential, indirect, or punitive damages" unavailable, Subcontract App. A § 16, but it also specifically anticipates the potential for equitable remedies and injunctive relief. *Id.* at App. A, § 19 ("[i]n no event shall the foregoing [dispute resolution procedure] prevent or delay either party from seeking injunctive or equitable relief from a court of competent jurisdiction."). This combination of contracting parties' decision to drastically limit their abilities [**27] to obtain damages from each other but hold open the potential for injunctive relief makes an injunction particularly appropriate and equitable. *Cf.* Flex-Plan Servs., Inc., 2013 U.S. Dist. LEXIS 201868, 2013 WL 12092543 at *7.

Second, Apprio continues to employ Beacon's 40 employees, thus benefiting from its solicitation and termination breaches of the subcontract. Because Beacon is likely to succeed in showing that Apprio breached the contract when it employed Beacon's employees, and destroyed Beacon's competitive position, Apprio's current employment of Beacon's employees is a factor that favors Beacon.

## D. In These Circumstances, an Injunction is in the Public Interest

Under 48 C.F.R. § 3.101-1, "Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct." Failure to enjoin this conduct will undermine the integrity of public contracting and subcontracting. If no injunction issued, I would be allowing Apprio to benefit from an egregious breach of contract [*291] that destroyed Beacon's ability to compete on level ground.

Apprio argues that every subcontractor who is terminated by a prime contractor would expect to suffer the exact same injuries as alleged here. I disagree. There is overwhelming evidence that [**28] Apprio committed a blatant violation of the subcontract's anti-poaching provisions. And given the timeline of this case, there is some evidence of a calculated

Case 5:21-cv-01727-EJD   Document 37-1   Filed 03/25/21   Page 9 of 10

Page 9 of 10

308 F. Supp. 3d 277, *291; 2018 U.S. Dist. LEXIS 63034, **28

attempt to set up Beacon for supposed breach, to remove Beacon as potential competition. Apprio gave offer letters and retention bonuses to Beacon's FEMA Center workforce about two weeks after FEMA provided notice that a contract competition was about to begin. This immediately secured some of Beacon employees for Apprio's pending proposal, and ensuring that the remainder had offer letters waiting in hand. In early February, Apprio's FEMA Center Project Manager learned that two American Coach invoices were unpaid, and chose to "inform[] Apprio management of this issue." Buzan Decl. ¶ 13. On February 27, 2018, Apprio terminated the subcontract, thereby avoiding its contractual obligation to renew Beacon's subcontract for Option Year 4 on March 14, 2018, when FEMA renewed Apprio's prime contract. Koffinke Decl. ¶¶ 53-54. The termination effectively fired Beacon's entire FEMA Center workforce, leaving them with no job and Apprio's offer letter. By close of business on February 28, 2018, Apprio had secured Beacon's workforce for [**29] the remainder of the existing prime contract, and for the contract competition to follow.

Furthermore, granting this injunction would return the parties to the status quo, defined as "the last uncontested status which preceded the pending controversy." *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am., 412 F.2d 165, 168, 134 U.S. App. D.C. 34 (D.C. Cir. 1969)*. "The primary purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo." *Aamer v. Obama, 742 F.3d 1023, 1043, 408 U.S. App. D.C. 291 (D.C. Cir. 2014)*; Cf. *Morgan Stanley, 150 F.Supp.2d at 80* ("In sum, the plaintiff seeks to return to the status quo, which would require the defendant to return all confidential data it has allegedly wrongfully diverted from the plaintiff. This would also require the defendant to be enjoined from further solicitation of the plaintiff's customers. The court agrees, and grants the plaintiff's motion.").

I conclude that an injunction is in the public interest: preserving integrity in federal contracting, and returning the parties to the prior status quo to "preserve the object of the controversy," enabling orderly adjudication on the merits. *Aamer, 742 F.3d at 1043*.

## IV. Conclusion

Weighing all four factors together, I find Beacon has met the high burden for the imposition of a preliminary injunction, with a strong showing on each factor. The scope of Beacon's [**30] requested injunction is properly tailored to the scope of the alleged wrongs, with the sole exception of the request that Apprio be enjoined from employing Beacon's employees for one year after the subcontract expires. Pl.'s Proposed Order at 2, ECF No. 6-1. Given the possibility that Apprio may win the follow-on FEMA Center contract, and Beacon may not, such an order might prevent Beacon's employees from seeking legitimate employment with Apprio in their current roles, and thus unfairly punish innocent parties.

Having considered the entire record before me, including the parties' briefs, documentary evidence, and oral submissions, the Plaintiff's Application for a Preliminary [*292] Injunction will be granted. A separate order will issue.

Dated: April 13, 2018

/s/ Trevor N. McFadden

TREVOR N. MCFADDEN

United States District Judge

[EDITOR'S NOTE: The following court-provided text does not appear at this cite in F. Supp. 3d.]

[*none] **ORDER**

For the reasons stated in the Memorandum Opinion, the Plaintiffs' Application for a Preliminary Injunction is hereby. **GRANTED**. It is hereby **ORDERED** that a preliminary injunction is entered against the Defendant as follows:

> a. The Defendant shall rescind the termination notice dated February 27, 2018 and reinstate the subcontract between Plaintiff and Defendant (Subcontract [**31] No. 14APP0001) with a period of performance through March 14, 2019;
> b. The Defendant shall rescind any and all employment agreements between Apprio and Beacon's former employees and release them from any and all obligations under such agreements;
> c. The Defendant is immediately prohibited from employing Beacon's former employees who began employment with Apprio on or around February 28, 2018, and shall not employ these persons for the duration of the Subcontract; and
> d. During the term of the Subcontract and for one year thereafter, the Defendant and its officers, employees, and agents are hereby enjoined from attempting to employ personnel who were employees of the Plaintiff prior to Defendant's termination of the Subcontract on February 27, 2018, and from otherwise violating Section 5 of Appendix A to the Subcontract.

**SO ORDERED**.

Case 5:21-cv-01727-EJD   Document 37-1   Filed 03/25/21   Page 10 of 10

Page 10 of 10

308 F. Supp. 3d 277, *292; 2018 U.S. Dist. LEXIS 63034, **31

Under *28 U.S.C. § 1292(a)(1)*, this is an appealable order.

Dated: April 13, 2018

/s/ Trevor N. McFadden

TREVOR N. MCFADDEN

United States District Judge

**End of Document**