Caution
As of: March 25, 2021 11:09 PM Z

# *Flex-Plan Servs. v. Evolution1, Inc.*

United States District Court for the Western District of Washington

December 31, 2013, Decided; December 31, 2013, Filed

CASE NO. C13-1986-JCC

**Reporter**
2013 U.S. Dist. LEXIS 201868 *; 2013 WL 12092543

FLEX-PLAN SERVICES, INC, Plaintiff, v. EVOLUTION1, INC., Defendant.

**Counsel:** [*1] For Flex-Plan Services Inc, a Washington corporation, Plaintiff, Counter Defendant: William A Kinsel, LEAD ATTORNEY, KINSEL LAW OFFICES, Seattle, Wa.

For Evolution1, Inc., a Delaware corporation, Defendant, Counter Claimant: Francis H Morrison, III, John M Tanski, LEAD ATTORNEYS, PRO HAC VICE, AXINN, VELTROP & HARKRIDER LLP, Hartford, CT USA; Brian William Esler, MILLER NASH (SEA), Seattle, WA USA.

For Alegeus Technologies, Interested Party: Russell Beck, Stephen D Riden, LEAD ATTORNEYS, PRO HAC VICE, BECK REED RIDEN LLP, Boston, MA USA; Clifford Freed, FRANK FREED SUBIT & THOMAS, Seattle, WA USA.

**Judges:** HONORABLE JOHN C. COUGHENOUR, UNITED STATES DISTRICT JUDGE.

**Opinion by:** John C. Coughenour

# Opinion

ORDER GRANTING PRELIMINARY INJUNCTION

This matter comes before the Court on Defendant and Counterclaim-Plaintiff Evolution1's motion for a preliminary injunction (Dkt. No. 17), the response of Plaintiff and Counterclaim-Defendant Flex-Plan Services, Inc. (Dkt. No. 22), and Evolution1's reply (Dkt. No. 38.) Having considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

## I. BACKGROUND[1]

### A. Flex-Plan and Evolution1's Relationship [*2]

The instant matter is a contract dispute with ramifications slated to take effect on January 1, 2014. Plaintiff Flex-Plan Services, Inc. ("Flex-Plan") provides benefits administration services for employers who provide health and other benefits to their employees. Plaintiff's services include administration of tax-advantaged account plans such as Flexible Spending Accounts ("FSA's"), Health Reimbursement Arrangements ("HRA's"), transit plans, and Health Savings Accounts ("HSA's"). (Dkt. No. 1 at ¶ 5.) According to Flex-Plan, it provides eligibility and payroll deduction updates, compliance support, claims management, and payments and account maintenance and tracking to its clients. (*Id.*)

Flex-Plan, as the third-party administrator, contracts with other companies to provide the software and services that it uses to perform its own administration responsibilities. Since the early 2000's, Flex-Plan and Defendant Evolution1[2] have worked together. Evolution1 provides Flex-Plan with

---

[1] For purposes of this motion for a preliminary injunction, "[t]he district court is not required to make any binding findings of fact; it need only find probabilities that the necessary facts can be proved." *Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1423 (9th Cir. 1984)*. Accordingly, the facts discussed herein are those the Court finds could probably be proven at trial.

[2] The parties' contractual relationship began when Evolution1 was "Evolution Health." Following a merger with Lighthouse1, Evolution1 was created and continued to work with Flex-Plan.

software platforms and other products, such as its "Benny Card" and "Benny Central debit card administration platform." These products allow plan participants to use the "Benny" debit card to directly spend their [*3] qualified funds rather than spending the money upfront and submitting a claim for reimbursement. (Dkt. No. 18 at ¶¶ 9-15.)

In 2012, Flex-Plan needed a new solution to provide HSA administration services to certain clients. Flex-Plan worked with Evolution1 to come up with a software solution and renewed its agreement to use Evolution1 as its exclusive services provider until December 31, 2014. (*See* Dkt. No. 18-1.) Flex-Plan's new HSA offering required that a limited number of client-employees be able to access funds in multiple accounts—for example, their HSA and FSA accounts. (*See id.* at ¶ 36-40.) Rather than requiring two Benny Cards for these customers, Flex-Plan wanted to continue offering a single card that could be used to access both accounts. (*Id.*) The parties agreed that this functionality would be provided through a beta software module that "allowed Flex-Plan's two platforms to "talk' to each other." (*Id.* at ¶ 41.) Evolution1 notes, and Plaintiff does not dispute, that the "beta software module" with which Flex-Plan now takes issue is only relevant to 49 out of Flex-Plan's 58,000 Benny Card users. On October 1, 2012, Flex-Plan went "live" with its new HSA administration strategy, [*4] which included the beta module. (*Id.* at ¶ 43.) According to Plaintiff, this beta software module—and Evolution1's accompanying service—were unsatisfactory.

The parties' relationship began to deteriorate in mid-2013. Executives from Flex-Plan and Evolution1 met in St. Louis on July 31 and August 1, 2013, at which point Flex-Plan expressed concern about the functionality of the beta software module. (*Id.* at ¶ 45.) The following week, on August 9, 2013, Flex-Plan executives contacted Evolution1 to request that they be allowed to terminate the current contract one year early—as of December 31, 2013—without paying a termination fee. (Dkt. No. 18-2.) In that e-mail, Flex-Plan did not claim that Evolution1 was in breach of the contract. Instead, its executives acknowledged that Flex-Plan agreed to implement the "EV1 HSA platform for proprietary software as beta testers[,]" and "understood that we were one of two TPAs to implement the software, and that there might be some hiccups." (*Id.*) Flex-Plan then explained that there were indeed "hiccups" and that they needed to terminate the contract because the functionality of the beta module was not working for the company from a financial standpoint. [*5] (*Id.*)

Evolution1 requested more information about the bugs that Flex-Plan was referencing, offering for the second time to dispatch a team of experts to Seattle to address Flex-Plan's concerns. (*Id.*) Evolution1 also explained that there were HSA solutions that did not involve the beta module. (*Id.*) In response, Flex-Plan listed a few of the issues but declined to allow Evolution1 to address them. Instead, Flex-Plan's executives explained that they were frustrated, that their issues had gone unaddressed, and that the contract would be terminated effective December 31, 2013. (Dkt. No. 18-3.) Flex-Plan again requested that Evolution1 "waive the termination fees." (*Id.*) Evolution1 again offered to meet in person, and Flex-Plan declined. (*Id.*) As of August 14, 2013, the day Flex-Plan's executives responded to Evolution1's offer to again send a team to Seattle, Flex-Plan confirmed to Evolution1 that the parties "need[ed] to part ways." (*Id.*) Following this discussion, the parties did meet in person once more, but Flex-Plan never relented, instead making clear that it would terminate the contract.

While Flex-Plan was in communication with Evolution1 during August and September, 2013, it had [*6] in reality negotiated and ultimately inked a deal with another software provider for a solution that would go "live" on January 1, 2014.[3] Beginning in May 2013, Flex-Plan had been in communication with another provider about pricing for a solution to replace Evolution1's software and services. Flex-Plan negotiated a lower price than it was paying Evolution1. The new provider also offered financial incentives to earn Flex-Plan's business, including a cash bonus, free issuance of the new debit cards, free set-up, and free processing for six months. As the negotiations continued in August 2013, Flex-Plan and the third-party's representatives grappled with the need for Flex-Plan to end its exclusive contract with Evolution1. The new provider offered to absorb any termination fees that resulted from early termination of the Flex-Plan/Evolution1 agreement. Flex-Plan accepted the new provider's offer. While Flex-Plan agreed to use a new company's software and services, it remained in communication with Evolution1 (without disclosing that it had entered into another contract), expressing its desire to terminate the parties' agreement without paying the contractual termination fee. Flex-Plan [*7] never provided formal notice of Evolution1's alleged breaches and never provided Evolution1 the formal opportunity to cure any such breaches. Evolution1 declined to let Flex-Plan out of the contract for the amount offered, reasoning that it was not required to do so under the contract. Instead, Evolution1 insisted that it remain Flex-Plan's exclusive provider or that Flex-Plan buy out the contract for $900,000.

---

[3] For purposes of this Order, the Court declines to provide details that the parties have filed under seal. The third-party's name is accordingly omitted. However, the Court has considered the evidence provided with Evolution1's reply brief.

**B. The Contractual Provisions at Issue**

Before turning to the specific allegations of breach, the Court reviews the contractual provisions at issue. The parties' current agreement is titled "Evolution1 Services Agreement" and became effective on July 23, 2012. (Dkt. No. 18-1.) Flex-Plan agreed that "Evolution1 will be its exclusive [HSA] administrative system provider, as well as its exclusive Card/services provider for [FSA's] both health and dependent care, [HRA's] and [HSA's]." (*Id.* at ¶ 19.9.) The agreement states that it continues through December 31, 2014, unless terminated in accordance with its provisions. (*Id.* at ¶ 4.1.) The agreement also provides that if one party commits a material breach, the other "may, at its option, terminate this Agreement with written notice of **[*8]** its intent to terminate, which notice shall describe the basis for such termination and specify a date thirty (30) days or longer after the date of the notice by which the breach must be cured or, if not cured, on which termination shall be effective." (*Id.* at ¶ 4.2.1.)

Another provision establishes certain remedies available to Evolution1 in the event that Flex-Plan breaches the agreement. Paragraph 4.2.5 provides in relevant part:

> [Flex-Plan] acknowledges that Evolution1 will make a significant upfront investment in adapting the Application and the Services to meet the needs of [Flex-Plan], which investment will only be recouped over the course of the full Term. Accordingly, in the event that this Agreement is terminated prior to the end of the Term due to an Event of Default attributable to Subscriber [Flex-Plan], Subscriber [Flex-Plan] shall pay a fee for termination ("Termination Fee")[.]

(*Id.* at ¶ 4.2.5.) Beyond this specified termination fee available to Evolution1, which Flex-Plan specifically requested that Evolution1 waive when it first asked to terminate the contract in August 2013, the agreement establishes the general relief available to either party if the other commits **[*9]** a material breach. In addition to the option to terminate (*see id.* at ¶ 4.2.1), the non-breaching party may recover damages as limited under the "limitation of liability" provision and equitable relief otherwise available. The "limitation of liability" paragraph provides:

> THE TOTAL CUMULATIVE LIABILITY OF EVOLUTION1 OR [FLEX-PLAN] . . . FOR COSTS, LOSSES, OR DAMAGES FROM ALL CLAIMS, ACTIONS OR SUITS HOWSOEVER CAUSED OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE LIMITED TO DIRECT DAMAGES AND SHALL NOT EXCEED THE GREATER OF: [CERTAIN SPECIFIED AMOUNTS]. EXCEPT IN CASES OF CLAIMS BY THIRD PARTIES, IN NO EVENT SHALL THE PARTIES OR ANY MEMBER THEREOF BE LIABLE FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR OTHER INDIRECT DAMAGES, FOR LOSS OF PROFITS, LOSS OF USE OR LOSS OF DATA, HOWSOEVER CAUSED OR ARISING AND REGARDLESS OF LEGAL THEORY OR FORESEEABILITY.

(*Id.* at ¶ 10) (emphasis in original). While the agreement limits the parties' ability to obtain certain types of damages, it preserves their ability to obtain injunctive relief. Paragraph 17 provides:

> The parties understand and agree that a material breach of this Agreement by [Flex-Plan], including without **[*10]** limitation a breach by [Flex-Plan] of Sections 3, 11, and 12, would be damaging to the non-breaching Party and that the non-breaching Party may not have an adequate remedy at law to prevent the harm caused by such material breach. Each Party agrees, therefore, that the non-breaching Party *shall be entitled to injunctive or other equitable relief from any court of competent jurisdiction, without any further showing of irreparable harm, preventing the breaching Party from any further material breach*.[].

(*Id.* at ¶ 17) (emphasis added).

Next, the agreement establishes the parties' mutual responsibilities. As relevant to the instant dispute, Exhibit D specifies Evolution1's service level responsibilities with regard to "Application Availability" and "Application Response Time." (*Id.*, Ex. D.) Paragraph 5 provides that "Application Availability will be 24 hours per day, 365 days per year (366 for leap years) at levels at or above 99.0% of the time as measured monthly, except during the [scheduled maintenance windows]." (*Id.* at ¶ 5.) When the application availability falls below 99.0% for a given month, paragraph 6 provides for specific penalties: "For each full 1.0% of Application Availability below 99.0%, **[*11]** the Service Level Penalty shall be equal to 10% of that month's Subscription fees." (*Id.* at ¶ 6.) The Service Level Agreement also defines "Application Response Time" as "the time between when a Subscriber's administrator user submits information to the Application and a response is provided[.]" (*Id.* at ¶ 7.) If the Application Response Time exceeds 1.0 second for more than twenty (20%) percent of user transactions under normal conditions, "Evolution1 will work with [Flex-Plan] to identify the primary cause(s) of degraded performance. If it is determined that the cause of the Application Response Time performance degradation is within the Application, Evolution1 will make improvements

to the Application within five (5) days to meet this performance level." (*Id.*) Notably, the agreement does not provide a mandatory "five-day fix" for all service issues as it does in the Application Response Time clause; for non-Application Response Time issues and non-"severity level one" problems, the agreement provides that Evolution1 will respond to Flex-Plan's inquiry "within one (1) Business Day[,]" and if a problem exists, a "plan and expected resolution time will be provided in five (5) business [*12] days." (*Id.* at ¶ 8.4.)

Finally, the agreement provides an express warranty disclaimer. (Dkt. No. 18-1 at ¶ 9.) Evolution1 agreed to "perform its obligations . . . in a good and workmanlike manner and shall use its commercially reasonable efforts to ensure that the Application and Services provided hereunder are provided substantially in compliance with the terms of [the Service Level Agreement discussed above]." (*Id.* at ¶ 9.1.) The agreement further provides that the Service Level Agreement "shall contain the sole and exclusive list of obligations of Evolution1 with regard to any support, maintenance, enhancements or upgrades to be provided to [Flex-Plan]." (*Id.* at ¶ 9.3.) The agreement provides the following disclaimer:

> Evolution1 specifically does not warrant that the Application or Services will meet all of [Flex-Plan]'s requirements that the Application or Services will be uninterrupted or error-free, that patches or workarounds will be provided, or that errors will be corrected in Application updates, or that the Application will operate without error after testing. [].

(*Id.* at ¶ 9.2.)

**C. The Alleged Breaches**

When Evolution1 refused to allow Flex-Plan to terminate the contract early, [*13] Flex-Plan filed this lawsuit on November 1, 2013. (Dkt. No. 1.) Flex-Plan seeks a declaration that it is entitled to terminate the agreement effective December 31, 2013. (*Id.*) Along with the complaint, Flex-Plan provided the first official "notice" that it was terminating the contract due to Evolution's breach of the parties' service agreement. (Dkt. Nos. 18 at ¶ 77; 18-5.) In its complaint, Flex-Plan alleges breaches that can be categorized as (1) breaches of Evolution1's contractual obligation to resolve any "Application Response Time" issues within five (5) business days; and (2) Evolution1's alleged failure to provide fully functional services, which it suggests constitute a breach of the "Application Availability" provision. (*See* Dkt. No. 1 at 2-9.) Defendant filed an Answer and Counterclaim in which it asserts that Flex-Plan's allegations are based on a clearly erroneous reading of the contract and that Flex-Plan has itself breached the parties' agreement by (i) not providing the requisite notice and opportunity to cure before terminating the contract and by (ii) committing anticipatory breach by terminating the contract. (Dkt. Nos. 16, 17.) In its counterclaim, Evolution1 seeks [*14] money damages and specific performance for Flex-Plan's alleged breach and anticipatory breach of the parties' exclusive contract.[4] (Dkt. No. 16.)

Faced with the fact that Flex-Plan plans to terminate the contract as of December 31, 2013 and begin providing its services through another software provider on January 1, 2014—which necessarily required Flex-Plan to work with the other service provider while still bound by the current Evolution1 agreement—Evolution1 moved for a preliminary injunction to maintain the status quo while the parties resolve Flex-Plan's entitlement to terminate the contract. Evolution1 argues that it is likely to prevail on the merits given Flex-Plan's misreading of the contract and Flex-Plan's own breach; that it will be irreparably harmed because it will lose revenue from collecting "interchange fees" and it cannot recover these lost fees from Flex-Plan under the contract's limitation of liability provision; and that the balance of the equities and the public interest both favor a preliminary injunction. Upon review, the Court agrees.

**II. DISCUSSION**

**A. Legal Standard**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc., 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*. The basic function [*15] of a preliminary injunction is to "preserv[e] the status quo until trial," and "prevent[] the irreparable loss of rights before judgment." *Textile Unlimited, Inc., v. A.BMH Co., Inc., 240 F.3d 781, 786 (9th Cir. 2001)* The moving party seeking a preliminary injunction must establish that he is "[1] likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that

---

[4] Evolution1 also argues in its Reply brief—which it filed with the benefit of newly obtained discovery—that Flex-Plan breached its exclusivity obligations by signing with the third-party service provider and marketing that company's services while it was still under contract with Evolution1. The Court considers this contention as well in determining whether Evolution1 is likely to succeed on the merits.

the balance of the equities tips in his favor, and [4] that an injunction is in the public interest." *Winter, 555 U.S. at 20*; *Fox Broadcasting Co., Inc. v. Dish Network, LLC, 723 F.3d 1067, 1072-73 (9th Cir. 2013)*. The Ninth Circuit has also articulated an alternate formulation of the *Winter* test, under which "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support the issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest. *Farris v. Seabrook, 677 F.3d 858, 864 (9th Cir. 2012)* (quoting *Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011))*. The Court addresses each requirement in turn.

**B. Likelihood of Success on the Merits**

In Washington,[5] the essential elements of an action for breach of contract are: (1) a valid contract between the parties; (2) breach; and (3) resulting damage. *Lehrer v. State Dept. of Social and Health Servs., 101 Wn. App. 509, 5 P.3d 722, 727 (Wash. App. 2000)*. Additionally, anticipatory breach occurs when "one of the parties to a bilateral contract either [*16] expressly or impliedly repudiates the contract prior to the time of performance." *Wallace Real Estate Inv., Inc. v. Groves, 881 P.2d 1010, 1019, 124 Wn.2d 881 (1994)*. An anticipatory breach cannot be "implied from doubtful and indefinite statements that performance may or may not take place," but must be a "positive statement or action by the promisor indicating distinctly and unequivocally that he either will not or cannot substantially perform any of his contractual obligations." *Id.*

Here, Evolution1 is likely to succeed in proving that it has not breached the Services Agreement, that Flex-Plan's early termination constitutes an anticipatory breach of the parties' contract, and that Flex-Plan breached the agreement by failing to provide notice and an opportunity to cure before terminating the agreement and obtaining a new software provider. There is no dispute that Flex-Plan and Evolution1 had a valid contract and that Flex-Plan has clearly stated its intention to stop performing under the agreement after December 31, 2013. There is also no dispute that Flex-Plan has entered into an agreement with another services provider and undertaken steps to implement that provider's software and debit card solution so that the system may go "live" on January 1, 2014. Thus, [*17] if Evolution1 has not committed a breach entitling Flex-Plan to walk away from the contract, then Flex-Plan itself has breached the agreement. The Court also analyzes whether Evolution1 will likely prevail on its claims that Flex-Plan has breached the agreement by entering into an agreement with another software provider before the term of this agreement was complete and for failing to provide notice and an opportunity to cure before terminating the agreement.

Flex-Plan's claims for breach, as discussed above, are based on two Evolution1 obligations under the agreement. The first is Evolution1's duty to resolve any "Application Response Time" issues within five (5) days. "Application Response Time" is defined based on how quickly the software responds to user commands: "the time between when a [Flex-Plan] administrator user submits information to the Application and a response is provided." (Dkt. No. 181, Ex. D, at ¶ 7.) The contract requires that if the Application Response Time exceeds 1.0 second for more than twenty (20%) percent of user transactions under normal conditions, and the delayed performance is due to an error in the Application, Evolution1 will resolve the problem within [*18] five days. According to Flex-Plan, Evolution1 breached this obligation on eleven occasions when issues went unresolved for more than five days. (Dkt. No. 1 at ¶ 23.) It further states that "[a]ny single failure to comply with [the] mandatory 5 business day requirement is a material breach" (*Id.* at ¶ 21.)

Flex-Plan's allegations are based on a dubious reading of the contract. As Defendant points out, none of the support requests that Flex-Plan relies upon involved "application response time" issues, and Plaintiff does not contend that they do. (*See* Dkt. No. 22 at 8-11.) Those events would instead be governed by the contract provision requiring Evolution1 to respond to non-Application Response Time service requests "within one (1) Business Day[,]" and if a problem exists, to provide a "plan and expected resolution time [] in five (5) business days." (*Id.* at ¶ 8.4.) Importantly, this provision does *not* require that Evolution1 "resolve" any issue within five business days. Flex-Plan does not allege a breach of this provision and does not otherwise dispute that its eleven examples of Evolution1's breaching conduct do not involve Application Response Time issues. Because Flex-Plan has not [*19] pointed to any conduct that would support its claim for breach of the "Application Response Time" provision, the Court finds that Evolution1 is likely to prevail in defending against this claim.[6]

---

[5] Because both parties cite Washington law in the course of their briefing but fail to address whether Washington law in fact governs in the instant diversity matter, the Court applies Washington contract principles.

[6] Evolution1 also points out that in 2013, Evolution1 resolved "74% of Flex-Plan's support requests within one business day" and "93.5% of Flex-Plan's support requests within five business days." (Dkt. No. 18 at ¶¶ 21-22.) Flex-Plan fails to address these statistics.

Second, Flex-Plan asserts that Evolution1 breached its obligations with regard to the "Application Availability" provision. As noted above, the agreement provides that Evolution1's HSA products will be "up"—*i.e.*, available for use and not down due to maintenance—"24 hours per day, 365 days per year (366 days for leap years) at levels at or above 99.0% of the time as measured monthly, except during the Routine Window [for maintenance]." (Dkt. No. 18-1, Ex. D, at § 5.) As the Court understands Flex-Plan's complaint, it alleges that anytime there is an error with Evolution1's product or services—of which Plaintiff believes there are many—this provision is breached. But the Court cannot see the support for such a reading in the contract's language. Indeed, the agreement contains an express disclaimer that releases Evolution1 from liability for this exact type of alleged breach—*i.e.*, those dealing with "errors" in the program that Flex-Plan is unhappy about. (Dkt. No. 18-1 at ¶ 9.2 ("Evolution1 specifically **[*20]** does not warrant that the Application or Services will meet all of [Flex-Plan]'s requirements that the Application or Services will be uninterrupted or error-free . . . or that the Application will operate without error after testing.) And even if such a reading were accepted, Flex-Plan's claims would be unpersuasive for two reasons. First, Flex-Plan has not actually alleged that these errors resulted in the software application being "down" for more than 1% of time per month. It merely asserts in a vague fashion that an error means the product is "down" and provides a long list of complaints about Evolution1's products and service. Second, even assuming that it correctly read the contract, Flex-Plan's remedy for a breach of the "Application Availability" provision would be a credit on the following month's subscription fee. (*Id.*, Ex. D at § 6.)

Given Flex-Plan's allegations and the Court's reasonable reading of the contract, Evolution1 is likely to prevail in proving that it did not materially breach the agreement. Accordingly, Evolution1 is also likely to prevail in demonstrating that Flex-Plan (1) breached the contract's exclusivity provision by signing an agreement with another services **[*21]** provider before the term of the Evolution1/Flex-Plan exclusive agreement had concluded; and (2) committed anticipatory breach by clearly indicating its intention to terminate the contract without providing notice and an opportunity to cure the alleged breaches.

**C. Irreparable Harm**

To support the entry of a preliminary injunction or temporary restraining order, irreparable harm must be "likely, not just possible." *Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011)*. "[S]peculative injury does not constitute irreparable injury[,]" *Colorado River Indian Tribes v. Parker, 776 F.2d 846, 849 (1985)*, and "[m]ere financial injury . . . will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation." *Goldie's Bookstore, Inc. v. Superior Court of the State of Cal., 739 F.2d 466, 471 (9th Cir. 1984)*. Here, the Court is satisfied that Evolution1 is likely to suffer severe and irreparable harm if injunctive relief is not granted.

First, the Court notes that the parties expressly agreed that "the non-breaching Party shall be entitled to injunctive or other equitable relief from any court of competent jurisdiction, without any further showing of irreparable harm[.]" (Dkt. No. 18-1 at ¶ 17.) This provision makes sense when viewed as part of the contract as a whole. The parties included an express limitation of liability provision that precludes a non-breaching **[*22]** party from recovering anything other than direct compensatory damages. (*Id.* at ¶ 10.) In exchange for a limitation of liability, the parties agreed to be subject to injunctive relief preventing them from committing a material breach. The Court thus begins from the parties' own understanding that this type of breach—unjustified termination, as alleged by Evolution1—is the type of conduct that could cause irreparable harm under the contract.

In light of the contractual language, Evolution1 argues—and the Court agrees—that it will be irreparably harmed if Flex-Plan is allowed to wrongfully terminate the agreement. The reason is that Evolution1 recovers a significant portion of its Flex-Plan-related revenue from third-party "interchange fees." (Dkt. No. 17 at 19-21.) Interchange fees are recovered from merchants each time a plan participant swipes his or her Benny Card. (*Id.*) The fees are thus collected from third-parties not subject to this contract (or any other contract with Evolution1). (*Id.*) It follows that if Evolution1 is prevented from collecting interchange fees that it otherwise would as a result of its Flex-Plan relationship, it will be unable to obtain monetary damages for these **[*23]** lost revenues from Flex-Plan due to the contract's limitation of liability provision. Even though an injury is ordinarily insufficient if money damages would make the party whole, Flex-Plan and Evolution1 contractually removed that option in this matter. The Court accordingly agrees that Evolution1 is likely to suffer harm that, under the plain terms of the contract, cannot be remedied by an award of monetary damages.

**D. Balance of the Equities and the Public Interest**

In considering the equities of a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or

withholding of the requested relief," and should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Resources Defense Council, Inc., 555 U.S. at 24* (internal quotation marks and citation omitted). Here, the Court considers the "balance of the equities" and the "public interest" factors together. Upon review, the Court concludes that both favor issuance of an injunction.

As discussed above, Defendant stands to lose a substantial portion of its Flex-Plan-related revenue if Flex-Plan terminates the contract early. If it ultimately prevails, Evolution1 **[*24]** will still be unable to recover such lost revenue under the limitation of liability provision. On the contrary, Plaintiff will merely have to continue with the status quo if the injunction is granted—that is, Flex-Plan will have to continue using Evolution1 as its exclusive provider until this lawsuit is resolved, which it has been doing for quite some time without the detrimental result it now claims to face. On this point, the Court takes note that Flex-Plan continued adding plan participants to Evolution1's HSA solution in the latter portion of 2013 and has itself noted the business advantages of waiting to go live with its new solution until April 2014. (*See* Dkt. No. 38 at 9.) Such facts undermine Flex-Plan's assertions of injury should it forced to continue with the Evolution1 agreement while this litigation is resolved. Finally, the Court notes that Flex-Plan has the backing of its new service provider to cover any termination fees arising out of the parties' dispute. The Court accordingly discounts Flex-Plan's argument that as a smaller company, it faces a more severe threat of financial harm than Evolution1.

Issuance of an injunction would also serve the public interest. First, **[*25]** the Court wishes to avoid the unnecessary "swapping" of services that will occur if Flex-Plan terminates the contract but is ultimately required to return to using Evolution1's services. If Evolution1 prevails on the merits, numerous individuals would have had their Benny Cards replaced by the new provider's cards, only to have them switched back to Evolution1's product once the litigation is concluded. Such a result can be easily avoided by holding Flex-Plan to its contract with Evolution1 for the pendency of this dispute. If Flex-Plan prevails, it can then arrange for the orderly transition of services for its customers. The Court also finds that the public has an interest in holding parties to their contractual obligations. *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., 511 F.3d 535, 551 (6th Cir. 2007)*. That interest would be served by enforcing the parties' agreement—and thus, the status quo—at least until a trial on the merits can be held.

In sum, both the "balance of the equities" and "public interest" factors favor issuance of a preliminary injunction.

### E. Bond Amount

*Rule 65(c) of the Federal Rules of Civil Procedure* provides that a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any **[*26]** party found to have been wrongfully enjoined or restrained." The court retains continuing discretion as to the amount of bond, if any, but should consider the realistic likelihood of harm to an enjoined party when considering the amount of the bond. *Diaz v. Brewer, 656 F.3d 1008, 1015 (9th Cir. 2011)*. The "bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Connecticut General Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 882 (9th Cir. 2003)*. The burden of establishing the amount of bond necessary to secure against the wrongful issuance of an injunction rests with the party opposing the injunction. *See e.g., Doctor's Assocs. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996)* (suggesting burden on defendant to support claim for bond).

Here, Flex-Plan requests that Evolution1 be required to post a bond in the amount of $1,000,000. (Dkt. No. 22 at 23-24.) That amount would cover roughly $350,000 that Plaintiff believes Evolution1 "strong-armed" out of Flex-Plan prior to the lawsuit being filed; annual revenue of approximately $320,000 from 38 clients that are directly threatened by Evolution1's "defective product"; and roughly $320,000 as the liquidated damages for Flex-Plan's own potential recovery. (Dkt. No. 22.) Evolution1 has not expressly opposed Plaintiff's requested amount.

The Court declines to require a $1,000,000 bond at this time. **[*27]** Flex-Plan requests a bond amount that reflects its entire potential recovery and more. But Plaintiff's request does not explain how it stands to lose $1,000,000 if it is wrongfully enjoined—*i.e.*, if the Court ultimately determines that it is entitled to terminate the contract. The bond amount should include only the losses Flex-Plan could suffer from being wrongfully forced to abide by the Evolution1 contract for the remainder of the litigation rather than terminating the agreement as of December 31, 2013. *See, e.g., Kelly v. Public Utility Dist. No. 2, No. C11-0023, 2012 U.S. Dist. LEXIS 43889, 2012 WL 1068079, at *5 (E.D. Wash. March 29, 2012)* ("the court must consider the potential damages arising from the operation of the injunction itself, not from damages occasioned independently of the injunction."). Accordingly, the Court concludes that Plaintiff has not carried its burden to demonstrate the appropriate bond amount.

Within seven (7) days of this order, the parties are directed to confer as to the appropriate bond amount and submit a

stipulation regarding the amount that Evolution1 will be required to post while this lawsuit proceeds. If the parties cannot agree on an amount, Plaintiff may file a motion not to exceed three (3) pages establishing the bond amount it believes to be reasonably necessary. Defendant's **[*28]** response shall be limited to the same page length and be filed within three (3) days of Plaintiff's motion.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion for a preliminary injunction (Dkt. No. 17) is GRANTED. Plaintiff shall continue to abide by the terms of the Evolution1/Flex-Plan agreement until December 31, 2014, or until its entitlement to terminate the contract is resolved in its favor in the course of this litigation, whichever is sooner.

DATED this 31st day of December 2013.

/s/ John C. Coughenour

John C. Coughenour

UNITED STATES DISTRICT JUDGE

**End of Document**